UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X

JENNIFER D. ARAOZ,

                    *Plaintiff*,

        - against –

THE NEW ALBANY COMPANY LLC, et al.

               *Defendants*,

-----------------------------------------------------------------X

INDEX NO.: 1:22-CV-00125 (AMD) (RML)

JURY TRIAL DEMANDED

## Verified Complaint

Plaintiff Jennifer D. Araoz ("Plaintiff"), in accordance with CPLR § 214-g as and for her Complaint, against defendants The New Albany Company, LLC, The Wexner Family Charitable Fund, The YLK Charitable Fund, Abigail S. Wexner, The Wexner Foundation, and Leslie H. Wexner ("Defendants"), alleges with personal knowledge as to her own actions, and upon information and belief as to those of others, as follows;

## I.    INTRODUCTION

This case arises out of the belief that the townhouse located at 9 East 71st Street, New York, NY 10021 (the "Property"), which was the scene of various acts of sexual abuse against plaintiff as a teenager was owned by Lesley Wexner at the time of these occurrences and/or employees of Wexner and or related entities contributed to the acts complained of herein. In spite of efforts to resolve this case and avoid further court intervention, particularly at the federal level, with its potential attendant unwanted publicity, plaintiff simply requested additional information related to determining title of the property in question. In fact, a request by plaintiffs' counsel to have an independent expert, appointed by the Magistrate Judge issue a Report and Recommendation to

the Court, on the issue of title, was rejected by defendants' counsel, leaving plaintiff no option other than to proceed with this action, and while informal discovery has been exchanged on the matter, Defendants have failed or refused to deliver documents and information which could have resolved the issue as to title of the property, as set forth more fully herein.

## II.     <u>**BACKGROUND AND HISTORY**</u>

1. Historically, New York's statute of limitations for victims of child sex abuse was among the most stringent in the country, requiring that lawsuits alleging child sex abuse be filed before the victim's 23rd birthday.

2. On August 14, 2019, New York's Child Victims Act ("CVA") went into effect, which amended New York's antiquated laws to ensure that perpetrators of child sex abuse, and the individuals and institutions that helped them, are held accountable for their actions, regardless of when the crime occurred

3. Under the CVA, past victims of child sex abuse are given a one-year window (extended to August 14, 2021) to sue an alleged abuser or their estate, and the individuals and institutions that helped them, regardless of how long ago the crime occurred.

4. At the signing of the CVA, the Bill Sponsor, Senator Brad Hoylman said, "With the Child Victims Act now signed into law by Governor Cuomo, survivors of child sexual abuse in New York State finally have the opportunity to seek justice against their abusers and the institutions who may have harbored them." Further, Senator Hoylman stated, "Abusers currently out of reach because of New York's archaic statutes of limitations will now be subject to civil suits, as well as their estates."

5. Under the CVA, CPLR § 214-g was enacted to govern the one-year "look-back window" to

file retroactive child sexual abuse lawsuits - reviving cases that expired years ago under previous statute of limitations, and in relevant part, states:

> Notwithstanding any provision of law which imposes a period of limitation to the contrary ... **every civil claim or cause of action brought against any party alleging intentional or negligent acts or omissions by a person for physical, psychological, or other injury or condition suffered as a result of conduct which would constitute a sexual offense as defined in article one hundred thirty of the penal law committed against a child less than eighteen years of age...which is barred as of the effective date of this section because the applicable period of limitation has expired ... is hereby revived, and action thereon may be commenced not earlier than six months after [August 14, 2019], and not later than one year and six months after the effective date of this section [extended to August 14, 2021].**

6. The claims in this Complaint are all timely under the CVA, CPLR § 214-g, as they constitute civil claims brought against parties alleging intentional or negligent acts or omissions for physical, psychological, and/or other injuries or conditions suffered by Plaintiff as a result of conduct perpetrated against her when she was under the age of 18 that constitute sexual offenses as defined in Article One Hundred Thirty of the New York Penal Law ("Article 130"). *See* NYPL § 130.20; NYPL § 130.25; NYPL § 130.35; NYPL § 130.52; NYPL § 130.65; NYPL § 130.67.

7. This lawsuit presents the exact circumstances that the legislature contemplated in adopting the new law as this is an action for damages caused by the intentional or negligent acts or omissions of the primary enablers of Jeffrey Epstein, a Level 3 sex offender in New York State, who is one the world's most notorious pedophiles.

8. In 2001, Jennifer Araoz was just a 14-year-old child attending a public high school near Leslie Wexner's NYC residence, 9 East 71st Street, New York, NY 10021 (the "Property"), where despite having notice of Epstein's behavior, he permitted him to live

and run his nonprofit organizations, when she fell prey to Epstein's scheme of exploitation and abuse.

9. Epstein was a predator, who groomed Ms. Araoz with the help of Leslie and Abigail Wexner, and a network of charities and trusts, and their employees, which enabled Epstein to perpetuate these sexual crimes against her.

10. This was not a one-time incident; the grooming and sexual abuse of Ms. Arroz took place several times a week for over a year until it finally culminated in a brutal rape of a 15- year-old child.

11. Ms. Araoz brought forth details about Epstein's physical appearance and the Property that had never been made public, and with specificity, she communicated those details to federal prosecutors, who were able to corroborate her story, as they had executed a search warrant of the Property, so there is no doubt as to her credibility.

12. As is the case for many victims of child abuse, Ms. Araoz had self-blame. She thought she was the only victim  and thought how she could be so stupid to fall for Epstein's antics

13. She had recently lost her father to HIV/AIDS and was living on welfare and food stamps, being raised by a single parent.  She was just the type of child that Epstein would prey upon.

14. This lawsuit is about Ms. Araoz reclaiming her power, becoming a survivor, not a victim, and getting restitution for the sexual crimes perpetuated against her.

15. She has real damages from this that are lasting as she dropped out high school; never pursued college; never pursued the career she wanted; and it took many years before she was able to leave her house alone without her mother or her brother by her side.

16. Leslie and Abigail Wexner, along with the nonprofit organizations and other defendants named herein, who helped Jeffrey Epstein perpetrate crimes of sexual abuse, sexual

assault, and rape against Ms. Araoz, must be held responsible for their assistance in ruining her life.

### III. PARTIES AND RELEVANT NON-PARTIES

17. Plaintiff, Jennifer D. Araoz ("Plaintiff" or "Ms. Araoz") is, and at all times relevant herein was, a New York resident, who was a minor child under the age of 16 years old.

18. At all times relevant herein, Leslie Wexner ("Wexner") maintained a residence at 9 East 71st Street, New York, NY 10021 (the "Property"), the location where his employee and tenant, Jeffrey Epstein, committed repeated crimes of child sex abuse in violation of Article 130 against minor Plaintiff, Ms. Araoz.

19. Defendant The New Albany Company, LLC, ("New Albany") is a Delaware Limited Liability Company with its principal place of business in the State of Ohio. It is therefore a citizen of Delaware and Ohio at the time relevant to the claims herein. See 28 U.S.C.§ 1332(c).

20. Defendant The YLK Charitable Fund was a Delaware non-profit corporation that was incorporated on December 20, 2007, and dissolved on December 29, 2010, with its principal place of business in the State of Ohio. It was therefore a citizen of Delaware and Ohio. Its directors and officers were all citizens of Ohio. See 28 U.S.C. § 1332(c).

21. Defendant The Wexner Family Charitable Fund is a Delaware non-profit corporation with its principal place of business in the State of Ohio. It is therefore a citizen of Delaware and Ohio. See 28 U.S.C. §1332(c).

22. Defendant Abigail S. Wexner is a natural person and a citizen of Ohio. In December 2007, Ms. Wexner formed the YLK Charitable Fund as a 501c3 tax exempt nonprofit, and at all relevant times she was president and director of the organization. She was also

a director of the Wexner Charitable Family Fund and the Wexner Foundation, at all relevant times herein.

23. Defendant The Wexner Foundation is an Ohio non-profit corporation with its principal place of business in the State of Ohio. It is therefore a citizen of Ohio. See 28 U.S.C. § 1332(c).

24. Defendants The Wexner Family Charitable Fund, The YLK Charitable Fund, The Wexner Foundation are referred to herein as the "Institutional Defendants".

25. At all times relevant herein, non-party Jeffrey E. Epstein ("Jeffrey Epstein" or "Epstein") worked for, and was a tenant of, Wexner at the Property, the location where he committed repeated crimes of child sex abuse in violation of Article 130 against minor Plaintiff, Ms. Araoz.

26. At all times relevant herein, Epstein was an adult male over the age of 48, born on January 20, 1953.

27. Jeffrey Epstein was an officer, director, or employee of many corporate entities and trusts controlled by Leslie Wexner, and defendants in this action.

28. Epstein and Wexner were listed as presidents of Defendant, the New Albany Company LLC, in its 1998 registration document.

29. Upon information and belief, Epstein served as an officer of New Albany until 2007.

30. Epstein served as a trustee of Defendant, the Wexner Foundation, from 1992 to 2007.

31. Epstein served as Vice President of Defendant, the Wexner Family Charitable Fund, from 2001 - 2004.

32. Thereafter, Epstein's attorney Darren Indyke served as Vice President from 2004-2007.

33. At all times relevant herein, non-party Ghislaine Maxwell ("Ms. Maxwell"),[1] was a New York resident, who was an adult female over the age of 39, and was second in command of Jeffrey Epstein's sex trafficking enterprise, co-managing the employees that worked for Corporate Defendants and Institutional Defendants, and all of the other companies, foundations, and trusts, controlled and/or owned by Mr. Wexner and Mr. Epstein.

34. She directly facilitated and conspired with Epstein and the other co-conspirators to make possible and otherwise facilitate the sexual offenses committed against minor Plaintiff, Ms. Araoz, in violation of Article 130 and was recently convicted and sentence to 30 to 55 years in prison for aiding and abetting Jeffery Epstein.

35. At all times relevant herein, non-party Rosalyn S. Fontanilla A.K.A. Lynn Fontanilla ("Ms. Fontanilla"), also referred to in this Complaint as the "Housekeeper or Maid," was an adult female working at the Property, who employed as the housekeeper and directly facilitated the sexual offenses Epstein and his co-conspirators committed against minor Plaintiff, Ms. Araoz, in violation of Article 130.

36. Ms. Fontanilla passed away on October 26, 2016.

37. Non-party Lesley Groff ("Ms. Groff"), referred to in this Complaint as the "Secretary," is a resident of Fairfield County, CT, and at all times relevant herein, was an adult female over the age of 34, who was an assistant of Jeffrey Epstein and employed by Mr. Wexner and Mr. Epstein, working at the Property, and was one of the people in charge of scheduling for all Epstein's owned and/or controlled companies, foundations and trusts. Upon information and belief Ms. Groff directly facilitated, as well as conspired with

---

[1] https://en.wikipedia.org/wiki/Ghislaine_Maxwell

Epstein and the other co-conspirators, to make possible and otherwise facilitate the sexual offenses committed against minor Plaintiff, Ms. Araoz, in violation of Article 130.

38. Additional individuals who worked at Wexner's Property where Epstein committed sexual violations against Plaintiff, as well as others who assisted him in committing such violations, were employed through, or worked for, numerous other corporate entities, private foundations and trusts, whose negligence and/or intentional tortious conduct caused or contributed to the sexual violations that caused harm to Plaintiff.

39. At all times relevant herein, Leslie and Abigail Wexner owed a duty to Plaintiff to treat her in a non-negligent manner and not to commit, or conspire to commit, or cause to be committed, intentional, criminal, fraudulent, or tortious acts against Plaintiff, including any acts that would cause Plaintiff to be harmed through conduct committed against her in violation of NYPL § 130.20; NYPL § 130.25; or NYPL § 130.35; or NYPL § 130.52; or NYPL § 130.65; or NYPL § 130.67.

## IV.    JURISDICTION AND VENUE

40. Complete diversity exists between Plaintiff, on the one hand, and the Defendants, on the other.

41. The amount in controversy alleged in the State Action exceeds the sum or value of Seventy-Five Thousand Dollars ($75,000.00), exclusive of interest and costs.

42. This Court therefore has jurisdiction in the matter pursuant to 28 U.S.C. § 1332, because there is complete diversity of citizenship between the parties and the amount in controversy exceeds the sum of Seventy-Five Thousand Dollars ($75,000.00), exclusive of interests and costs while the actions complained of herein occurred in and or impacted New York.

43. Defendants have also availed themselves to the jurisdiction of this court by Removing the action from state court pursuant to 28 U.S.C. § 1441.

## V.      HISTORY AND NATURE OF THE ACTION

44. On August 14, 2021, plaintiff Jennifer D. Araoz ("Plaintiff"), then *Pro Se*, commenced an action in the Supreme Court of the State of New York, County of Queens State Action by filing a Summons with Notice, under New York's Child Victims Act, CPLR § 214-g, which case bore the Index No. 400298/2021. (the "State Action").

45. The Summons with Notice alleged that that Plaintiff suffered injuries as a result of the conduct of persons at the Property, which occurred during the time period 2001-2002, and the said premises were owned and/or controlled at that time by all of or some of the Defendants.

46. Defendants have claimed that the subject premises were not owned by them at the times in question.

47. The parties have engaged in informal discovery on the topic of ownership of the property at the time in question, however Defendants have failed or refused to deliver documents and information which should dispose of the issue definitively at least as to title of the property.

48. Specifically, among other things, Plaintiff's counsel has requested but be denied access to certain information such as:

    a.  a copy of  the fully executed Purchase and Sale Agreement pertaining to the property located at 9 East 71st Street, NYC that states the terms and conditions of such alleged transfer of said property along with a copy of: (i) the NYS Transfer Tax Return that corresponds with such alleged transfer; (ii) the NYC Transfer Tax

9

Return that corresponds with such alleged transfer; (iii) copies of cancelled checks that were paid in connection with such NYS and NYC Transfer Tax Returns; and (iv) any and all ACRIS documents filed along with such NYS and NYC Transfer Tax Returns. This would assist in determining whether or not such transfer actually took place.

b.  a copy of the New York State and New York City Transfer Tax Forms and other ancillary documents along with a copy of the check (indicated as paid by Mr. Wexner's bank) that indicates that such New York State and New York City transfer taxes were duly paid as of the date of the alleged sale.

c.  the name of the "Guarantor" referenced in a relevant promissory note dated 11/11/1998, and a signed document relating to such guaranty; (ii) along with proof of payments relating to the principal amount of $10 million and all accrued interest payments (wire transfer statements or checks). [2]

d.  Defendants have also failed to provide an explanation as to why Mr. Wexner is listed as Owner of the Property on two NYC permits dated 1/8/2002 and 6/4/2002.

49. This complaint seeks declaratory judgment on whether the Property was owned or controlled by any of the defendants at the times in question.

50. Due to the ownership or control over the Property and the actions of persons believed to be employees of the Defendants, this complaint also seeks damages for (1) Aiding and

---

[2] It is outside the usual practice and custom that a Promissory Note, as referenced above, would not be secured by a real asset (in this case the real property located at 9 East 71st Street or another hard asset) since it is associated with the sale of such property located at 9 East 71st Street. In the event of a default of such Promissory Note, they would not have a secured interest in such property.

abetting physical, psychological, and/or other injuries or conditions suffered by plaintiff as a result of conduct perpetrated against her in violation of NYPL §§ 130.20, 130.25, 130.35, 130.52, 130.65 and/or 130.67; (2) intentional acts or omissions for physical, psychological, and/or other injuries or conditions suffered by plaintiff as a result of conduct perpetrated against her in violation of NYPL §§ 130.20, 130.25, 130.35, 130.52, 130.65 and/or 130.67; (3) negligent acts or omissions for physical, psychological, and/or other injuries or conditions suffered by plaintiff as a result of conduct perpetrated against her in violation of NYPL §§ 130.20, 130.25, 130.35, 130.52, 130.65 and/or 130.6; (4) negligent security resulting in violations of §§ 130.20, 130.25, 130.35, 130.52, 130.65 and/or 130.67; (5) fraudulent conveyance; and/or (6) fraudulent concealment.

## VI.  **FACTUAL ALLEGATIONS**

51. At all times relevant herein, Jeffrey Epstein ("Epstein") was an adult male over 48 years old. Epstein was an extremely wealthy financier, who used his wealth, power, resources, and connections to commit illegal sexual crimes in violation of Article 130, and to employ and conspire with other individuals, corporate entities, private foundations and trusts, to assist him in committing those sexual crimes or torts or to facilitate or enable those acts to occur.

52. Epstein displayed his enormous wealth, power, and influence to his employees; to the employees of the corporate entities, private foundations, and trusts, who worked at his direction; to the victims procured for sexual purposes; and to the public, in order to advance and carry out and conceal his crimes and torts.

53. In 1982, Leslie Wexner ("Wexner") acquired the lingerie business Victoria's Secret. After Wexner assumed ownership, Victoria's Secret became widely known for marketing its

items with the use of super models known as "angels" which were featured in an annual fashion show.

54. In 1987, Jeffrey Epstein ("Epstein") became Leslie Wexner's financial manager. Through his proximity to Wexner, Epstein gained unique access to young women.

55. On September 1, 1989, Wexner acquired the Property, for $13.2 million. As common with real estate, Wexner held title to the premises through a closely held New York Corporation he owned, Nine East 71st Street Corporation.

56. In July of 1991, Wexner granted Epstein power of attorney, despite knowing or should have knowing Epstein's proclivities and illicit actions on the Property as detailed herein.

57. Upon information and belief, This power of attorney was used to carry out his assaults and coverups.

58. Epstein and Wexner were also connected through their numerous tax exempt 501c3 organizations, which, upon information and belief, they used to illegally transfer assets to one another, as well as for hush money payments to keep victims of Epstein quiet.

59. Wexner installed Epstein as a trustee on the board and bookkeeper of the defendant the Wexner Foundation, as well as trustee of a series of ambiguously named entities such as Health and Science Interests, Health and Science Interests II, International Charitable Interests.

60. Wexner even made Epstein trustee of the trusts for his children where Epstein was given voting power over millions of dollars' worth of Limited shares.

61. In the mid 1990's, two executives at L Brands told the New York Times that they learned that Epstein was trying to involve himself in the recruitment of lingerie models for the Victoria's Secret catalog, a coveted assignment for young models and aspiring actresses.

62. The executive found that troubling, since Victoria's Secret sourced models from talent agencies, not individuals.

63. The executives said that when Wexner was informed about what Epstein was doing, he promised to take care of the issue. *See* https://www.nytimes.com/2019/07/25/business/jeffrey-epstein-wexner-victorias-secret.html.

64. Not only did Wexner not 'take care' of the issue, but he also further enabled Epstein by allowing him to stay at the Property, co-manage it, and run all of Wexner's nonprofits out of it, beginning in 1996.

65. In 1996, Maria Farmer ("Farmer"),[3] according to an affidavit Ms. Farmer filed in 2019 in federal court in Manhattan, was hired to man the front door at the Property and keep records of people who came to the premises.

66. While supervising the front door of the Property, Farmer testified that she witnessed a number of school age girls coming to the home, some of the young girls would be wearing their school uniforms

67. The girls, she testified, would come into the NY mansion and then would be escorted upstairs.

68. In papers filed in court, Farmer further alleges that Ghislaine Maxwell described her role as recruiting models for Epstein and told Maria that the girls being escorted upstairs at the Property were interviewing for modeling positions with Victoria's Secret.

---

[3] https://en.wikipedia.org/wiki/Maria_Farmer

69. During the summer of 1996, Farmer testified that she was working on an art project for Epstein in Wexner's Ohio mansion. While she was there, she testified that Epstein and Maxwell sexually assaulted her without her consent.

70. She testified that she fled the room and called the sheriff's office but did not get a response. She then pleaded with Wexner's security staff who refused to let her leave for 12 hours.

71. Court papers state, that "Wexner's security personnel held Maria against her will and did not let her leave the property for several hours, even after she pleaded with them and told them about her assault.

72. They eventually let Maria leave with her father, who had driven from Kentucky to Ohio to get Maria away from Epstein and Maxwell."

73. Farmer told the Washington Post that the Ohio property was monitored by Wexner's wife, Abigail, and the Wexner security team.

74. She said that she communicated frequently with Abigail Wexner, whose permission she had to be granted before she could leave the house during the two months she stayed there.

75. Farmer testified that upon her return to New York, she reported the sexual assault to the Sixth Precinct of the New York City Police Department, who referred her to the Federal Bureau of Investigation to file a report.

76. Years later, the FBI agents came back to Farmer with questions about the incident. Farmer and her sister also went to leaders in the New York art world and she and her sister tried to tell their story to Vanity Fair.

77. Within a year of Farmer's complaint, in 1997, the actress Alicia Arden filed a police report in Los Angeles detailing that Epstein had misrepresented himself as a recruiter for Victoria's Secret, a company owned by defendant Wexner, prior to another alleged assault.

78. In 2001 and 2002, Wexner still owned and controlled the Property, the security company that controlled and stored all of surveillance equipment at the Property and was responsible for operating the Property.

79. Wexner has been accused of failing to take action when complaints were raised against Epstein, including after executives of L Brands reported (in the mid-1990s) that Epstein was abusing his power and connection to Wexner by posing as a recruiter of Victoria's Secret models.[4]

80. The artist Maria Farmer contacted local and federal authorities about an assault she allegedly endured by Epstein and Ghislaine Maxwell while working as an artist-in-residence on Wexner's Ohio property in 1996.

81. Despite this and other notice, at all times relevant herein, the Defendants gave Epstein access to numerous mansions, a fleet of airplanes, motor vehicles, boats, several helicopters, money, employment, status, and utilized their employees to provide him an air of legitimacy.

82. The allegations herein surround Jeffrey Epstein's conduct while at the Property and concern the various individuals, corporate entities, private foundations and trusts, which provided the opportunity for his illicit conduct to occur and remain concealed for years.

---

[4] https://en.wikipedia.org/wiki/Les_Wexner#cite_note-:7-21

83. According to a ruling by U.S. District Judge Kenneth Marra in February 2019, "from between about 1999 and 2007, Jeffrey Epstein sexually abused more than 30 minor girls...at his mansion in Palm Beach, Florida, and elsewhere in the United States and overseas."

84. The ruling goes on to describe a child sex ring: "In addition to his own sexual abuse of the victims, Epstein directed other persons to abuse the girls sexually. Epstein used paid employees to find and bring minor girls to him. Epstein worked in concert with others to obtain minors not only for his own sexual gratification, but also for the sexual gratification of others." *See Doe v. United States,* 359 F. Supp. 3d 1201, 1204 (S.D. Fla. 2019) (internal citations omitted).

85. On July 2, 2019, the United States Attorney's Office for the Southern District of New York filed a Sealed Two Count Indictment inclusive of One Count of Sex Trafficking Conspiracy and One Count of Sex Trafficking, in part due to Epstein's criminal activities against children in the Property. See Criminal Indictment, *United States v. Jeffrey Epstein*, 19 Cr. 490 (RMB).

86. The indictment stated, and Plaintiff herein adopts as true, that "When a victim arrived at the New York Residence, she typically would be escorted to a room with a massage table, where she would perform a massage on JEFFEY EPSTEIN, the defendant. The victims, who were as young as 14 years of age, were told by EPSTEIN or other individuals to undress before beginning partially or fully the "massage."

87. During the encounter, EPSTEIN would escalate the nature and scope of physical contact with his victim to include, among other things, sex acts such as groping and direct and indirect contact with the victims genitals.

88. EPSTEIN typically would also masturbate during these sexualized encounters, ask

victims to touch him while he masturbated, and touch victims' genitals with his hands..." *See* Criminal Indictment at 4.

89. The indictment further stated, and Plaintiff adopts as true that, "In connection with each sexual encounter, JEFFFEY EPSTEIN, the defendant, or one of his employees or associates, paid the victims in cash. Victims typically were paid hundreds of dollars in cash for each encounter.

90. The indictment further stated, and Plaintiff adopts as true, that "JEFFREY EPSTEIN, the defendant, knew that many of his New York victims were underage, including because certain victims told him their age.

91. Further, once these minor victims were recruited, many were abused by EPSTEIN on multiple subsequent occasions at the [Property]. EPSTEIN sometimes personally contacted victims to schedule appointment at the [Property].

92. In other instances, EPSTEIN directed employees and associates ... to communicate with victims via phone to arrange for these victims to return to the [Property] for additional sexual encounters with EPSTEIN." *See* Criminal Indictment at 4-5.

93. Plaintiff was initially recruited under false pretenses, and not informed that she would be asked to perform massages, sexual or otherwise.

94. Defendants herein enabled Jeffrey Epstein to receive near daily massages from young females, often minors, who were not experienced in massage.

95. Rather than receive regular body massages, Epstein was predictably sexually abusing the young females in violation of Article 130.

96. Additionally, employees of the various Defendants performed actions or inactions that further placed victims, including Plaintiff, in danger of being sexually abused by Epstein, and assisted in the concealment of his sexually abusive acts.

97. Defendants employed many recruiters of young females. The nature of the Jeffrey Epstein's sex trafficking venture and enterprise enabled victims themselves to elevate their status to that of a paid recruiter of other victims, an elevation only made possible through the negligence of Defendants.

98. Recruiters, employees of the Defendants, were trained by Defendants to inform targeted victims that Epstein possessed extraordinary wealth, power, resources, and influence; that he was a philanthropist who would help female victims advance their careers and lives.

99. The collaboration from Defendants and the many employees fulfilled Epstein's compulsive need for sex with young females by preying on their personal, psychological, financial, and related vulnerabilities. Defendants' tactics included promising the victims money, shelter, transportation, gifts, employment, admission into educational institutions, educational tuition, protection, and other things of value in exchange for sex and concealment of Jeffrey Epstein's actions.

100. Jeffrey Epstein's sexual attraction to young, often underage, females, dated back to at least the mid-nineties and the number of victims increased substantially with the necessary assistance from Defendants and Defendants' employees.

101. Defendants, at the direction of Epstein or in furtherance of his demands, and with help from assistants, associates and underlings, and even other victims, recruited or procured dozens if not hundreds of young females, including minors, for the purpose of Epstein's sexual gratification.

102. Jeffrey Epstein, and consequently the Defendants, specifically targeted underprivileged, emotionally vulnerable and/or economically disadvantaged young females to sexually molest and abuse.

103. Additionally, the Institutional Defendants, through its employees, informed young

females that Jeffrey Epstein was wealthy, well-connected, and could either advance the career or education of any young female.

## VII.   MS. ARAOZ AND THE RECRUITER

104. Child victim, Plaintiff, Jennifer Araoz, was subjected to the types of illegal sexual acts detailed in the Criminal Indictment filed against Jeffrey Epstein by the Southern District of New York.

105. Jeffrey Epstein committed abhorrent acts of sexual abuse against Plaintiff in 2001 and 2002 when she was only fourteen and fifteen years old.

106. She grew up poor and largely raised by her mother, a single parent, in Middle Village, Queens.

107. The loss of her father at age 12 caused emotional vulnerability and issues surrounding the lack of having a father figure in her life.

108. Ms. Araoz was a prime target for grooming by a pedophile like Jeffrey Epstein.

109. In September of 2001, at age 14, Ms. Araoz entered high school. She attended a special public high school for performing arts called Talent Unlimited High School, where she majored in musical theater (i.e., singing, dancing, acting).

110. During the first semester of Ms. Araoz's freshman year of high school, while she was 14 years old, after school one day, she was approached by a

111. The woman, who appeared to be in her early 20s, on the sidewalk in front of her school. The woman, who we shall refer to as "the Recruiter," tried to befriend her.

112. Upon information and belief, the Recruiter was an employee of Mr. Epstein and the Defendants, hired to procure underage girls from Talented Unlimited High School and other schools, and oversaw the process that led to the recruitment and grooming of Ms. Araoz.

113. The Recruiter asked Ms. Araoz where she lived, where her parents were, if they were together, where she was born and where her parents worked.

114. The Recruiter approached Ms. Araoz repeatedly over the course of a week or two, offering to take her for lunches close by the school, and during the meals, would continue to ask personal questions about her.

115. At some point during this approximate two-week period, the Recruiter began to speak about Jeffrey Epstein, almost as if he was her uncle or a family friend.

116. The Recruiter said that Epstein was a "nice guy," and that he takes care of her and her family.

117. The Recruiter spoke glowingly of Epstein, stating he is very wealthy, and "you have to see his house."

118. Ms. Araoz would come to find out this house was the Property owned or controlled by Defendants herein.

119. The Recruiter eventually said that she told Epstein about Ms. Araoz, about how pretty and smart she is and about how she recently lost her father to AIDS.

120. The Recruiter then told Ms. Araoz that Epstein felt horrible about the loss of her father and said that he wanted to help her.

121. The Recruiter said that Epstein is a "caring guy," that he said she "should not be struggling," and that he wanted "to be there for her."

122. The Recruiter then said that she wanted Ms. Araoz to meet Epstein, that he knows a lot of people in the acting/modeling world, such as the owner of Victoria's Secret, referring to Defendant Wexner, and that he could possibly help her get in the catalog; the Recruiter said Epstein wanted to "guide her."

123. The Recruiter said that he was "very caring, very wealthy, very successful, and someone

good to know."

124. The Recruiter said that if Ms. Araoz did not want to meet Epstein, she did not have to, but doing so could "benefit her." The Recruiter also enticed Ms. Araoz by repeatedly saying how the Property is so beautiful, and that it was "right here" by Ms. Araoz's high school.

125. The Recruiter said that they could go by the Property together.

126. One day, the Recruiter made plans with Ms. Araoz to meet after school to visit the Property and meet Jeffery Epstein.

## VIII.   EPSTEIN'S SEXUAL ASSAULT, BATTERY AND RAPE OF MS. ARAOZ

127. Upon arrival at Wexner's NYC Property at 9 East 71st Street, New York, NY 10021, Ms. Araoz and the Recruiter were greeted at the front door by the Maid, Ms. Fontanilla, who brought them to the Secretary, Ms. Leslie Groff's, office to wait. When Epstein came to greet them, he appeared very welcoming, even humble.

128. Upon information and belief, the Maid, Ms. Fontanilla, and Ms. Leslie Groff were employees of the Defendants.

129. Inside the front door, there were many security cameras pointing in all directions. On the little TVs, Ms. Araoz could actually see herself on the camera walking inside.

130. On Ms. Araoz's first visit, she recalls her and the Recruiter waiting for Epstein in Ms. Groff's office where Ms. Groff was sitting behind her desk. Subsequently, Ms. Araoz was offered cheese, crackers and wine in the kitchen by Ms. Fontanilla. In Ms. Groff's and Ms. Fontanilla's presence, Ms. Araoz identified that she was a first-year student at the local High School.

131. At the end of this first visit, Ms. Araoz recalls Epstein giving the Recruiter a gift— a digital camera. The Recruiter then said to Ms. Araoz, "You see what I mean, he's such a nice guy".

132. Epstein then gave Ms. Araoz $300 in cash on this first visit, and said, "Here is a little something to help you out. I take care of the people I care about."

133. He also told Ms. Araoz that he was "a big AIDS activist," which meant a lot to Ms. Araoz at the time, because her father had recently passed away from the disease.

134. After an hour or two, Ms. Araoz and the Recruiter left together.

135. Within a couple days, the Recruiter reached out to Ms. Araoz and said that she made a great impression on Epstein and that he wanted to see her again.

136. At the time, Ms. Araoz figured there was no harm as the Property was only a couple blocks from her high school and, at this point, he had done nothing to her to give her pause or cause her concern.

137. So, again, the Recruiter brought Araoz back to the Property after school.

138. The second time Ms. Araoz went to Epstein's NY Residence, he gave Ms. Araoz the same camera that he had previously given the Recruiter on Ms. Araoz's first visit to his home.

139. Ms. Araoz visited the Property with the Recruiter about once or twice a week for the first month. Each time, Ms. Araoz stayed between 1-2 hours, and at the end of the stay, Epstein would either personally or direct Ms. Groff to give her $300 in cash and just say that he "wanted to help her out," while she and the Recruiter would be served cheese, crackers and wine by Ms. Fontanilla.

140. Ms. Araoz openly discussed with Epstein, in front of the Recruiter, Ms. Groff, and Ms. Fontanilla, that she was a freshman at a performing arts high school right down the street and that her dream was to be an actress and singer.

141. After about a month of making these visits to the Property with the Recruiter, always waiting with the Recruiter in the Secretary Office with Ms. Groff there at her desk, Ms. Groff contacted Ms. Araoz directly and scheduled arrangements for her to visit the Property

alone for the first time and gave Ms. Araoz instructions for when she arrived.

142. At this point, during Araoz's first visit *alone,* Epstein took Araoz on the elevator for the first time and showed her his massage room on one of the upper floors.

143. The ceilings of most of the rooms of the house were painted with ornate murals to look like ancient Rome, Greece, and even the Sistine Chapel.

144. Upon showing Ms. Araoz his massage room for the first time, Epstein said, "I want to show you something now. I love this room. It's my favorite room in the house."

145. The massage room was on the smaller side compared to the other rooms in the house. The ceiling was painted to look like a blue sky with clouds and angels to give the appearance that you were in heaven.

146. Epstein showed Ms. Araoz the artwork in the room and the massage table, stating that "not many people know about this room." He then stated, "You really should be a model," "You're beautiful," "I'll bet your body is incredible," and "In order to help you with your modeling career, I will need to see your body."

147. Epstein had a lot of paintings of nude women on the walls. He even commented on one painting of a nude woman with small breasts and brunette hair, but you could not see her face clearly because she was partially turned.

148. That painting was right behind the massage table, and he said how much the woman in the picture looked like Ms. Araoz, then 14 years old.

149. He said he liked "girls with small breasts" because they were "natural and real." He then complimented Ms. Araoz repeatedly about her breasts.

150. He then told Ms. Araoz again that she would "do great" in the modeling industry and said that he had a lot of connections in the modeling industry and could help her.

151. Still in the massage room, Jeffrey Epstein quickly turned the encounter into a sexual

encounter with the then fourteen-year-old Plaintiff, asking Ms. Araoz to take her top off so he could see her body and frame, which he insinuated he needed to see if he was going to help her with modeling. He was very complimentary.

152. Feeling uncomfortable and confused and feeling trapped in Jeffrey Epstein's large mansion under the impression that there was no feasible or safe means of escape, Ms. Araoz did as Epstein instructed. Epstein then immediately started harmful, forcibly, physical touching and sexual exploitation of Plaintiff, feeling Ms. Araoz's breasts and rubbing her nude shoulders.

153. He then asked her if she were good at giving massages and, considering all of the financial help he had been giving her family over the past month, insinuated that he would like one. Epstein then walked out of the room and returned in a bathrobe.

154. He instructed Ms. Araoz to remove everything but her bottom underwear and laid down on the massage table (with only a towel on) instructing Ms. Araoz to proceed with a back massage. Ms. Araoz recalls Epstein having a lot of birth marks and/or freckles on his back.

155. After massaging Epstein's back for about 20 to 25 minutes, Epstein suddenly turned over, removed his towel and began masturbating.

156. Ms. Araoz, feeling uncomfortable and intimated, stood frozen to the side of the massage table as Epstein ejaculated on himself.

157. Ms. Araoz recalls Epstein also having a lot of birth marks and/or freckles around his genitalia area.

158. Epstein's exposing his penis made Ms. Araoz extremely nervous and uncomfortable, but she felt intimidated, so she did as she was told.

159. Also, Epstein insinuated that because of the money he gave her, she owed him. Epstein said,

"I take care of you, you take care of me."

160. He was giving Ms. Araoz instructions and telling her what to do the entire time.

161. Epstein ultimately ejaculated on himself, and then it ended.

162. He said, "This was amazing, you're beautiful, I can't wait to see you again. I will give you a call during the week and we'll see each other again."

163. He also warned Ms. Araoz not to tell anyone what had occurred or about her visits to the Property, something he would consistently repeat to her and insist upon throughout the more than one year of abusive sexual assaults and battery, and eventual forcible rape.

164. Ms. Araoz remembers after the first sexual encounter with Epstein, he showed her a room on the same floor as the massage room that he said was designed to look like his favorite room at the White House, which he called the Blue Room. It was blue and had a distinct oval shape.

165. He then he showed her some more artwork, his master bedroom with a large jacuzzi and prosthetic breasts on the wall in a bathroom that he could look at or play with while in the bathtub.

166. Plaintiff observed the opulence of the mansion owned or controlled by Wexner, which collectively facilitated her further cooperation with Jeffrey Epstein, culminating in New York Penal Law Section 130 crimes being committed against her by Jeffrey Epstein.

167. Plaintiff was paid $300 cash before being escorted out of the Property, all with assistance from Defendants; this payment was made to induce Plaintiff to conceal the activities of Epstein and to entice her to return.

168. Going forward, sometimes Epstein would call Ms. Araoz directly, but primarily Ms. Groff would call, email and/or page Ms. Araoz, not necessarily in that order, but they would speak on the phone, and she would give her instructions for her next sexual encounter with

Epstein.

169. There were also two assistants of Epstein that would call Ms. Araoz from Epstein's office to schedule these sexual encounters, who like Ms. Groff, would give Ms. Araoz explicit instructions to follow upon arrival. One of those assistants was Ms. Espinosa, who Ms. Araoz would see at the Property after speaking to.

170. These sexual encounters with Epstein, which of course were horribly abusive sexual assaults of a child, became more aggressive and escalated. For example, the second time it occurred, while Epstein started to masturbate, he grabbed Ms. Araoz's breasts hard without asking and, this time, insisted that Ms. Araoz rub his chest, arms and legs, and pinch his nipples, which he said was one of the main things that turned him on sexually.

171. These encounters would continue on a weekly basis, once or twice a week, throughout the first and second semester of Ms. Araoz's freshman year of high school and through the beginning of the first semester of her sophomore year of high school.

172. $300 in cash would be left for Ms. Araoz in a drawer in the massage room (the same drawer each time), and as Epstein left the room, he would state that he had left something for her to help her family. At the time, this was a lot of money to Ms. Araoz.

173. Later on, this became routine where Epstein would have an employee of the Defendants take Ms. Araoz upstairs to the massage room. The employee would put towels and lotions out and tell Araoz to get changed in the bathroom.

174. When one walked in the massage room, there was the painting of a nude woman, previously mentioned.

175. To the right, there was the massage table, and to the right of the massage table, there was a bathroom, which is where Araoz would be directed to get changed.

176. Finally, one day, during the fall of her sophomore year of high school (while she was 15

26

years old), she was giving Epstein a massage in her underwear, as she had routinely been instructed to do, but this time instead of turning over to masturbate and fondle her breasts, while she stood off to the side of the massage table, Epstein became more aggressive with her and started touching her vaginal area.

177. He said, "Why don't we do it where you're on top of me massaging me and take your underwear off."

178. Ms. Araoz said to Epstein that this made her uncomfortable and she wanted to stick to what they were doing before, but Epstein ignored her and continued to engage in the improper and illegal sexual contact.

179. Epstein responded that he "loved her and cared for her," was going to "look out for her," that it "was okay" and that she should just climb on top of him and "try something different."

180. Ms. Araoz felt completely intimidated and knowing that she had no way out of the Property, did not know what to do, so she just complied with Jeffrey Epstein's orders and got on top of him.

181. Epstein masturbated, as he instructed Ms. Araoz to rub his chest and pinch his nipples.

182. Then, suddenly, without giving Ms. Araoz any notice, Epstein forced his penis (which already had massage oils on it) inside her vagina and proceeded to have sex with her while Plaintiff resisted.

183. Throughout the duration of the sexual encounter, Araoz was petrified, and finding herself trapped in Property under the impression that there was no feasible or safe means of escape, didn't know what to do, so she just did as she was told. Epstein held her tightly and forcibly raped her.

184. On top of this brutal rape, Epstein did not use a condom, which substantially contributed to extreme emotional distress and the development of a panic disorder, which was

exacerbated by the fact that Ms. Araoz had recently lost her father to AIDS.

185. Epstein's monstrous conduct cannot be understated.

186. Epstein, after raping Ms. Araoz, told her that "she was amazing, that she felt amazing, and that she did nothing wrong."

187. Ms. Araoz was disgusted with Jeffrey Epstein (and herself at the time) and left the Property soon thereafter, never to return.

188. Afterward, Jeffrey Epstein, often through employees of the Defendants, tried to contact Ms. Araoz, but she ignored his calls. Epstein also tried to reach out to Ms. Araoz in later years, but she did not take his calls.

189. Following the rape, Ms. Araoz refused to go back to Talent Unlimited High School out of fear of seeing Epstein, who lived at the Property, just blocks away from her high school, or seeing the Recruiter again.

190. At the time, Ms. Araoz told her mom the reason was that she was being bullied at school concealing from her the truth involving Epstein, reflecting her extreme shame about what she experienced and the intimidation she felt from Epstein.

191. Ms. Araoz, still 15 years old at the time, transferred to Forest Hills High School in Queens by her home to avoid any continued contact with Epstein and the Recruiter.

192. Having left a special public high school for performing arts that she had to audition to get into, to instead go to a regular high school, caused Ms. Araoz to lose interest in school, drop out, and give up on her career of being an actress, model and singer.

193. All sexual acts were performed by Jeffrey Epstein intentionally and for no legitimate purpose and for his own gratification when Plaintiff was a minor child less than seventeen years of age.

194. The intentional acts of Jeffrey Epstein against Plaintiff constitute a sexual offense as defined

in Article 130.

195. Pursuant to NYPL § 130.05, a person is deemed incapable of consent when she is less than seventeen years old.

196. Jeffrey Epstein committed sexual misconduct against Plaintiff as defined in §130.20 of the NYPL, inasmuch as Jeffrey Epstein engaged in sexual intercourse with Plaintiff without Plaintiffs consent.

197. Jeffrey Epstein committed rape in the third degree as defined in § 130.25 of the NYPL, inasmuch as Jeffrey Epstein, being twenty-one years old or more, engaged in sexual intercourse with Plaintiff, who was less than seventeen years old;

198. Jeffrey Epstein committed rape in the first degree as defined in NYPL § 130.35, inasmuch as Jeffrey Epstein engaged in sexual intercourse with Plaintiff by forcible compulsion;

199. Jeffrey Epstein committed a forcible touching against Plaintiff as defined in NYPL § 130.52, inasmuch as Jeffrey Epstein, intentionally and for no legitimate purpose, engaged the forcible sexual touching of Plaintiff for the purpose of degrading or abusing her or for the purpose of gratifying his sexual desire.

200. Jeffrey Epstein committed sexual abuse in the first degree against Plaintiff as defined in NYPL §130.65, inasmuch as Jeffrey Epstein subjected Plaintiff to sexual contact by forcible compulsion.

201. Jeffrey Epstein committed an aggravated sexual abuse in the second degree against Plaintiff as defined in NYPL §130.67, inasmuch as Jeffrey Epstein caused physical injury to Plaintiff when he inserted a finger into the vagina of Plaintiff by forcible compulsion.

202. This illegal conduct perpetrated on the Property under the supervision and with the material assistance of the Defendants continues to have impact in every aspect of Plaintiffs life today.

## IX.    **LESLIE WEXNER FRAUDULENTLY CONVEYS HIS OWNERSHIP**

203. On September 11, 1989, Leslie Wexner purchased 9 East 71st Street under his company, Nine East 71st Street Corporation, for $13.2 million dollars.

204. Public records indicate Mr. Wexner, and Mr. Epstein were officers of Nine East 71st Street Corporation, which was dissolved in 2015.

205. In early 2006, Epstein was charged in Florida with "multiple counts of molestation and unlawful sexual activity with a minor."

206. On or about October 23, 2007, an alleged child abuse victim, Ava Cordero aka Maximilia Cordero filed a civil against Epstein, the alleged perpetrator, and against Wexner, among other defendants, as the owners of the premises where the alleged abuse occurred.[5]

207. In the lawsuit, the plaintiff alleges that in 2000 and 2001, while plaintiff was a minor, Epstein lured her to the Property and violently sexually assaulted her.

208. On December 7, 2007, Epstein finalized the Florida non-prosecution Agreement, in which he agrees to plead guilty to one count of solicitation of prostitution and solicitation of minors to engage in prostitution (an offense requiring him to register as a sex offender), and to be sentenced to consecutive terms of 12 months and 6 months in county jail, as well as 12 months of probation.

209. Epstein attorneys negotiated the deal, so that his guilty plea would occur sometime after January 1, 2008.

210. Prior to Epstein pleading guilty and a month after Nine East 71st Street Corporation was named in the lawsuit, as owner of the premises, in December 2007, Mrs. Wexner formed

---

[5] This action was dismissed for reasons unrelated to ownership of the Property.

the YLK Charitable Fund as a 501c3 tax exempt nonprofit, and she was president of the organization.

211. In order to avoid liability to Araoz and other victims that were sexually assaulted by Epstein in the Property, Wexner fraudulently transferred his interest in his shell company, which held the title to the Property, to Epstein on January 1, 2008, and had sources close to the family publicly claim that Wexner sold his interests in 1998, which is not the case.

212. Wexner clearly still owned and controlled the Property in 2001 and 2002, during the time period Araoz was abused, as work permits filed on January 4, 2002, and May 31, 2002, reveal.

213. In order to facilitate the fraudulent transfer, on December 20, 2007, Wexner's wife, Abigail S. Wexner a.k.a. Abigail S. Koppel, forms a Delaware exempt corporation, YLK Charitable Fund, which subsequently applied and received 501c3 status.

214. On December 21, 2007 (effective January 1, 2008), the attached irrevocable assignment agreement was executed between Jeffrey Epstein's 501c3 tax exempt nonprofit, The C.O.U.Q.Foundation. (These assignment agreements were part of COQU's 2007 990 public filings with the IRS).

https://fm.cnbc.com/applications/cnbc.com/resources/editorialfiles/2019/7/10/couq2007.pdf )

215. As stated in the assignment agreements, in consideration of the premises, COQU assigned interests valued at $13,425,914 (almost the exact amount Wexner paid for the house in 1991) to YLK Charitable Fund.

216. The only other donation ever made to the YLK Charitable Fund was also made from Epstein in January 2008 from his company, Financial Trust Company, Inc. (hereinafter "Financial Trust") was a U.S. Virgin Islands corporation conducting business in New

31

York.

217. In 2010 Leslie Wexner became a director of YLK Charitable Fund, and in December 2010, the YLK Charitable Fund was shut down and its remaining assets from Jeffrey Epstein's fraudulent conveyance (thru his charity COQU) — about $33.3 million (which included the $13,425,914 fraudulently conveyed to pay for the New York premises) — were transferred to the Wexner Family Charitable Fund, a 501c3 tax exempt nonprofit that the Wexner's have used to support a variety of charities.

218. During the three years in which the YLK fund was in existence, it made two donations totaling $6.5 million to the Columbus Foundation, according to the tax records.

219. During the three years in which the YLK fund was in existence, it made two donations totaling $6.5 million to the Columbus Foundation, according to the tax records.

220. Finally, it appears that there was a fraudulent conveyance of these funds to the Wexner foundation since in 2011, for $10, the deed for Nine East 71st Street was transferred from Nine East 71st Corporation to Jeffrey Epstein's corporation in the Virgin Island, Maple, Inc.

## X.

## FIRST CLAIM
## DECLARATORY JUDGEMENT REGARDING OWNERSHIP OF THE PROPERTY

221. Plaintiff incorporates by reference all preceding paragraphs and re-alleges them as if set forth fully herein.

222. An actual, present and justiciable controversy has arisen between the Plaintiff and the Defendants concerning the ownership of the Property at the time of the Plaintiff's assaults.

223. Plaintiff seeks declaratory judgment from this Court that Leslie Wexner, or companies, or

organizations he controlled, owned the Property at relevant times.

## SECOND CLAIM
## NEGLIGENCE AGAINST
## LESLIE WEXNER

224. Plaintiff incorporates by reference all preceding paragraphs and re-alleges them as if set forth fully herein.

225. At all times relevant herein, Defendant, Mr. Wexner, through his ownership of Nine East 71st Street Corporation ("Nine East"), was the lawful owner of the property located at 9 East 71st Street, New York, New York, 10021.

226. Nine East acquired title to the property on September 6, 1989, and retained such title until the property was fraudulently transferred to Maple, Inc. on December 11, 2011.

227. At all relevant herein, Mr. Wexner maintained legal control over the subject premises.

228. Jeffrey Epstein was a tenant of Mr. Wexner's, who lived and worked out of the premises when he was present in New York.

229. Mr. Wexner knew or should have known Jeffrey Epstein had young females, including minor females, such as Plaintiff, at the premises.

230. When Plaintiff was sexually abused by Jeffrey Epstein in 2001 and 2002, Mr. Wexner, as the owner or co-owner of the property where all of the sexual abuse of Plaintiff occurred, had a non-delegable duty to maintain the premises in a reasonably safe condition.

231. Defendant Mr. Wexner had a duty of care to take precautions to protect guests, visitors, or invitees, such as Plaintiff, from foreseeable harm, including foreseeable criminal conduct.

232. Defendant Wexner had a duty to take reasonable precautionary measures to minimize the risk of sexual assaults upon visitors to the premises, such as Plaintiff.

233. Jeffrey Epstein's sexual assault and battery of Plaintiff was foreseeable, and no actions

and/or precautions were taken by Mr. Wexner to prevent it. In fact, his actions and/or inactions helped enable it.

234. Nearly every day that Jeffery Epstein was on or in the Property of Mr. Wexner, he was engaging in criminal sexual behavior in violation of Article 130, including ever single encounter described herein with Plaintiff.

235. Defendant, Wexner, breached its duty to Plaintiff by failing to take even minimal safety precautions to protect against the predictable criminal acts of Jeffrey Epstein, which were reasonably predictable and foreseeable to occur on the property.

236. Defendant Wexner's negligence was a proximate cause of the sexual offenses committed against Plaintiff in violation of Article 130.

237. As a direct and proximate result of Defendant Mr. Wexner's breach, the Plaintiff has in the past suffered and, in the future, will continue to suffer physical injury, pain, emotional distress, psychological trauma, mental anguish, humiliation, embarrassment, loss of self-esteem, loss of dignity, invasion of her privacy and a loss of her capacity to enjoy life, as well as other damages.

238. Plaintiff incurred medical and psychological expenses and Plaintiff will in the future suffer additional medical and psychological expenses. These injuries are permanent in nature and Plaintiff will continue to suffer these losses in the future.

### THIRD CLAIM
### NEGLIGENCE AGAINST
### ALL DEFENDANTS

239. Plaintiff incorporates by reference all preceding paragraphs and re-alleges them as if set forth fully herein.

240. At all times relevant herein, upon information and belief, one of or multiple of the Defendants employed Jeffrey Epstein. ("Defendant-Employers").

34

241. Upon information and belief such Defendant-Employers had a duty to exercise reasonable care to refrain from retaining in its employ a person with known dangerous propensities in a position that would present a foreseeable risk of harm to others.

242. Upon information and belief such Defendant-Employers operated in part to satisfy the personal needs of Jeffrey Epstein, which included daily massages, which Epstein required to be sexual in nature.

243. Jeffrey Epstein's requirement that he receive regular massages from untrained young females caused Such Defendant-Employers, and their other employees to knowingly ignore the dangerous sexual addictive propensities of Jeffrey Epstein, despite knowledge that he would cause harm to many young females, including Plaintiff, in order to retain its most valuable employee—Jeffrey Epstein.

244. Upon information and belief such Defendant-Employers operated in part to further Jeffrey Epstein's goal to obtain, recruit, and procure young females for the purposes of providing sexually explicit massages to Jeffrey Epstein.

245. Upon information and belief, during the course and scope of Jeffrey Epstein's employment for such Defendant-Employers, he fulfilled the corporate objective of receiving sexual massages procured for him by employees of such Defendant-Employers.

246. Jeffrey Epstein was notorious for converting each massage into a sexually exploitive activity in violation of New York Penal Law Section 130, a fact which was known or should have been known in the exercise of reasonable care by such Defendant-Employers.

247. Upon information and belief even though such Defendant-Employers, knew of Jeffrey Epstein's propensity for the sort of behavior that caused Plaintiffs harm and Jeffrey Epstein's constant engagement in this type of criminal behavior during the course and

scope of his employment, such Defendant-Employers, retained Jeffrey Epstein and failed to properly supervise him.

248. Jeffrey Epstein did not have a set work schedule or office, but instead, conducted business on behalf of such Defendant-Employers, from various locations all over the world.

249. Upon information and belief s while conducting said business, Jeffrey Epstein was frequently using such Defendant-Employers' corporate finances in furtherance of his sexually explicit behavior.

250. Upon information and belief, at times other employees of the Defendant-Employers, were coordinating these sexually explicit massages for Epstein to engage in during business hours, while he was within the course and scope of his employment.

251. In fact, while Jeffrey Epstein was conducting business telephone calls or authorizing company actions on behalf of such Defendant-Employers, he would frequently be receiving a sexually explicit massage of the nature detailed herein.

252. Upon information and belief in certain circumstances, sexually explicit massages provided by young women, oftentimes minor children, who were untrained in the art of massage, were coordinated by another employee of such Defendant-Employers, who knew or should have known that the massage was being conducted by an underage girl for the exclusive purpose of committing sexual crimes against her.

253. Upon information and belief Jeffrey Epstein engaged in this type of sexually abusive behavior daily to the extent that engaging in sexual massages became the most regular activity that he engaged in while in the course and scope of his employment.

254. Upon information and belief Jeffrey Epstein's habitual routine of recruiting and engaging in sexually explicit massages began many years before the formation of many of the Corporate and Institutional Defendants and was not a lifestyle unknown to the

Defendants.

255. Upon information and belief such Defendant-Employers, knew or in the exercise of reasonable care should have known that Jeffrey Epstein was potentially dangerous, had engaged in a pattern of criminal sexual behavior against young females, including minors, for years, and that he was not going to cease committing criminal sexual acts.

256. Upon information and belief, Jeffrey Epstein was retained by such Defendant-Employers, with knowledge of the propensity of this sort of behavior.

257. Upon information and belief such Defendant-Employers retained Jeffrey Epstein with knowledge that he would in fact injure others, such as Plaintiff, during the course and scope of his employment.

258. Upon information and belief despite such knowledge, such Defendant-Employers knowingly placed Jeffrey Epstein in a position to cause foreseeable harm to Plaintiff, which could have been prevented had such Defendant-Employers, taken reasonable care in making decisions regarding the retention and supervision of Jeffrey Epstein.

259. Such Defendant-Employers negligence was a proximate cause of the sexual offenses committed against Plaintiff in violation of Article 130.

260. As a direct and proximate result of such Defendant-Employers negligence, the Plaintiff has in the past suffered and, in the future, will continue to suffer physical injury, pain, emotional distress, psychological trauma, mental anguish, humiliation, embarrassment, loss of self-esteem, loss of dignity, invasion of her privacy and a loss of her capacity to enjoy life, as well as other damages. Plaintiff incurred medical and psychological expenses and Plaintiff will in the future suffer additional medical and psychological expenses. These injuries are permanent in nature and Plaintiff will continue to suffer these losses in the future.

**FOURTH CLAIM OF ACTION NEGLIGENCE AGAINST THE WEXNER FAMILY CHARITABLE FUND, THE WEXNER FOUNDATION, LESLIE H. WEXNER, THE NEW ALBANY COMPANY, LLC**

261. The Plaintiff incorporates by reference all preceding paragraphs and re-alleges them as if set forth fully herein.

262. Upon information and belief, Ghislaine Maxwell ("Ms. Maxwell"), Rosalyn S. Fontanilla A.K.A. Lynn Fontanilla ("Ms. Fontanilla") referred to in this Complaint as the "Maid,", Lesley Groff ("Ms. Groff"), referred to in this Complaint as the "Secretary," were employees or agents of the Defendants in this action. (the "Named Employees")

263. Upon information and belief, it was the primary responsibility or at least a portion of the job responsibilities of each of the Named Employees as well as other unnamed employees of the Defendants to fulfill the needs or requests of Jeffrey Epstein; more particularly, his daily massage schedule. (Named Employees and such unnamed employees referred to herein as the "Employees").

264. Upon information and belief, the Employees were compensated to primarily, if not exclusively, procure or maintain each young female massage therapist, or to assist, knowingly or unknowingly, in the concealment of any misconduct committed against each massage therapist.

265. Upon information and belief, the employment responsibilities of the various Employees, included but were not limited to 1) recruiting young females, including minor children such as Plaintiff, to provide massages, 2) creating Jeffrey Epstein's massage schedule, 3) maintaining Jeffrey Epstein's massage schedule, 4) escorting various young females into the massage room at the Property 5) maintaining contact with the various young females who were recruited to the Property for the purposes of providing Jeffrey Epstein with a

massage, 6) providing compensation to each young masseuse upon the completion of her engagement with Jeffrey Epstein, 7) providing meals and food and other services to the young females in order to provide an air of legitimacy to the functions of the corporation, 8) providing hospitality services to the young females in order to provide an air of legitimacy to the functions of the corporation, 9) providing educational services, 10) providing medical services, 11) providing transportation services, 12) providing housing services, 13) providing various other enticements to ensure the continued cooperation of the various young female masseuse with Defendant and Epstein's objective, 14) encouraging individuals, including the females who were recruited to the house to provide a massage to recruit other young females to engage in the same activity for Jeffrey Epstein, and 15) coordinating together and with Jeffrey Epstein to convey a powerful and legitimate enterprise system capable of gaining cooperation from young females recruited for massage, often minors such as Plaintiff.

266. In fulfilling their employment responsibilities, each Employee voluntarily assumed a duty with respect to each young female recruited to massage Jeffrey Epstein, including Plaintiff.

267. To fulfill said duty, each Employee was required to perform their assumed duty carefully without omitting to do what an ordinarily prudent person would do in accomplishing the task.

268. The young females being recruited to engage in massages for Jeffrey Epstein were inexperienced in the art of massage, a fact that was known or should have been known Employees in the exercise of reasonable care.

269. Plaintiff relied on the Employees voluntary assumption of a duty to act with reasonable care towards her.

270. In the exercise of reasonable care, the Employees knew or should have known of the dangerous propensities of Jeffrey Epstein and the proximate harm that would be caused by his likely sexual misconduct and various violations of Article.

271. The failure of the Employees to act in the same manner as an ordinarily prudent person, placed Plaintiff in a more vulnerable position than if the Employees had not assumed the obligation to treat her with reasonable care.

272. In breaching its duty, Defendants and their Employees launched a force or instrument of harm directed toward Plaintiff. In doing so, Defendants and their Employees enhanced the risk Plaintiff faced and caused her to forego any opportunity she may otherwise have had to avoid the risk inherent with being in a room alone with Jeffrey Epstein to perform a massage as an untrained minor child, and in the case of Ms. Araoz, someone who was not invited there to give massages.

273. Defendants' and their Employees', negligence was a proximate cause of the sexual offenses committed against Plaintiff in violation of Article 130.

274. As a direct and proximate result of Defendants' and their Employees' negligence, the Plaintiff has in the past suffered and, in the future, will continue to suffer physical injury, pain, emotional distress, psychological trauma, mental anguish, humiliation, embarrassment, loss of self-esteem, loss of dignity, invasion of her privacy and a loss of her capacity to enjoy life, as well as other damages. Plaintiff incurred medical and psychological expenses and Plaintiff will in the future suffer additional medical and psychological expenses. These injuries are permanent in nature and Plaintiff will continue to suffer these losses in the future.

**FIFTH CLAIM**
**FRAUDULENT CONVEYANCE AGAINST LESLIE WEXNER, ABIGAIL S. WEXNER, YLK CHARITABLE TRUST, THE WEXNER FAMILY CHARITABLE FUND, THE**

**WEXNER FOUNDATION.**

275. The Plaintiff incorporates by reference all preceding paragraphs and re-alleges them as if set forth fully herein.

276. Defendants were engaged in a business or transaction.

277. At the time of the fraudulent conveyance, Plaintiff was a future creditor as defined under the New York Debtor and Creditor law.

278. On or about October 23, 2007, an alleged child abuse victim, Ava Cordero aka Maximilia Cordero filed a civil against Epstein, the alleged perpetrator, and against Wexner and Nine East, as the owners of the premises where the alleged abuse occurred. In the lawsuit, the plaintiff alleges that in 2000 and 2001, while Cordero was a minor, Epstein lured Cordero to Wexner's Property and violently sexually assaulted her in violation of §§ 130.20, 130.40; 130.50, 130.52; 130.52, 130.65, 130.91, and 130.91 of Article

279. Less than two months after the lawsuit was filed, and less that 2 weeks after Epstein finalized his non-prosecution agreement in Florida which would have him pleading guilty to solicitation of underage prostitution and registering as a sex offender, in order to shield Wexner from liability, Wexner's wife formed YLK Charitable Fund for the purpose of enabling Epstein to clandestinely purchase the Property.

280. In order to shield himself from liability, for negligence in allowing violations of Article 130 to repeatedly occur at the Property, where all of the alleged crimes against Cordero, Ms. Araoz and so many other victims, from claims of current and future creditors, whose claims had not matured, Wexner fraudulently transferred his interest in Nine East, which held title to the property, to Epstein.

281. The transfer documents were done as an assignment whereby "in consideration of the

premises," an Epstein controlled 501c3 nonprofit assigned all of its interest in and to several assets worth $12,377,844, which was approximately the same amount ($12,300,000) that Wexner paid for premises.

282. At the time of the fraudulent transfers, Defendants were aware of current legal claims against Epstein, and knew, or reasonably should have known, about Plaintiffs potential exposure to Ms. Araoz for legal claims.

283. The fraudulent transfers were effectuated for the express purpose of evading financial liability to current and future creditors, including Plaintiff.

284. Defendants, by these fraudulent transfers, intended to hinder, delay or defraud, both present and future creditors, including Plaintiff, from satisfying any judgment they may have against the property where all of the sexual crimes in violation of Article 130 against minors occurred.

285. Defendants' fraudulent conveyances were made without fair consideration, despite the person making it, Leslie Wexner, being a defendant in actions for money judgements.

286. The conveyances were fraudulent as to plaintiff as a future creditor as defined under New York debtor creditor law.

287. Plaintiff is therefore entitled to avoid the fraudulent transfers.

288. Plaintiff is thereby entitled to attach or levy execution upon any property or assets that were fraudulently conveyed.

289. In addition, Plaintiff is entitled to recover interest, costs, and disbursements of this action, including reasonable attorney's fees pursuant to New York Debtor and Creditor law.

290. Defendants have violated each of the following sections of New York Debtor Creditor law: 273-a, 276, 276-a, 278 and 279.

**SIXTH CLAIM**

**AIDING AND ABETTING AGAINST THE WEXNER FAMILY CHARITABLE FUND, THE WEXNER FOUNDATION, LESLIE H. WEXNER, THE NEW ALBANY COMPANY, LLC**

291. Plaintiff incorporates by reference all preceding paragraphs and re-alleges them as if set forth fully herein.

292. Plaintiff suffered physical, psychological, and/or other injuries or conditions suffered as a result of conduct perpetrated against her by Jeffery Epstein in violation of NYPL §§ 130.20, 130.25, 130.35, 130.52, 130.65 and/or 130.67.

293. Upon information and belief, The Wexner Family Charitable Fund, The Wexner Foundation, Leslie H. Wexner, The New Albany Company, LLC and their employees were all aware of their roll as part of an overall illegal or tortious activity at the time they provided the assistance to Mr. Epstein in perpetrating the injuries;

294. Upon information and belief, The Wexner Family Charitable Fund, The Wexner Foundation, Leslie H. Wexner, The New Albany Company, LLC and their employees knowingly and substantially assisted Jeffery Epstein in his violation as detailed in paragraph 245 and otherwise herein;

295. As a direct and proximate result of Defendants' and their Employees' actions, the Plaintiff has in the past suffered and, in the future, will continue to suffer physical injury, pain, emotional distress, psychological trauma, mental anguish, humiliation, embarrassment, loss of self-esteem, loss of dignity, invasion of her privacy and a loss of her capacity to enjoy life, as well as other damages. Plaintiff incurred medical and psychological expenses and Plaintiff will in the future suffer additional medical and psychological expenses. These injuries are permanent in nature and Plaintiff will continue to suffer these losses in the future.

## SEVENTH CLAIM
## CONSPIRACY AGAINST THE WEXNER FAMILY CHARITABLE FUND, THE WEXNER FOUNDATION, LESLIE H. WEXNER, THE NEW ALBANY COMPANY, LLC

296. Plaintiff incorporates by reference all preceding paragraphs and re-alleges them as if set forth fully herein.

297. Plaintiff suffered physical, psychological, and/or other injuries or conditions suffered as a result of conduct perpetrated against her by Jeffery Epstein in violation of NYPL §§ 130.20, 130.25, 130.35, 130.52, 130.65 and/or 130.67.

298. Upon information and belief, The Wexner Family Charitable Fund, The Wexner Foundation, Leslie H. Wexner, The New Albany Company, LLC along with Jefferey Epstein established an agreement to participate in perpetrating the above referenced harms;

299. The Wexner Family Charitable Fund, The Wexner Foundation, Leslie H. Wexner, The New Albany Company, LLC through their employees executed several overt acts in furtherance of the agreement including but not limited to those actions set forth in paragraph 245 and otherwise herein.

300. The Wexner Family Charitable Fund, The Wexner Foundation, Leslie H. Wexner, The New Albany Company, LLC and their employees intentionally participated in the furtherance of the plan and purpose.

301. As a direct and proximate result of Defendants' and their Employees' actions, the Plaintiff has in the past suffered and, in the future, will continue to suffer physical injury, pain, emotional distress, psychological trauma, mental anguish, humiliation, embarrassment, loss of self-esteem, loss of dignity, invasion of her privacy and a loss of her capacity to

enjoy life, as well as other damages. Plaintiff incurred medical and psychological expenses and Plaintiff will in the future suffer additional medical and psychological expenses. These injuries are permanent in nature and Plaintiff will continue to suffer these losses in the future.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests this Court for judgment on their behalf and for the following relief:

1. Enter Judgment according to the declaratory relief sought;

2. On the First Claim, as against Defendant Leslie Wexner, compensatory damages and punitive damages in an amount to be determined at trial;

3. On the Second Claim, as against Leslie Wexner, compensatory damages and punitive damages in an amount to be determined at trial;

4. On the Third Claim, as against all named Defendants, compensatory damages in an amount to be determined at trial;

5. On the Fourth Claim, as against The Wexner Family Charitable Fund, The Wexner Foundation, Leslie H. Wexner, The New Albany Company, LLC, compensatory and punitive damages in an amount to be determined at trial;

6. On the Fifth Claim, as against Leslie Wexner, Abigail S. Wexner, YLK Charitable Trust, The Wexner Family Charitable Fund, The Wexner Foundation, compensatory and punitive damages in an amount to be determined at trial;

7. On the Sixth Claim, as against The Wexner Family Charitable Fund, The Wexner Foundation, Leslie H. Wexner, The New Albany Company, LLC compensatory and punitive damages in an amount to be determined at trial;

8. Expedited discovery including but not limited to;

    a. a copy of the fully executed Purchase and Sale Agreement pertaining to the property located at 9 East 71st Street, NYC that states the terms and conditions of such alleged transfer of said property along with a copy of: (i) the NYS Transfer Tax Return that corresponds with such alleged transfer; (ii) the NYC Transfer Tax Return that corresponds with such alleged transfer; (iii) copies of cancelled checks that were paid in connection with such NYS and NYC Transfer Tax Returns; and (iv) any and all ACRIS documents filed along with such NYS and NYC Transfer Tax Returns.

    b. A copy of the New York State and New York City Transfer Tax Forms and other ancillary documents along with a copy of the check (indicated as paid by Mr. Wexner's bank) that indicates that such New York State and New York City transfer taxes were duly paid as of the date of the alleged sale.

    c. the name of the "Guarantor" referenced in a relevant promissory note dated 11/11/1998, and a signed document relating to such guaranty; along with proof of payments relating to the principal amount of $10 million and all accrued interest payments (wire transfer statements or checks).

    d. explanation as to why Mr. Wexner is listed as Owner of the Property on two NYC permits dated 1/8/2002 and 6/4/2002.

9. For a court order voiding any and all fraudulent conveyances described herein;

10. Attorney's fees and interest, and disbursements;

11. For such other relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues so triable.

Dated: June 29, 2022

By: /s/ Robert J. Hantman

Robert J. Hantman, Esq.
Nyall J. Cook , Esq.
Hantman & Associates
ww.hantmanlaw.com
Avenue of the Americas, 4th Floor New
York, NY 10036
Tel: (212) 684-3933
rhantman@hantmanlaw.com

<u>VERIFICATION</u>

I Jennifer Araoz, declare as follows:
1. I am the Plaintiff in this case and a citizen of the United States of America above the age of majority.
2. I have personal knowledge of myself my activities, and my intentions, including those set out in the Verified Complaint, and if called on to testify I would competently testify as to the matters stated herein.
3. I verify under penalty of perjury under the laws of the United States of America that the factual statements in the Verified Complaint concerning myself, my activities, and my intentions are true and correct.

Executed on: _6/29/22_

_[signature]_
Jennifer Araoz

Signed before me on ____6/29/2022____

Notary Public____ _[signature]_ ____

Samuel J. Kim
NOTARY PUBLIC, STATE OF NEW YORK
Registration No. 01KI6371804
Qualified in Queens County
Commission Expires    March 5, 2026