UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
JENNIFER D. ARAOZ,                          :
                                            :
        Plaintiff,                  :     No. 1:22-cv-00125 (AMD) (RML)
                                            :
    v.                                      :
                                            :
THE NEW ALBANY COMPANY, LLC, et al.,        :
                                            :
        Defendants.                 :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

### DEFENDANTS' MOTION TO DISQUALIFY PLAINTIFF'S COUNSEL

Defendants The New Albany Company, LLC, The Wexner Family Charitable Fund, The YLK Charitable Fund, Abigail S. Wexner, The Wexner Foundation, and Leslie H. Wexner move this Court for an order disqualifying Plaintiff's current counsel. The basis for this motion is set forth in the attached Memorandum in Support.

Dated: August 24, 2022

                                                  Respectfully submitted,

                                                  /s/ Marion H. Little, Jr.
                                                  Marion H. Little, Jr. (Ohio Bar # 0042679)
                                                  *Admitted pro hac vice*
                                                  Matthew S. Zeiger (Ohio Bar #0075117)
                                                  *Admitted pro hac vice*
                                                  ZEIGER, TIGGES & LITTLE LLP
                                                  41 S. High St., Suite 3500
                                                  Columbus, OH 43215-6110
                                                  Phone: (614) 365-9900
                                                  Fax: (614) 365-7900
                                                  Email: little@litohio.com
                                                  *Counsel for Defendants The New Albany Company, LLC, The Wexner Family Charitable Fund, The YLK Charitable Fund, Abigail S. Wexner, The Wexner Foundation, and Leslie H. Wexner*

## **MEMORANDUM IN SUPPORT**

**I.**         **INTRODUCTION**

> *"The existence of this [Confidentiality] Agreement, its terms and conditions and the **existence, delivery, and contents of the Due Diligence Materials shall be strictly confidential** and not communicated or disclosed to any other person, except as incidental to the enforcement of this Agreement."*
>
>                                                                  [Exh. A (emphasis added).]

Plaintiff's counsel has repeatedly violated the parties' Confidentiality Agreement by publicly disclosing the "existence, delivery, and contents of the Due Diligence Materials." Plaintiff's Complaint, belatedly filed on June 29, 2022, is the most recent example of Plaintiff's counsel simply flouting his client's contractual obligations and materially breaching the Confidentiality Agreement—a breach obligating Plaintiff to pay Defendants' attorneys' fees.

To be clear, Plaintiff's complaint is riddled with false claims. Having received the benefit of the Due Diligence Materials (or, specifically, the documents produced pursuant to the terms of the Confidentiality Agreement), one can readily argue these false claims are knowingly made. Cognizant of this, the Complaint spins a misleading narrative about the parties' so-called "informal discovery." **What counsel is referring to is the "Due Diligence" and "Due Diligence Materials" under the Confidentiality Agreement—even though he was expressly not permitted to disclose the "existence, delivery, and contents of the Due Diligence Materials."**

As explained below, such conduct violates, at the very least, Rule 3.3(a)(1) ("Conduct Before a Tribunal"), Rule 1.6(a) ("Confidentiality of Information"), and Rule 4.4(a) ("Respect for Rights of Third Persons") of the New York Rules of Professional Conduct. This is grounds for disqualification, just as is was in U.S. *ex rel.* Holmes v. Northrop Grumman Corp., 2015 WL

3504525, *3-5 & n.8 (S.D. Miss., June 3, 2015), aff'd, 642 Fed. Appx. 373 (5th Cir. 2016), where the court confronted a similar fact pattern in finding an attorney violated Rules 1.6(a), 3.3(a)(1), and 4.4(a) of the ABA Model Rules of Professional Conduct – which are substantially similar to the New York Rules of Professional Conduct – and disqualified counsel from proceeding pro se in a *qui tam* action for disclosing the contents of a confidentiality agreement and protective order.[1]

## II.  STATEMENT OF PROCEEDINGS

### A.  Plaintiff's Demands Of $10 Million To Avoid Publicity.

On or about August 14, 2021, Plaintiff filed a summons with a notice in the Supreme Court of New York, County of Queens. Roughly four months later in December, Plaintiff proceeded with service of a notice demanding $10 million based upon alleged "conduct perpetrated against her at the premises owned and/or controlled by defendant Leslie H. Wexner, located at 9 East 71st Street, New York, NY, ***from 2001-2002***." (Emphasis added.) The foregoing were purportedly filed *pro se*. However, contemporaneously with service of process, Plaintiff sent an unsolicited email on December 14, 2021, to the undersigned counsel advising she had retained Attorney Hantman and was hopeful there could be a "fair and reasonable resolution" of her $10 million claim "out of the public spotlight and without further public filings, court intervention and potential trial." [Exh. B.]

---

[1]  A motion to disqualify at this point in the litigation is timely. "Since disqualification is in the public interest," even a movant's delay in filing the motion cannot weigh against disqualification except perhaps in "extreme cases" of delay. Galloway v. Nassau County, 569 F. Supp. 3d 143, 147 (E.D.N.Y. 2021). Here there is no delay and no need to wait for the passage of time to determine whether Attorney Hantman's misconduct has tainted this matter. It already has.

The undersigned counsel advised Attorney Hantman of Plaintiff's email and requested that Plaintiff not communicate directly with the undersigned's firm given her retention of counsel. [Exh. C] Defense counsel's letter also noted:

- The allegations advanced were false. Mr. Wexner sold his entire interest in the subject property ***in 1998***, several years before the relevant time period during which Plaintiff claims she was harmed. The media, of course, had already extensively reported on the timing of this sale.

- The numerous other Defendants ***never*** had any relationship with the subject property. A review of the public record would show that some of the named Defendant entities did not even exist at the time of the alleged harm.

- Defendants rejected Plaintiff's coercion attempt. Defendants would "not pay her any amount based on her demonstrably false claims" and rejected Plaintiff's "threat to damage them in the '***public spotlight***' or by "***further public filings***."

[Id. (emphasis in original).]

Thereafter, on January 7, 2022, Defendants removed this case to federal court. By rule, Plaintiff was obligated to file her complaint within twenty days, or by ***January 27, 2022***. She did not, however, and thereafter refused to file her complaint until the Magistrate Judge ultimately ordered her to do so.

### B. The Simple Truth: Mr. Wexner Did Not Own Or Control The Subject Property During The Relevant Time Frame.

Attorney Hantman responded to Defendants in mid-January, offering statements strongly suggesting no reasonable investigation into Plaintiff's allegations had been made, but declaring a desire to "avoid litigation." In response, Defendants stated the following as plainly as possible:

4

> We now turn to your client's allegations against our clients. We accept your representation that your client would "prefer to avoid litigation." The only way for her to do so, however, is to voluntarily dismiss this action. Our clients will not pay any monetary payment or other consideration to her. No basis exists for any claim she may wish to pursue against our clients. As we expressed to you when we first spoke last month, the undersigned's practice is to be forthright with opposing counsel and specifically advise at the inception of a case when no payment will ever be paid. Such is the case here. Nothing outlined in your January 10 letter supports a different conclusion.

[Exh. D.]

Defendants also responded to Plaintiff's failed efforts to identify a basis for her claims:

> The 16 numbered paragraphs recited in your letter fall into three general categories. The first is the recitation of facts that are of no consequence to the noticed claims—that is, they offer no evidence in support of your client's position. In other instances, the numbered paragraphs simply draw conclusions from facts that are either untrue or otherwise draw conclusions that are not reasonably supported by the asserted facts. As a final category, you conflate distinct events and transactions and then conveniently assume that they relate to "property control" when, in fact, they do not. Virtually every allegation shares at least one common element: they are cobbled together from press clippings that, much like your letter, offer defamatory speculation and innuendo, but nothing beyond that.

[Id.]

Not only did Plaintiff have no basis for her claims, Defendants informed counsel there were documents available disproving Plaintiff's premise that any Defendant owned the subject property during the relevant time period:

> The relevant documentary evidence easily disproves your client's allegations, and in particular, they conclusively demonstrate our clients' lack of involvement or control of the subject property during the stated time frame. The documents include:
>
> - Mr. Wexner's 1998 sale of his interest in the 9 East 71st Street Corporation.

5

- The 1998 settlement statement reflecting the transaction and the apportionment of the real estate taxes.

- The consideration paid to Mr. Wexner for the sale.

- Mr. Wexner's 1998 resignation of any officer status or association with 9 East 71st Street Corporation.

*<u>But Defendants would permit such a pre-discovery inspection to be conducted only "subject to a confidentiality agreement."</u>* Defendants further warned: "[I]f your client is intent on seeking payment irrespective of whatever documents you review, you should proceed with the litigation without delay because no payment will be forthcoming. You can then simply review the documents as part of the ordinary discovery process . . . ." [Exh. D].

As a side note, Defendants repeatedly urged Attorney Hantman to enter an appearance, but he failed to do so until February 15, 2022. [Exhs. E, F.]

C. **The Confidentiality Agreement.**

On March 25, 2022, the parties entered into a Confidentiality Agreement, a copy of which is attached hereto as Exhibit A. The intent of the agreement was expressly spelled out on the first page: Defendants are confident that there is absolutely no merit to Plaintiff's claims, and Defendants were willing to provide documents to allow Plaintiff's counsel to conduct his due diligence before proceeding further before this Court.

> WHEREAS, Defendants believe there is no merit to Plaintiff's claims because, among other reasons, the subject property was not owned or controlled by any of the Defendants at the time of the challenged conduct; assert that Plaintiff is obligated to file a complaint with twenty days of the Defendants' notice of appearance; and contest the court's jurisdiction in the Federal Action over Defendants.
> 
> WHEREAS, Defendants are willing to provide documents to allow Plaintiff's counsel to investigate this matter before proceeding further in the Federal Action (the "<u>Due Diligence</u>").

6

> The Magistrate Judge has deferred certain scheduling matters in the Federal Action to permit this Due Diligence to occur.
>
> WHEREAS, Plaintiff's counsel shall review the materials and information produced by Defendants during the Due Diligence (the "Due Diligence Materials") pursuant to the terms and conditions of this Agreement.

To be clear, all information exchanged between the parties during the Due Diligence period constituted Due Diligence Material under the Confidentiality Agreement. This is made clear in Section 2:

> The time period commencing with the Effective Date and continuing until the delivery of a Party's written notice terminating the Due Diligence constitutes the "Due Diligence Period." Any information or documents exchanged between or among the Parties during the Due Diligence Period shall be deemed Due Diligence Materials and shall be governed by the terms and conditions of this Agreement. Any Party may terminate the Due Diligence Period upon three business days' notice to the other Parties.

Under Section 3 of the Confidentiality Agreement, the Due Diligence Materials could be used only "for purposes of evaluating claims advanced" in this lawsuit.

> The attorneys for the Party receiving the Due Diligence Materials pursuant to this Agreement shall use such Due Diligence Materials solely for purposes of evaluating the claims advanced in the Federal Action. For purposes of this Agreement, a Party's attorney is limited to counsel of record in the Federal Action as of the Effective Date. Nothing in this Agreement, however, shall limit or prohibit a Party from independently seeking discovery of any Due Diligence Materials in any continued proceedings in the Federal Action.

Defendants agreed to enter into this arrangement subject to a strict confidentiality obligation, which is expressly stated in paragraph 4 of the Confidentiality Agreement:

> The existence of this Agreement, its terms and conditions and the ***existence, delivery, and contents of the Due Diligence Materials shall be strictly confidential*** and not communicated or disclosed to any other person, except as incidental to the enforcement of this Agreement.

7

[Exh. A (emphasis added).]

The confidentiality obligations imposed under the Agreement never lapse: "A Party's confidentiality obligation under this Agreement shall become effective as of the Effective Date and shall remain perpetually in effect." [Exh. A, § 7.] If a party were forced to bring an action to enforce the Confidentiality Agreement, the prevailing party is entitled to its cost of suit and reasonable attorneys' fees. [Id. § 10.]

D.     **Defendants' Production Of Information.**

Pursuant to the Confidentiality Agreement, Defendants produced materials for counsel's review—including several data points improperly referenced in the Complaint. This information conclusively established that neither Mr. Wexner nor any of the other Defendants had any ownership or control of the subject premises at the time of Plaintiff's interactions with Jeffrey Epstein.

It ultimately became clear, however, that no matter what information Defendants produced, it would never be sufficient. Instead, Plaintiff was simply playing a game. During the course of this game, Plaintiff falsely stated to the Magistrate Judge that there were ongoing settlement discussions and information exchanged, with the latter being a violation of the Confidentiality Agreement. For example, in conferences with Magistrate Judge Levy, Plaintiff's counsel disclosed the process being undertaken pursuant to the Confidentiality Agreement notwithstanding the express confidentiality provisions. Defendants ultimately gave the requisite notice under the Confidentiality Agreement to terminate its provisions, except for the continued confidentiality obligations. [Exh. G.]

Over Plaintiff's objections, Defendants demanded that Plaintiff file the complaint that should have been filed no later than January 27, 2022, as she was statutorily obligated to do so.

The Magistrate Judge ordered Plaintiff to file her complaint on or before June 8, 2022. [05/19/2022 Docket Entry.] Plaintiff did not. Instead, Plaintiff filed a motion for an extension of time. [Doc. No. 19.] Plaintiff's counsel made the following false statement to the Court:

> Following this entry, the parties continued to engage in their settlement discussions and informal discovery on the topic of ownership of the subject property in this action, 9 East 71st Street, New York, NY 10021 (the "Property"), at the time in question. While Defendants have provided some information on the issue, they have failed or refuse to deliver further documents and information requested which should dispose of the issue definitively. Additionally, while Plaintiff has not been available, we have been informed that she has information on an old computer that she is trying to access which would assist in the filing of the complaint.

Defense Counsel filed a letter with the Magistrate Judge [Doc. No. 20] specifically noting counsel's misstatements to the Court.

> The motion is premised upon inaccuracies. First, counsel represents that the parties have "continued to engage in their settlement discussions." This is untrue. Defendants have never had any settlement discussions with the Plaintiff or her counsel and have affirmatively stated they never will. To the contrary, we have simply made documents available to counsel in an effort to inform them that no factual basis exists for the advancement of Plaintiff's claims. Second, Counsel represents that following the May 19, 2022 minute entry the parties continued to engage in "informal discovery." That is also untrue. The information establishing the lack of any good faith basis for the advancement of the claims in this case, as required under Rule 11, was provided long ago.

### E. Plaintiff Files The Long-Awaited Complaint—And In Doing So Again Violates The Confidentiality Agreement.

When Plaintiff finally filed her Complaint on June 29, 2022, counsel caused Plaintiff to repeatedly violate the Confidentiality Agreement as part of his effort to create a false and misleading narrative throughout the text of the Complaint. For example, each of the following

9

paragraphs of the Complaint discloses information protected under the Confidentiality Agreement:

1. . . . In spite of efforts to resolve this case and avoid further court intervention, particularly at the federal level, with its potential attendant unwanted publicity, plaintiff simply requested additional information related to determining title of the property in question. In fact, a request by plaintiffs' counsel to have an independent expert, appointed by the Magistrate Judge issue a Report and Recommendation to the Court, on the issue of title, was rejected by defendants' counsel, leaving plaintiff no option other than to proceed with this action, ***and while informal discovery has been exchanged on the matter, Defendants have failed or refused to deliver documents and information which could have resolved the issue as to title of the property, as set forth more fully herein***.

47. The parties have engaged ***in informal discovery on the topic of ownership of the property at the time in question***, however Defendants have failed or refused to deliver documents and information which should dispose of the issue definitively at least as to title of the property.

48(c). The name of the "Guarantor" referenced in a relevant ***promissory note dated 11/11/1998***, and a signed document relating to such guaranty; (ii) along with proof of payments relating to the ***principal amount of $10 million and all accrued interest payments*** (wire transfer statements or checks). (text from footnote: It is outside the usual practice and custom that a ***Promissory Note***, as referenced above, would not be secured by a real asset (in this case the real property located at 9 East 71st Street or another hard asset) since it is associated with the sale of such property located at 9 East 71st Street. In the event of a default of such Promissory Note, they would not have a secured interest in such property.

281(c). the name of the "Guarantor" referenced in a relevant ***promissory note dated 11/11/1998***, and a signed document relating to such guaranty; along with proof of payments relating to the ***principal amount of $10 million*** and all accrued interest payments (wire transfer statements or checks).

10

In short, Plaintiff compounded the prior breaches of the Confidentiality Agreement by doubling down and creating a misleading narrative in the complaint based upon the delivery and disclosure of the Due Diligence Materials, including: (a) the fact that Defendants had voluntarily disclosed information to Plaintiff; (b) the specific non-public mechanics by which the sales transaction occurred; (c) the consideration paid to Defendant; and (d) even what was allegedly not included. In doing so, Plaintiff's counsel has subjected the Plaintiff to a breach of contract claim and Defendants' recovery of attorneys' fees—fees that Defendants intend to collect.

### III.     LAW AND ANALYSIS

Federal courts have the inherent authority to disqualify attorneys in pending litigation in order to "preserve the integrity of the adversary process." Hempstead Video, Inc. v. Inc. Vill. of Valley Stream, 409 F.3d 127, 132 (2nd Cir. 2005) (citing Bd. of Educ. v. Nyquist, 590 F2d 1241, 1246 (2nd Cir. 1979)). In deciding whether to disqualify an attorney, the Second Circuit directs district courts "to strike a delicate balance between [a litigant's] interest in representation by counsel of its choice and the need to maintain high ethical standards within the profession of law. … [A]bove all else, we must maintain public trust in the integrity of the Bar." Fund of Funds, Ltd. v. Arthur Andersen & Co., 567 F.2d 225, 236-37 (2nd Cir. 1977). Disqualification is determined "in the context of the particular facts presented by each case." Galloway v. Nassau County, 569 F. Supp. 3d 143, 147 (E.D.N.Y. 2021). However, "any doubt is to be resolved in favor of disqualification." Hull v. Celanese Corp., 513 F.2d 568, 571 (2nd Cir. 1975). Courts "should not hesitate to grant such a motion if there be any doubt regarding ... counsel's ability to fulfill counsel's ethical obligations." World Food Sys., Inc. v. BID Holdings, Ltd., 2001 WL 246372, at *3 (S.D.N.Y. Mar. 12, 2001).

The Court in U.S. *ex rel.* Holmes v. Northrop Grumman Corp., 2015 WL 3504525, *3-5 & n.8 (S.D. Miss., June 3, 2015), aff'd, 642 Fed. Appx. 373 (5th Cir. 2016), confronted a similar fact pattern in finding an attorney violated Rules 1.6(a), 3.3(a)(1), and 4.4(a) of the ABA Model Rules of Professional Conduct – which are substantially similar to the New York Rules of Professional Conduct – by his conduct of violating terms of a confidentiality agreement his client had entered into, as well as violating a related protective order, and then using that information to pursue an action against a third party. Based on the attorney's misconduct, the court disqualified him from serving as the relator in a *qui tam* action filed against the third party and dismissed the action.

Specifically, in Holmes, Attorney Holmes represented Munich Re in a claims-adjustment process initiated by Northrop Grumman under its reinsurance policy with Munich Re. 2015 WL 3504525, at *1. During this process, Munich Re and Northrop Grumman entered into a confidentiality agreement that prohibited Munich Re and its agents – including Attorney Holmes – from disclosing confidential documents and information received from Northrop Grumman. Munich Re ultimately initiated arbitration to resolve the coverage dispute. Id. While the arbitration was pending, Munich Re requested documents relating to Northrop Grumman from the U.S. Navy, which agreed to release the documents after Munich Re – represented by Attorney Holmes – filed a complaint in the U.S. District Court for the District of Columbia for the purpose of obtaining a protective order. Id. Munich Re, through Attorney Holmes, submitted a stipulated protective order, the terms of which were agreed to by Munich Re, Northrop Grumman, and the Navy, which specifically recited that the documents were being produced by the Navy solely for the purpose of the arbitration. Id. at *5.

While the arbitration (which later was settled) and the protective order action were both still pending, Attorney Holmes filed the *qui tam* action against Northrop Grumman as the relator under the False Claims Act. In the complaint, Holmes alleged that he had "properly gained access to documents and information showing that the U.S. Government has been defrauded in the amount of not less than $835 million by the unlawful actions of Northrop Grumman." 2015 WL 3504525, at *2.

In response to Northrop Grumman's motion to disqualify Holmes from serving as relator *pro se* and to dismiss the action, Holmes argued that the confidentiality agreement entered into with Munich Re was "not a bar" to the action and "appear[ed] to argue that the [protective order] is not entitled to be accorded the weight of a court order." Id. at *2. The court rejected these arguments, and further declared that because Holmes was permitted to act as a relator *pro se* due to his status as an attorney, "the Court will evaluate whether he should be disqualified from serving as a relator by reference to the rules of professional conduct governing Holmes as an attorney." Id. at *3. Pertinent here, the court found:

- Attorney Holmes violated his duty of candor and violated Model Rule 3.3(a)(1) ("A lawyer shall not knowingly … make a false statement of material fact or law to a tribunal … .") when (1) he represented to the Court that he "properly gained access to" Northrop Grumman's documents and information and (2) represented to the District of Columbia that the documents kept by the Navy pertaining to Northrop Grumman would be limited to use in the arbitration. 2015 WL 3504525, at *4-5.

- Attorney Holmes violated Model Rule 1.6(a) ("A lawyer shall not reveal information relating to the representation of a client unless the client gives informed consent … ."), given that (1) the documents "were subject to various confidentiality obligations existing between Munich Re, Northrop Grumman, and the Navy"; (2) "there is no indication that Holmes would otherwise have come into possession of these document but for his representation of Munich Re"; and (3) "Absent Munich Re's informed consent, Holmes violated the duty to keep information related to his representation of Munich Re confidential when he revealed and made use of the documents he obtained during his representation of Munich Re." Id. at *7-8.

13

- Attorney Holmes also likely violated Model Rule 4.4(a) ("In representing a client, a lawyer shall not use ... methods of obtaining evidence that violate the legal rights of ... a [third] person.") when, on behalf of Munich Re, he obtained documents from Northrop Grumman and the Navy, having "submitted to at least one agreement to keep documents Munich Re received from Northrop Grumman confidential and participated in the creation and submission of the Stipulated Protective Order restricting the use and dissemination of documents received by Munich Re from the Navy." Id. at *8, n.8. The court stated that "Holmes' use of these documents for his own purposes in this *qui tam* action can reasonably be construed as violating the legal rights of Northrop Grumman and the Navy." Id.

Essentially the same analysis applies here. Defendants would not have shared their confidential information with Attorney Hantman but for the fact that Attorney Hantman represented Ms. Araoz, an adverse party. Indeed, it is ironic that Defendants shared the documents in part so that Attorney Hantman could satisfy his duty under Rule 11 to investigate the facts before filing a complaint.

Attorney Hantman's conduct violates the New York Rules of Professional Conduct in at least three ways:

First, Rule 3.3(a)(1) ("Conduct Before a Tribunal") provides that "[a] lawyer shall not knowingly … make a false statement of fact or law to a tribunal … ." Attorney Hantman violated that Rule by filing a Complaint that identifies and uses confidential information obtained under the Confidentiality Agreement to support the claims brought, and then by making false and misleading representations to the Court – in the Introduction and in Paragraph 47 of the Complaint – that information used in the pleading was obtained via "informal discovery." Just as Attorney Holmes misrepresented that he "properly gained access" to information used in his complaint, Attorney Hantman made a misrepresentation about "informal discovery" and failed to inform the Court that information contained in the Complaint was obtained under terms of the Confidentiality Agreement, which his client, Ms. Araoz, had entered into, and then used it publicly in violation of that Agreement.

14

Second, Rule 1.6(a) ("Confidentiality of Information") provides that "[a] lawyer shall not knowingly reveal confidential information" belonging to the client "or use such information … for the advantage of the lawyer," unless certain factors are met, such as that "the client gives informed consent" or that "the disclosure is impliedly authorized to advance the best interests of the client and is either reasonable under the circumstances or customary in the professional community." See Rule 1.6(a)(1) & (2). Just like Attorney Holmes, Attorney Hantman violated the duty to keep the confidential information related to his representation of Ms. Araoz confidential under terms of the Confidentiality Agreement. It is highly unlikely Ms. Araoz provided her "informed consent" to risk personal liability for breach of the Agreement, which would have required Attorney Hantman to advise his client that using the confidential information in a public court filing would expose her to that legal liability. It is also obvious that it is not impliedly in Ms. Araoz's "best interests" to incur liability by violating the Confidentiality Agreement. Nor is it "customary in the professional community" for an attorney to cause his client to violate a confidentiality agreement. It is obvious that Attorney Hantman created a conflict of interest between himself and his client by exposing her to legal liability in order to pursue this lawsuit. We submit that this conduct serves to undermine "the court's confidence in the vigor" of his representation of Ms. Araoz. Bobal v. Rensselaer Polytechnic Inst., 916 F.2d 759, 764-65 (2nd Cir. 1990) (citing Nyquist).

Third, Rule 4.4(a) ("Respect for Rights of Third Persons") provides in pertinent part that "[i]n representing a client, a lawyer shall not … use methods of obtaining evidence that violate the legal rights of [a third] person." Attorney Hantman could reasonably be found to have violated Defendants' legal rights by purporting that he would comply with the Confidentiality Agreement in order to obtain documents he otherwise had no legal right to receive, but then, just

15

like Attorney Holmes did, he used the documents "for his own purposes" in filing a lawsuit for which he expects to receive legal fees.

## CONCLUSION

For these many reasons, Attorney Hantman should be disqualified from his representation of Plaintiff in this litigation.

Dated: August 24, 2022

Respectfully submitted,

/s/ Marion H. Little, Jr.
Marion H. Little, Jr. (Ohio Bar # 0042679)
*Admitted pro hac vice*
Matthew S. Zeiger (Ohio Bar #0075117)
*Admitted pro hac vice*
ZEIGER, TIGGES & LITTLE LLP
41 S. High St., Suite 3500
Columbus, OH 43215-6110
Phone: (614) 365-9900
Fax: (614) 365-7900
Email: little@litohio.com

*Counsel for Defendants The New Albany Company, LLC, The Wexner Family Charitable Fund, The YLK Charitable Fund, Abigail S. Wexner, The Wexner Foundation, and Leslie H. Wexner*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on August 24, 2022, a copy of the foregoing was filed electronically with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all attorneys of record.

/s/ Marion H. Little, Jr.
Marion H. Little, Jr. (Ohio Bar # 0042679)

770-964:953302