UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X

JENNIFER D. ARAOZ,

                            *Plaintiff*,

            - against –

THE NEW ALBANY COMPANY LLC, et al.

                            *Defendants*,

-----------------------------------------------------------------X

INDEX NO.: 1:22-CV-00125
(AMD) (RML)

JURY TRIAL DEMANDED

### <u>First Amended Verified Complaint</u>

Plaintiff Jennifer D. Araoz ("Plaintiff"), in accordance with CPLR § 214-g as and for her

Complaint, against Defendants The New Albany Company, LLC, The Wexner Family Charitable

Fund, The YLK Charitable Fund, Abigail S. Wexner, The Wexner Foundation, and Leslie H.

Wexner ("Defendants"), alleges with personal knowledge as to her own actions, and upon

information and belief as to those of others, as follows;

## I.    **INTRODUCTION**

This case arises out of the  reasonable belief that the townhouse located at 9 East 71st Street,

New York, NY 10021 (the "Property"), which was the scene of various acts of sexual abuse

against Plaintiff as a teenager was owned by Leslie Wexner at the time of these occurrences

and/or employees of Wexner and/or entities controlled or owned by Wexner, and his agents

contributed to the acts complained of herein.

In spite of efforts to resolve this case and avoid court intervention, particularly at the

federal level, Plaintiff requested to have an independent expert, appointed by the Magistrate

Judge issue a Report and Recommendation to the Court, on the issue of title, which was opposed by Defendants' counsel requiring discovery on that issue.

## II. <u>**BACKGROUND AND HISTORY**</u>

1. On August 14, 2019, New York's Child Victims Act ("CVA") went into effect.

2. Under the CVA, past victims of child sex abuse are given a one-year window (extended to August 14, 2021) to sue an alleged abuser or their estate, and the individuals and institutions that helped them, regardless of how long ago the crime occurred.

3. The claims in this Complaint are all timely under the CVA, CPLR § 214-g, as they constitute civil claims brought against parties alleging intentional or negligent acts or omissions for physical, psychological, and/or other injuries or conditions suffered by Plaintiff as a result of conduct perpetrated against her when she was under the age of 18 that constitute sexual offenses as defined in Article One Hundred Thirty of the New York Penal Law ("Article 130"). *See* NYPL § 130.20; NYPL § 130.25; NYPL § 130.35; NYPL § 130.52; NYPL § 130.65; NYPL § 130.67.

4. This lawsuit presents the exact circumstances that the legislature contemplated in adopting the new law as this is an action for damages caused by the intentional or negligent acts or omissions of the primary enablers of Jeffrey Epstein, a Level 3 sex offender in New York State, who was one the world's most notorious pedophiles.

5. In 2001, Jennifer Araoz was just a 14-year-old child attending a public high school near Defendant Leslie Wexner's NYC residence, 9 East 71st Street, New York, NY 10021 (the "Property"), where despite having notice of Epstein's behavior, he permitted Epstein to live and run his companies and nonprofit organizations, when she fell prey to Epstein's

scheme of exploitation and abuse, aided by employees of the named Defendant's here and employees of Wexner's other companies and organizations.

6. Epstein was a predator, who groomed Ms. Araoz with the help of Leslie and Abigail Wexner, and a network of charities, companies, and trusts, and their employees, which enabled Epstein to perpetuate these sexual crimes against her.

7. This was not a one-time incident; the grooming and sexual abuse of Ms. Arroz took place several times a week for over a year until it finally culminated in a brutal rape of a 15- year-old child.

8. Further, the Plaintiff was not the only victim of this scheme perpetrated by Mr. Epstein under the supervision and with the help and assistance of the Defendants and their employees.

9. Leslie and Abigail Wexner, along with the nonprofit organizations and other Defendants named herein, who's employees directly and materially aided Jeffrey Epstein in perpetrating crimes of sexual abuse, sexual assault, and rape against Ms. Araoz, must be held responsible.

III.     <u>**PARTIES AND RELEVANT NON-PARTIES**</u>

10. Plaintiff, Jennifer D. Araoz ("Plaintiff" or "Ms. Araoz") is, and at all times relevant herein was, a New York resident, who was a minor child under the age of 16 years old.

11. At all times relevant herein, Leslie Wexner ("Wexner") maintained a residence at 9 East 71st Street, New York, NY 10021 (the "Property"), the location where his employee and tenant, Jeffrey Epstein, committed repeated crimes of child sex abuse in violation of Article 130 against minor Plaintiff, Ms. Araoz, and where other employees of his

companies and organizations solicited the Plaintiff and created an environment that trapped the her including providing her alcohol, gifts, money, and other incentives.

12. Defendant, Abigail S. Wexner is a natural person and a citizen of Ohio. In December 2007, Ms. Wexner formed the YLK Charitable Fund as a 501c3 tax exempt nonprofit, and at all relevant times she was president and director of the organization. She was also a director of the Wexner Family Charitable Fund and the Wexner Foundation, at all relevant times herein.

13. Defendant, The New Albany Company, LLC, ("New Albany") is a Delaware Limited Liability Company with its principal place of business in the State of Ohio. It is therefore a citizen of Delaware and Ohio at the time relevant to the claims herein. See 28 U.S.C.§ 1332(c). New Albany is 95% owned by Leslie Wexner and 5% owned by Abigail Wexner.

14. Defendant, The YLK Charitable Fund was a Delaware non-profit corporation that was incorporated on December 20, 2007, and dissolved on December 29, 2010, with its principal place of business in the State of Ohio. It was therefore a citizen of Delaware and Ohio. Its directors and officers were all citizens of Ohio. See 28 U.S.C. § 1332(c). YLK Charitable Fund had two trustees, Abigail Wexner and Peggy Ugland, a longtime Wexner employee. Abigail Wexner was also president.

15. Defendant The Wexner Family Charitable Fund is a Delaware non-profit corporation with its principal place of business in the State of Ohio. It is therefore a citizen of Delaware and Ohio. See 28 U.S.C. §1332(c).

16. Defendant, The Wexner Foundation is an Ohio non-profit corporation with its principal place of business in the State of Ohio. It is therefore a citizen of Ohio. See 28 U.S.C. § 1332(c).

17. Defendants The Wexner Family Charitable Fund, The YLK Charitable Fund, The Wexner Foundation are referred to herein as the "Institutional Defendants".

18. The Institutional Defendants along with The New Albany Company, LLC; The Wexner Family Charitable Fund; The YLK Charitable Fund; and The Wexner Foundation are referred to herein as the "Corporate Defendants".

19. At all times relevant herein, non-party Jeffrey E. Epstein ("Jeffrey Epstein" or "Epstein") worked for, and was a tenant of, Wexner at the Property, the location where he committed repeated crimes of child sex abuse in violation of Article 130 against minor Plaintiff, Ms. Araoz.

20. Jeffrey Epstein was an officer, director, or employee of many corporate entities and trusts controlled by Leslie Wexner, and Defendants in this action.

21. Epstein and Wexner were listed as presidents of Defendant, the New Albany Company LLC, in its 1998 registration document.

22. Upon information and belief, Epstein served as an officer of New Albany until 2007.

23. Epstein served as a trustee of Defendant, the Wexner Foundation, from 1992 to 2007.

24. Epstein served as Vice President of Defendant, the Wexner Family Charitable Fund, from 2001 - 2004.

25. Thereafter, Epstein's attorney Darren Indyke served as Vice President of the Wexner Family Charitable Fund from 2004-2007.

26. At all times relevant herein, non-party, The C.O.U.Q. Foundation, Inc. (the "COUQ Foundation"), was a tax-exempt Delaware nonprofit corporation authorized to conduct business in New York State on March 26, 1999, which Epstein served as Director and President and Ms. Maxwell, served as Director and Treasurer, and had offices and conducted business at 9 East 71st Street, New York, NY 10021. At all times relevant herein, the COUQ Foundation was controlled by Jeffrey Epstein, who used donations to COUQ Foundation to enable his recruitment of underage women and to make hush payments to witnesses, so he could perpetrate and conceal his sex crimes against minor Plaintiff in violation of Article 130.

27. At all times relevant herein, non-party Ghislaine Maxwell ("Ms. Maxwell"),[1] was a New York resident, who was an adult female over the age of 39, and was second in command of Jeffrey Epstein's international sex trafficking enterprise, co-managing the employees that worked for Corporate Defendants, and other companies, foundations, and trusts, controlled and/or owned by Mr. Wexner and Mr. Epstein.

28. Ms. Maxwell directly facilitated and conspired with Epstein and the other co-conspirators to make possible and otherwise facilitate the sexual offenses committed against minor Plaintiff, Ms. Araoz, in violation of Article 130 and was recently convicted and sentence to 30 to 55 years in prison for aiding and abetting Jeffery Epstein.[2]

29. At all times relevant herein, non-party Rosalyn S. Fontanilla A.K.A. Lynn Fontanilla ("Ms. Fontanilla"), also referred to in this Complaint as the "Housekeeper" or "Maid," was an adult female working at the Property, who employed as the housekeeper by Mr.

---

[1] https://en.wikipedia.org/wiki/Ghislaine_Maxwell
[2] United States v. Ghislaine Maxwell, 20 Cr. 330 (AJN)

Wexner and Mr. Epstein and directly facilitated the sexual offenses Epstein and his co-conspirators committed against minor Plaintiff, Ms. Araoz, in violation of Article 130.

30. Ms. Fontanilla passed away on October 26, 2016.

31. Non-party Lesley Groff ("Ms. Groff"), also referred to in this Complaint as the "Secretary," is a resident of Fairfield County, CT, and at all times relevant herein, was an adult female over the age of 34, who was an assistant of Jeffrey Epstein and employed by Mr. Wexner and Mr. Epstein, working at the Property, and was one of the people in charge of scheduling for all Epstein's owned and/or controlled companies, foundations and trusts.

32. Upon information and belief Ms. Groff directly facilitated, as well as conspired with Epstein, to make possible and otherwise facilitate the sexual offenses committed against minor Plaintiff, Ms. Araoz, in violation of Article 130.

33. Additional individuals who worked at Wexner's Property where Epstein committed sexual violations against Plaintiff, as well as others who assisted Epstein directly and indirectly in committing such violations, were employed through, or worked for, numerous other corporate entities, private foundations and trusts, owned or controlled by Wexner and the other Defendants herein, whose negligence and/or intentional tortious conduct caused or contributed to the sexual violations that caused harm to Plaintiff.

34. At all times relevant herein, Leslie and Abigail Wexner owed a duty to Plaintiff to treat her in a non-negligent manner and not to commit, or conspire to commit, or cause to be committed, intentional, criminal, fraudulent, or tortious acts against Plaintiff, including any acts that would cause Plaintiff to be harmed through conduct committed against her in

violation of NYPL § 130.20; NYPL § 130.25; or NYPL § 130.35; or NYPL § 130.52; or NYPL § 130.65; or NYPL § 130.67.

IV.    **JURISDICTION AND VENUE**

35. Complete diversity exists between Plaintiff, on the one hand, and the Defendants, on the other.

36. The amount in controversy alleged in the State Action exceeds the sum or value of Seventy-Five Thousand Dollars ($75,000.00), exclusive of interest and costs.

37. This Court therefore has jurisdiction in the matter pursuant to 28 U.S.C. § 1332, because there is complete diversity of citizenship between the parties and the amount in controversy exceeds the sum of Seventy-Five Thousand Dollars ($75,000.00), exclusive of interests and costs while the actions complained of herein occurred in and or impacted New York.

38. Defendants have also availed themselves to the jurisdiction of this court by Removing the action from state court pursuant to 28 U.S.C. § 1441.

39. This court has personal jurisdiction over Defendant Mr. Wexner as detailed below;

   a. He maintained residence at the Property,

   b. he conducted business in New York with a fair measure of permanence and continuity and was essentially at home in New York as the owner of L Brands, Victoria's Secret & Co., ("Victoria's Secret"), Nine East 71st Street Corporation, a closely held New York Corporation that originally owned the Property, the New Albany Company, and other businesses,

   c. he, himself, and through agents such as Epstein and the Employees transacts business in NY, out of the Property, including the employment of Epstein and the

Employees, contracted to supply goods or services into NY at the Property and with the Plaintiff and other child victims, committed tortious act in NY including the assaults perpetrated against the Plaintiff and others, and owns, possesses, or uses the Property in NY that was the location of the Plaintiff's injuries.

40. This court has personal jurisdiction over Defendant Abigail S. Wexner because she maintained residence at the Property, conducted business in New York with a fair measure of permanence and continuity and was essentially at home in New York as the founder and present of YLK Charitable Fund, that at one point owned the Property where the Plaintiff suffered her injuries.

41. YLK Charitable Fund was also used as a vehicle to facilitate and hide Epstein's crimes evidenced by its only donations being from him one of which included a transfer of $13,425,914 (almost the exact amount Wexner paid for the Property in 1991).

42. This court has personal jurisdiction over Defendant New Albany because it conducted business in New York with a fair measure of permanence and continuity and was essentially at home in New York as Epstein and Mr. Wexner were presidents of New Albany, Epstein served as an officer of New Albany until 2007, Epstein primarily worked from the Property in New York, perpetrated his crimes during the course of his duties to New Albany, was shielded by New Albany.

43. Upon information and belief New Albany also employed Epstein and the Employees that materially aided Epstein in his crimes and cover ups.

44. This court has personal jurisdiction over Defendant The YLK Charitable Fund because it conducted business in New York with a fair measure of permanence and continuity and was essentially at home in New York, and at one point owned the Property where the Plaintiff

suffered her injuries, was used a s vehicle to facilitate and hide Epstein's crimes, evidenced by its only donations being from him one of which included a transfer of $13,425,914 (almost the exact amount Wexner paid for the Property in 1991).

45. Upon information and belief The YLK Charitable Fund also employed Epstein and the Employees that materially aided Epstein in his crimes and cover ups.

46. This court has personal jurisdiction over Defendant The Wexner Family Charitable Fund because it conducted business in New York with a fair measure of permanence and continuity and was essentially at home in New York as Epstein served as Vice President of the Wexner Family Charitable Fund, from 2001 – 2004.

47. Epstein primarily worked from the Property in New York, perpetrated his crimes during the course of his duties to The Wexner Family Charitable Fund, thereafter, Epstein's attorney Darren Indyke served as Vice President from 2004-2007, it is also successor in interest to the YLK Charitable Fund as in December 2010, the YLK Charitable Fund was shut down and its remaining assets from Jeffrey Epstein's fraudulent conveyance (thru his charity COQU) — about $33.3 million (which included the $13,425,914 fraudulently conveyed to pay for the New York Property) — were transferred to the Wexner Family Charitable Fund.

48. The Wexner Family Charitable Fund also employed Epstein and the Employees that materially aided Epstein in his crimes and cover ups.

49. This court has personal jurisdiction over Defendant The Wexner Foundation because it conducted business in New York with a fair measure of permanence and continuity and was essentially at home in New York as Epstein served as a trustee the Wexner Foundation, from 1992 to 2007.

50. Epstein was also the bookkeeper for the Wexner Foundation, Epstein primarily worked from the Property in New York, perpetrated his crimes during the course of his duties to The Wexner Foundation, and was shielded by The Wexner Foundation.

51. Upon information and belief The Wexner Foundation also employed the Employees that materially aided Epstein in his crimes and cover ups.

## V.    <u>HISTORY AND NATURE OF THE ACTION</u>

52. On August 14, 2021, Plaintiff Jennifer D. Araoz ("Plaintiff"), then *Pro Se*, commenced an action in the Supreme Court of the State of New York, County of Queens State Action by filing a Summons with Notice, under New York's Child Victims Act, CPLR § 214-g, which case bore the Index No. 400298/2021. (the "State Action").

53. The Summons with Notice alleged that that Plaintiff suffered injuries as a result of the conduct of persons at the Property, which occurred during the time period 2001-2002, and the said premises were owned and/or controlled at that time by all of or some of the Defendants.

54. Due to the ownership or control over the Property and the actions of persons believed to be employees of the Defendants, this complaint also seeks damages for (1) Aiding and abetting physical, psychological, and/or other injuries or conditions suffered by Plaintiff as a result of conduct perpetrated against her in violation of NYPL §§ 130.20, 130.25, 130.35, 130.52, 130.65 and/or 130.67; (2) intentional acts or omissions for physical, psychological, and/or other injuries or conditions suffered by Plaintiff as a result of conduct perpetrated against her in violation of NYPL §§ 130.20, 130.25, 130.35, 130.52, 130.65 and/or 130.67; (3) negligent acts or omissions for physical, psychological, and/or other injuries or conditions suffered by Plaintiff as a result of conduct perpetrated against

11

her in violation of NYPL §§ 130.20, 130.25, 130.35, 130.52, 130.65 and/or 130.6; (4)

negligent security resulting in violations of §§ 130.20, 130.25, 130.35, 130.52, 130.65

and/or 130.67; (5) fraudulent conveyance; (6) fraudulent concealment, (7) and/or

Intentional Infliction of Emotional Distress.

## VI.     **FACTUAL ALLEGATIONS**

55.  The relationship between Jeffrey Epstein, Leslie Wexner and his entities, as well as

Wexner's actual knowledge of Epstein's misdoings, have been the subject of a recent

documentary detailing the nefarious relationship, on major streaming platform Hulu,[3] and

has also been revealed in the course of the recent civil actions and criminal trials

involving Ghislaine Maxwell.[4]

56. In 1982, Leslie Wexner acquired the lingerie business Victoria's Secret & Co.. After

Wexner assumed ownership, Victoria's Secret became widely known for marketing its

items with the use of super models known as "angels" which were featured in an annual

fashion show.

57. According to a July/August, 2021 interview with Vanity Fair, Wexner's close friend,

insurance mogul Robert Meister ("Meister"), whose firm handled insurance for The

Limited (the parent company of Vanity Fair), introduced Wexner to Epstein sometime

around 1986.  [5]

---

[3] https://press.hulu.com/shows/victorias-secret-angels-and-demons/ - "Investigated with journalistic rigor by director Matt Tyrnauer, this documentary tells the searing and provocative story of the Victoria's Secret brand and its longtime CEO, the larger-than-life, enigmatic billionaire Les Wexner. The underworld of fashion, the billionaire class, and Jeffrey Epstein are all revealed to be inextricably intertwined with the fall of this legendary brand in Victoria's Secret: Angels and Demons..."
[4] *Giuffre v. Maxwell*, Southern District of New York CIVIL DOCKET FOR CASE #: 1:15-cv-07433-LAP; *United States v. Ghislaine Maxwell*, 20 Cr. 330 (AJN) (which recently ended in a conviction).

58. "Soon after introducing Wexner and Epstein, Meister started hearing disturbing stories about Epstein's sexual proclivities. 'Think of whatever the worst thing anyone could do is, and Epstein did them all,' Meister said. The breaking point came when Epstein showed up unannounced at Meister's Park Avenue apartment with five models for Meister's sexual entertainment. 'Epstein thought he was bringing me a gift,' Meister recalled. 'I told him, 'Get the fuck out and I never want to see you again!'" *See Id.*

59. "Meister says he and his wife, Wendy, warned Wexner to stay away from Epstein. 'We begged him, don't get involved,' Meister recalled. It was too late: Wexner had hired Epstein as his financial adviser." *See Id.*

60.

61. In 1987, Epstein became Leslie Wexner's financial manager. Through his proximity to Wexner, Epstein gained unique access to young women.

62. On September 1, 1989, Wexner acquired the Property, for $13.2 million. As common with real estate.

63. Wexner held title to the Property through a closely held New York Corporation he owned, Nine East 71st Street Corporation.

64. In July of 1991, Wexner granted Epstein power of attorney, despite knowing or should have knowing Epstein's proclivities and illicit actions on the Property as detailed herein.

65. Upon information and belief, this power of attorney was used by Epstein to carry out his assaults and coverups.

66. Epstein and Wexner were also connected through their numerous tax exempt 501c3 organizations, which, upon information and belief, they used to illegally transfer assets to one another, as well as for hush money payments to keep victims of Epstein quiet.

67. Wexner installed Epstein as a trustee on the board and bookkeeper of the Defendant the Wexner Foundation, as well as trustee of a series of ambiguously named entities such as Health and Science Interests, Health and Science Interests II, International Charitable Interests.

68. Wexner even made Epstein trustee of the trusts for his children where Epstein was given voting power over millions of dollars' worth of Limited shares.

69. "[I]n the spring of 1993, an executive rushed into the office of Victoria's Secret catalog president Cynthia Fedus-Fields with disturbing news: A model told a hairdresser at a photo shoot that a man named Jeffrey Epstein was running around New York presenting himself as a Victoria's Secret scout. Fields knew Epstein was problematic. Fields, then in her 40s, had met him the previous year and rejected several inappropriate propositions from him to go out, one of which included a weekend date to Wexner's house in Aspen. (Fields declined Epstein's advances.) Fields told the executive to report Epstein to Wexner immediately, according to a source briefed on the conversation. 'Les said he would stop it,' the source recalled." [6]

70. In the mid 1990's, two executives at L Brands, Wexner's 'umbrella' corporation that owned Victoria's Secret & Co. until 2020, told the New York Times that they learned that Epstein was trying to involve himself in the recruitment of lingerie models for the Victoria's Secret catalog, a coveted assignment for young models and aspiring actresses.

71. The executive found that troubling, since Victoria's Secret sourced models from talent agencies, not individuals.

72. The executives said that when Wexner was informed about what Epstein was doing, he

---

[6] *See* https://www.vanityfair.com/news/2021/06/inside-jeffrey-epsteins-decades-long-relationship-with-his-biggest-client

promised to take care of the issue. [7]

73. Not only did Wexner not 'take care' of the issue, but he also further enabled Epstein by allowing him to stay at the Property, co-manage it, and run all of Wexner's nonprofits out of it, beginning in 1996.

74. Also in 1996, Maria Farmer ("Farmer"),[8] was hired to monitor and oversee the front door at the Property and keep records of people who came to the premises, according to an affidavit Ms. Farmer filed in 2019 in federal court in Manhattan.[9]

75. While supervising the front door of the Property, Farmer testified that she witnessed a number of school age girls coming to the home, some of the young girls would be wearing their school uniforms

76. The girls, she testified, would come into the NY mansion and then would be escorted upstairs.

77. In *Maria Farmer v. Darren Indyke and Richard D. Kahn, in their capacities as the executors of the Estate of Jeffrey Edward Epstein*, Case No.: 1:19-cv-10474 (S.D.N.Y. 2019), Farmer further alleges that Ghislaine Maxwell described her role as recruiting models for Epstein and told Maria that the girls being escorted upstairs at the Property were interviewing for modeling positions with Victoria's Secret.

78. During the summer of 1996, Farmer testified that she was working on an art project for Epstein in Wexner's Ohio mansion.

79. While she was there, she testified that Epstein and Maxwell sexually assaulted her without her consent.

---

[8] https://en.wikipedia.org/wiki/Maria_Farmer
[9] *See* Giuffre v. Dershowitz, Case No.: 19-cv-03377-LAP

80. She testified that she fled the room and called the sheriff's office but did not get a response. She then pleaded with Wexner's security staff who refused to let her leave for 12 hours.

81. Court papers state, that "Wexner's security personnel held Maria against her will and did not let her leave the property for several hours, even after she pleaded with them and told them about her assault.

82. They eventually let Maria leave with her father, who had driven from Kentucky to Ohio to get Maria away from Epstein and Maxwell."

83. Farmer told the Washington Post that the Ohio property was monitored by Wexner's wife, Abigail, and the Wexner security team.

84. She said that she communicated frequently with Abigail Wexner, whose permission she had to be granted before she could leave the house during the two months she stayed there.

85. Farmer testified that upon her return to New York, she reported the sexual assault to the Sixth Precinct of the New York City Police Department, who referred her to the Federal Bureau of Investigation to file a report.

86. Years later, the FBI agents came back to Farmer with questions about the incident. Farmer and her sister also went to leaders in the New York art world and she and her sister tried to tell their story to Vanity Fair.

87. Within a year of Farmer's complaint, in 1997, the actress Alicia Arden filed a police report in Los Angeles detailing that Epstein had misrepresented himself as a recruiter for Victoria's Secret, a company owned by Defendant Wexner, prior to another alleged assault.

88. "In September 1997, Wexner celebrated his 60th birthday with a dinner at his Ohio estate. Meister says he used the occasion to once again tell Wexner how untrustworthy Epstein was. 'My wife and I told him and Abigail hundreds of times to stay away from Epstein,' Meister said. In front of guests including former senator Joe Lieberman and real estate developer Marshall Rose, Meister said he begged Wexner to sever ties with Epstein." [10]

89. In 2001 and 2002, Wexner still owned and controlled the Property, the security company that controlled and stored all of surveillance equipment at the Property and was responsible for operating the Property.

90. Wexner has been accused of failing to take action when complaints were raised against Epstein, including after executives of L Brands reported (in the mid-1990s) that Epstein was abusing his power and connection to Wexner by posing as a recruiter of Victoria's Secret models.[11]

91. The artist Maria Farmer contacted local and federal authorities about an assault she allegedly endured by Epstein and Ghislaine Maxwell while working as an artist-in-residence on Wexner's Ohio property in 1996.

92. Despite this and other notice, at all times relevant herein, the Defendants gave Epstein access to numerous mansions, a fleet of airplanes, motor vehicles, boats, several helicopters, money, employment, status, and utilized their employees to provide him an air of legitimacy.

---

[10] *See* https://www.vanityfair.com/news/2021/06/inside-jeffrey-epsteins-decades-long-relationship-with-his-biggest-client
[11] https://en.wikipedia.org/wiki/Les_Wexner#cite_note-:7-21

93. In 2013, The Limited was renamed to L Brand, and the board hired Davis Polk to investigate Wexner's relationship with Epstein. The investigation was never made public, but months later, Wexner stepped down as CEO.

94. On October 6, 2017, attorney Stanley Pottinger testified that in the fall of 2014, he informed David Boies that "in the course of investigating facts related to Mr. Epstein's sex trafficking…there were assertions that Mr. Wexner had permitted Epstein to use, and entertain on, Mr. Wexner's Yacht, and that Mr. Wexner was alleged to have had sex with one or more of Mr. Epstein's girls, including Ms. Giuffre."

95. On November 22, 2017, attorney Stephen Zack testified, "In December 2014, at the request of Mr. Boies, I sent a letter to Leslie Wexner regarding possible claims against him." Further, Zack testified that on January 6, 2015, and March 25, 2015, he and attorney David Boies had a telephonic conference with Mr. Wexner's counsel. And that on July 8, 2015, he, Mr. Boies and attorney Sigrid McCawley had an in-person meeting with Mr. Wexner's counsel in New York.

96. On January 13, 2016, attorney Darren Indyke, on behalf of his client, Jeffrey Epstein, testified, "I was told by John Zeiger, who was Leslie Wexner's lawyer, that Sigrid McCawley claims that her client, Virginia Roberts [now Virginia Giuffre], alleges that she had sex with Leslie Wexner on numerous occasions, including one -- and she said this, according to Mr. Zeiger, very aggressively."

97. Mr. Giuffre's attorney, Sigrid McCawly, responded to Darren Indyke, "This is revealing confidential settlement discussions". *See Id.*

98. The allegations herein surround Jeffrey Epstein's conduct while at the Property and concern the various individuals, corporate entities, private foundations and trusts, which

provided the opportunity for, and materially aided, his illicit conduct to occur and remain concealed for years.

## VII.   <u>**MS. ARAOZ AND THE RECRUITER**</u>

99. In September of 2001, at age 14, Ms. Araoz entered high school at a special public high school for performing arts.

100. During the first semester of Ms. Araoz's freshman year of high school, she was approached by a woman, on the sidewalk in front of her school. (referred to herein as the "Recruiter")

101. Upon information and belief, the Recruiter was an employee of Wexner and the Corporate Defendants, hired to procure underage girls, and oversaw the process that led to the recruitment and grooming of Ms. Araoz.

102. The Recruiter approached Ms. Araoz repeatedly over the course of a week or two, offering to take her for lunches close by the school, and during the meals, would ask personal questions about her.

103. At some point during this approximate two-week period, the Recruiter began to speak about Jeffrey Epstein, almost as if he were her uncle or a family friend.

104. The Recruiter said that Epstein was a "nice guy," and that he takes care of her and her family.

105. The Recruiter spoke glowingly of Epstein, stating he is very wealthy, and "you have to see his house."

106. Ms. Araoz would come to find out this house was the Property owned or controlled by the Defendants herein.

107. The Recruiter eventually said that she told Epstein about Ms. Araoz, about how pretty and smart she is and about how she recently lost her father to AIDS.

108. The Recruiter then told Ms. Araoz that Epstein felt horrible about the loss of her father and said that he wanted to help her.

109. The Recruiter said that Epstein is a "caring guy," that he said she "should not be struggling," and that he wanted "to be there for her."

110. The Recruiter then said that she wanted Ms. Araoz to meet Epstein, that he knows a lot of people in the acting/modeling world, such as the owner of Victoria's Secret, referring to Defendant Wexner, and that he could possibly help her get in the catalog; the Recruiter said Epstein wanted to "guide her."

111. The Recruiter said that he was "very caring, very wealthy, very successful, and someone good to know."

112. The Recruiter said that if Ms. Araoz did not want to meet Epstein, she did not have to, but doing so could "benefit her."

113. The Recruiter also enticed Ms. Araoz by repeatedly saying how the Property is so beautiful, and that it was "right here" by Ms. Araoz's high school.

114. The Recruiter said that they could go by the Property together.

115. One day, the Recruiter made plans with Ms. Araoz to meet after school to visit the Property and meet Jeffery Epstein.

VIII.   **EPSTEIN'S SEXUAL ASSAULT, BATTERY AND RAPE OF MS. ARAOZ**

116. Upon arrival at Wexner's NYC Property at 9 East 71st Street, New York, NY 10021, Ms. Araoz and the Recruiter were greeted at the front door by the Maid, Ms. Fontanilla, who brought them to the Secretary, Ms. Leslie Groff's, office to wait. When Epstein came to greet them, he appeared very welcoming, even humble.

117. Upon information and belief, the Maid, Ms. Fontanilla, and Ms. Leslie Groff were employees of the Defendants.

118. Inside the front door, there were many security cameras pointing in all directions. On the little TVs, Ms. Araoz could actually see herself on the camera walking inside.

119. On Ms. Araoz's first visit, she recalls her and the Recruiter waiting for Epstein in Ms. Groff's office where Ms. Groff was sitting behind her desk. Subsequently, Ms. Araoz was offered cheese, crackers and wine in the kitchen by Ms. Fontanilla. In Ms. Groff's and Ms. Fontanilla's presence, Ms. Araoz identified that she was a first-year student at the local High School.

120. At the end of this first visit, Ms. Araoz recalls Epstein giving the Recruiter a gift— a digital camera. The Recruiter made a show of this to Ms. Araoz, stating "You see what I mean, he's such a nice guy".

121. After an hour or two, Ms. Araoz and the Recruiter left together.

122. Within a couple of days, the Recruiter reached out to Ms. Araoz and said that she made a great impression on Epstein and that he wanted to see her again.

123. So, again, the Recruiter met Araoz and brought her back to the Property after school.

124. The second time Ms. Araoz went to Epstein's NY Residence, he gave Ms. Araoz the same camera that he had previously given the Recruiter on Ms. Araoz's first visit to his home.

125. Ms. Araoz visited the Property, always with the Recruiter, about once or twice a week for the first month.

126. Each time, Ms. Araoz stayed between 1-2 hours, and at the end of the stay, Epstein would use the Ms. Groff as an intermediary to give Ms. Araoz $300 in cash each time and just say that he "wanted to help her out."

127. Each time Ms. Araoz and the Recruiter would be served cheese, crackers and wine by Ms.

Fontanilla.

128. Ms. Araoz openly discussed with Epstein, in front of the Recruiter, Ms. Groff, and Ms. Fontanilla, that she was a first-year student at a performing arts high school right down the street and that her dream was to be an actress and singer.

129. After about a month of making these visits to the Property with the Recruiter, Ms. Groff contacted Ms. Araoz directly and scheduled arrangements for her to visit the Property alone for the first time and gave Ms. Araoz instructions for when she arrived.

130. At this point, during Araoz's first visit *alone,* Epstein took Araoz on the elevator for the first time and showed her his massage room on one of the upper floors.

131. This began a yearlong grooming process where Epstein would progress from forcing Ms. Araoz to undress and massage him naked while he masturbated to ultimately her forcible rape at his hands.

132. Epstein used his connections with Victoria's Secret and Les Wexner's fashion companies to draw Ms. Araoz in telling her how beautiful she was and that she could have a successful modeling career with his help, but only if he could first see her naked.

133. Feeling uncomfortable and confused and feeling trapped in large mansion at the Property under the impression that there was no feasible or safe means of escape with the elevator, security cameras, and Ms. Groff and Ms. Fontanilla and other employees in her path, Ms. Araoz did as Epstein instructed.

134. Plaintiff was paid $300 cash before being escorted out of the Property, all with assistance from Defendants employees; this payment was made to induce Plaintiff to conceal the activities of Epstein and to entice her to return.

135. Going forward, sometimes Epstein would call Ms. Araoz directly, but primarily Ms. Groff would call, email and/or page Ms. Araoz, not necessarily in that order, but they would speak

on the phone, and she would give her instructions for her next sexual encounter with Epstein.

136. There were also two assistants of Epstein that would call Ms. Araoz from Epstein's office to schedule these sexual encounters, who like Ms. Groff, would give Ms. Araoz explicit instructions to follow upon arrival. One of those assistants was Ms. Espinosa, who Ms. Araoz would see at the Property after speaking to.

137. These encounters would continue on a weekly basis, once or twice a week, throughout the first and second semester of Ms. Araoz's freshman year of high school and through the beginning of the first semester of her sophomore year of high school.

138. This became routine where Epstein would have an employee of the Defendants take Ms. Araoz upstairs to the massage room.

139. The employee would put towels and lotions out and tell Araoz to get changed in the bathroom.

140. Finally, one day, during the fall of her sophomore year of high school (while she was 15 years old), she was giving Epstein a massage in her underwear, as she had routinely been instructed to do, but this time he also forcibly vaginally raped her.

141. Afterward, Jeffrey Epstein, often through employees of the Defendants, tried to contact Ms. Araoz, but she ignored his calls. Epstein also tried to reach out to Ms. Araoz in later years, but she did not take his calls.

142. Following the rape, Ms. Araoz refused to go back to Talent Unlimited High School out of fear of seeing Epstein, who lived at the Property, and because of the persistence of the Recruiter who solicited her at the school and the other employees of the Defendants who worked out of the Property, just blocks away from the high school.

143. Ms. Araoz, still 15 years old at the time, transferred to Forest Hills High School in Queens

by her home to avoid any continued contact with Epstein, the Recruiter, and the other employees of the Defendants.

144. Having left a special public high school for performing arts that she had to audition to get into, to instead go to a regular high school, caused Ms. Araoz to lose interest in school, drop out, and give up on her career of being an actress, model and singer.

145. All sexual acts were performed by Jeffrey Epstein intentionally and for no legitimate purpose and for his own gratification when Plaintiff was a minor child less than seventeen years of age.

146. The intentional acts of Jeffrey Epstein against Plaintiff constitute a sexual offense as defined in Article 130.

147. Pursuant to NYPL § 130.05, a person is deemed incapable of consent when she is less than seventeen years old.

148. Jeffrey Epstein committed sexual misconduct against Plaintiff as defined in §130.20 of the NYPL, inasmuch as Jeffrey Epstein engaged in sexual intercourse with Plaintiff without Plaintiffs consent.

149. Jeffrey Epstein committed rape in the third degree as defined in § 130.25 of the NYPL, inasmuch as Jeffrey Epstein, being twenty-one years old or more, engaged in sexual intercourse with Plaintiff, who was less than seventeen years old;

150. Jeffrey Epstein committed rape in the first degree as defined in NYPL § 130.35, inasmuch as Jeffrey Epstein engaged in sexual intercourse with Plaintiff by forcible compulsion;

151. Jeffrey Epstein committed a forcible touching against Plaintiff as defined in NYPL § 130.52, inasmuch as Jeffrey Epstein, intentionally and for no legitimate purpose, engaged the forcible sexual touching of Plaintiff for the purpose of degrading or abusing her or for the purpose of gratifying his sexual desire.

152. Jeffrey Epstein committed sexual abuse in the first degree against Plaintiff as defined in NYPL § 130.65, inasmuch as Jeffrey Epstein subjected Plaintiff to sexual contact by forcible compulsion.

153. Jeffrey Epstein committed an aggravated sexual abuse in the second degree against Plaintiff as defined in NYPL § 130.67, inasmuch as Jeffrey Epstein caused physical injury to Plaintiff when he inserted a finger into the vagina of Plaintiff by forcible compulsion.

154. This illegal conduct was perpetrated on the Property under the supervision and with the material assistance of the Corporate Defendants and the Defendants' employees.

155. Defendants and their employees provided Epstein the financial and physical means to carry out his act, an air of legitimacy, the direct solicitation of the Plaintiff, indeed, but for the employees such as the Recruiter Ms. Araoz would not have been pulled into Epstein's heinous scheme.

IX. **LESLIE WEXNER FRAUDULENTLY CONVEYS HIS OWNERSHIP**

156. On September 11, 1989, Leslie Wexner purchased 9 East 71st Street under his company, Nine East 71st Street Corporation, for $13.2 million dollars.

157. Public records indicate Mr. Wexner, and Mr. Epstein were officers of Nine East 71st Street Corporation, which was dissolved in 2015.

158. In early 2006, Epstein was charged in Florida with "multiple counts of molestation and unlawful sexual activity with a minor."

159. On or about October 23, 2007, an alleged child abuse victim, Ava Cordero aka Maximilia Cordero filed a civil against Epstein, the alleged perpetrator, and against Wexner, among

other defendants, as the owners of the Property where the alleged abuse occurred.[12]

160. In the lawsuit, the Plaintiff alleges that in 2000 and 2001, while Plaintiff was a minor, Epstein lured her to the Property and violently sexually assaulted her.

161. On December 7, 2007, Epstein finalized the Florida non-prosecution Agreement, in which he agreed to plead guilty to one count of solicitation of prostitution and solicitation of minors to engage in prostitution (an offense requiring him to register as a sex offender), and to be sentenced to consecutive terms of 12 months and 6 months in county jail, as well as 12 months of probation.

162. Epstein was still permitted to live at the Property and utilize it and the Defendant's employees and agents for his crimes.

163. Epstein attorneys negotiated the deal, so that his guilty plea would occur sometime after January 1, 2008.

164. Prior to Epstein pleading guilty and a month after Nine East 71st Street Corporation was named in the lawsuit, as owner of the premises, in December 2007, Leslie Wexner's wife, Defendant, Abigail S. Wexner a.k.a. Abigail S. Koppel ("Ms. Wexner"), formed the YLK Charitable Fund as a 501c3 tax exempt nonprofit, and she was president of the organization.

165. In order to avoid liability to Araoz and other victims that were sexually assaulted by Epstein in the Property, Wexner fraudulently transferred his interest in his shell company, which held the title to the Property, to Epstein on January 1, 2008, and had sources close to the family publicly claim that Wexner sold his interests in 1998, which is not the case.

166. Wexner clearly still owned and controlled the Property in 2001 and 2002, during the time

---

[12] This action was dismissed for reasons unrelated to ownership of the Property.

period Araoz was abused, as work permits filed on January 4, 2002, and May 31, 2002, reveal.

167. In order to facilitate the fraudulent transfer, on December 20, 2007, Wexner's wife, Abigail S. Wexner a.k.a. Abigail S. Koppel, formed a Delaware exempt corporation, YLK Charitable Fund, which subsequently applied and received 501c3 status.

168. On December 21, 2007 (effective January 1, 2008), an irrevocable assignment agreement was executed between Jeffrey Epstein's 501c3 tax exempt nonprofit, The C.O.U.Q.Foundation. (These assignment agreements were part of COQU's 2007 990 public filings with the IRS).

169. As stated in the assignment agreements, in consideration of the premises, COQU assigned interests valued at $13,425,914 (almost the exact amount Wexner paid for the house in 1991) to YLK Charitable Fund.

170. The only other donation ever made to the YLK Charitable Fund was also made from Epstein in January 2008 from his company, Financial Trust Company, Inc. (hereinafter "Financial Trust") was a U.S. Virgin Islands corporation conducting business in New York.

171. In 2010 Leslie Wexner became a director of YLK Charitable Fund, and in December 2010, the YLK Charitable Fund was shut down and its remaining assets from Jeffrey Epstein's fraudulent conveyance (thru his charity COQU) — about $33.3 million (which included the $13,425,914 fraudulently conveyed to pay for the New York premises) — were transferred to the Wexner Family Charitable Fund, a 501c3 tax exempt nonprofit that the Wexner's have used to support a variety of charities.

172. During the three years in which the YLK fund was in existence, it made two donations totaling $6.5 million to the Columbus Foundation, according to the tax records.

173. During the three years in which the YLK fund was in existence, it made two donations totaling $6.5 million to the Columbus Foundation, according to the tax records.

174. Finally, it appears that there was a fraudulent conveyance of these funds to the Wexner foundation since in 2011, for $10, the deed for Nine East 71st Street was transferred from Nine East 71st Corporation to Jeffrey Epstein's corporation in the Virgin Island, Maple, Inc.

## X.

### FIRST CLAIM
### DECLARATORY JUDGEMENT REGARDING OWNERSHIP OF THE PROPERTY

175. Plaintiff incorporates by reference all preceding paragraphs and re-alleges them as if set forth fully herein.

176. An actual, present and justiciable controversy has arisen between the Plaintiff and the Defendants concerning the ownership of the Property at the time of the Plaintiff's assaults.

177. Plaintiff seeks declaratory judgment from this Court that Leslie Wexner, or companies, or organizations he owned or controlled, owned the Property at relevant times.

### SECOND CLAIM
### NEGLIGENCE AGAINST
### LESLIE WEXNER

178. Plaintiff incorporates by reference all preceding paragraphs and re-alleges them as if set forth fully herein.

179. At all times relevant herein, Defendant, Mr. Wexner, through his ownership of Nine East 71st Street Corporation ("Nine East"), was the lawful owner of the property located at 9 East 71st Street, New York, New York, 10021.

180. Nine East acquired title to the property on September 6, 1989, and retained such title until

the property was fraudulently transferred to Maple, Inc. on December 11, 2011.

181. At all relevant herein, Mr. Wexner maintained legal control over the subject premises.

182. Jeffrey Epstein was a tenant of Mr. Wexner's, who lived and worked out of the premises when he was present in New York.

183. Mr. Wexner knew or should have known that Jeffrey Epstein had young females, including minor females, such as Plaintiff, at the premises.

184. When Plaintiff was sexually abused by Jeffrey Epstein in 2001 and 2002, Mr. Wexner, as the owner or co-owner of the property where all of the sexual abuse of Plaintiff occurred, had a non-delegable duty to maintain the premises in a reasonably safe condition.

185. Defendant Mr. Wexner had a duty of care to take precautions to protect guests, visitors, or invitees, such as Plaintiff, from foreseeable harm, including foreseeable criminal conduct.

186. Defendant Wexner had a duty to take reasonable precautionary measures to minimize the risk of sexual assaults upon visitors to the premises, such as Plaintiff.

187. Jeffrey Epstein's sexual assault and battery of Plaintiff was foreseeable, and no actions and/or precautions were taken by Mr. Wexner to prevent it. In fact, his actions and/or inactions helped enable it.

188. Nearly every day that Jeffery Epstein was on or in the Property of Mr. Wexner, he was engaging in criminal sexual behavior in violation of Article 130, including ever single encounter described herein with Plaintiff.

189. Defendant, Wexner, breached its duty to Plaintiff by failing to take even minimal safety precautions to protect against the predictable criminal acts of Jeffrey Epstein, which were reasonably predictable and foreseeable to occur on the property.

190. Defendant Wexner's negligence was a proximate cause of the sexual offenses committed against Plaintiff in violation of Article 130.

191. As a direct and proximate result of Defendant Mr. Wexner's breach, the Plaintiff has in the past suffered and, in the future, will continue to suffer physical injury, pain, emotional distress, psychological trauma, mental anguish, humiliation, embarrassment, loss of self-esteem, loss of dignity, invasion of her privacy and a loss of her capacity to enjoy life, as well as other damages.

192. Plaintiff incurred medical and psychological expenses and Plaintiff will in the future suffer additional medical and psychological expenses. These injuries are permanent in nature and Plaintiff will continue to suffer these losses in the future.

## THIRD CLAIM
## NEGLIGENCE AGAINST
## ALL DEFENDANTS

193. Plaintiff incorporates by reference all preceding paragraphs and re-alleges them as if set forth fully herein.

194. At all times relevant herein, upon information and belief, one of or multiple of the Defendants employed Jeffrey Epstein. ("Defendant-Employers").

195. Upon information and belief such Defendant-Employers had a duty to exercise reasonable care to refrain from retaining in its employ a person with known dangerous propensities in a position that would present a foreseeable risk of harm to others.

196. Upon information and belief such Defendant-Employers operated in part to satisfy the personal needs of Jeffrey Epstein, which included daily massages, which Epstein required to be sexual in nature.

197. Jeffrey Epstein's requirement that he receive regular massages from untrained young females caused such Defendant-Employers, and their other employees to knowingly ignore the dangerous sexual addictive propensities of Jeffrey Epstein, despite knowledge that he would cause harm to many young females, including Plaintiff, in order to retain

30

its most valuable employee—Jeffrey Epstein.

198. Upon information and belief such Defendant-Employers operated in part to further Jeffrey Epstein's goal to obtain, recruit, and procure young females for the purposes of providing sexually explicit massages to Jeffrey Epstein.

199. Upon information and belief, during the course and scope of Jeffrey Epstein's employment for such Defendant-Employers, he fulfilled the corporate objective of receiving sexual massages procured for him by employees of such Defendant-Employers.

200. Jeffrey Epstein was notorious for converting each massage into a sexually exploitive activity in violation of New York Penal Law Section 130, a fact which was known or should have been known in the exercise of reasonable care by such Defendant-Employers.

201. Upon information and belief even though such Defendant-Employers, knew of Jeffrey Epstein's propensity for the sort of behavior that caused Plaintiffs harm and Jeffrey Epstein's constant engagement in this type of criminal behavior during the course and scope of his employment, such Defendant-Employers, retained Jeffrey Epstein and failed to properly supervise him.

202. Jeffrey Epstein did not have a set work schedule or office, but instead, conducted business on behalf of such Defendant-Employers, from various locations all over the world.

203. Upon information and belief s while conducting said business, Jeffrey Epstein was frequently using such Defendant-Employers' corporate finances in furtherance of his sexually explicit behavior.

204. Upon information and belief, at times other employees of the Defendant-Employers, were coordinating these sexually explicit massages for Epstein to engage in during business hours, while he was within the course and scope of his employment.

31

205. In fact, while Jeffrey Epstein was conducting business telephone calls or authorizing company actions on behalf of such Defendant-Employers, he would frequently be receiving a sexually explicit massage of the nature detailed herein.

206. Upon information and belief in certain circumstances, sexually explicit massages provided by young women, oftentimes minor children, who were untrained in the art of massage, were coordinated by another employee of such Defendant-Employers, who knew or should have known that the massage was being conducted by an underage girl for the exclusive purpose of committing sexual crimes against her.

207. Upon information and belief Jeffrey Epstein engaged in this type of sexually abusive behavior daily to the extent that engaging in sexual massages became the most regular activity that he engaged in while in the course and scope of his employment.

208. Upon information and belief Jeffrey Epstein's habitual routine of recruiting and engaging in sexually explicit massages began many years before the formation of many of the Corporate and Institutional Defendants and was not a lifestyle unknown to the Defendants.

209. Upon information and belief such Defendant-Employers, knew or in the exercise of reasonable care should have known that Jeffrey Epstein was potentially dangerous, had engaged in a pattern of criminal sexual behavior against young females, including minors, for years, and that he was not going to cease committing criminal sexual acts.

210. Upon information and belief, Jeffrey Epstein was retained by such Defendant-Employers, with knowledge of the propensity of this sort of behavior.

211. Upon information and belief such Defendant-Employers retained Jeffrey Epstein with knowledge that he would in fact injure others, such as Plaintiff, during the course and scope of his employment.

212. Upon information and belief despite such knowledge, such Defendant-Employers knowingly placed Jeffrey Epstein in a position to cause foreseeable harm to Plaintiff, which could have been prevented had such Defendant-Employers, taken reasonable care in making decisions regarding the retention and supervision of Jeffrey Epstein.

213. Such Defendant-Employers negligence was a proximate cause of the sexual offenses committed against Plaintiff in violation of Article 130.

214. As a direct and proximate result of such Defendant-Employers negligence, the Plaintiff has in the past suffered and, in the future, will continue to suffer physical injury, pain, emotional distress, psychological trauma, mental anguish, humiliation, embarrassment, loss of self-esteem, loss of dignity, invasion of her privacy and a loss of her capacity to enjoy life, as well as other damages. Plaintiff incurred medical and psychological expenses and Plaintiff will in the future suffer additional medical and psychological expenses. These injuries are permanent in nature and Plaintiff will continue to suffer these losses in the future.

## FOURTH CLAIM OF ACTION NEGLIGENCE AGAINST THE WEXNER FAMILY CHARITABLE FUND, THE WEXNER FOUNDATION, LESLIE H. WEXNER, THE NEW ALBANY COMPANY, LLC

215. The Plaintiff incorporates by reference all preceding paragraphs and re-alleges them as if set forth fully herein.

216. Upon information and belief, Ghislaine Maxwell ("Ms. Maxwell"), Rosalyn S. Fontanilla A.K.A. Lynn Fontanilla ("Ms. Fontanilla") referred to in this Complaint as the "Maid,", Lesley Groff ("Ms. Groff"), referred to in this Complaint as the "Secretary," and Ms. Espinosa, were employees or agents of the Defendants in this action. (the "Named Employees")

217. Upon information and belief, it was the primary responsibility or at least a portion of the job responsibilities of each of the Named Employees as well as other unnamed employees of the Defendants to fulfill the needs or requests of Jeffrey Epstein; more particularly, his daily massage schedule. (Named Employees and such unnamed employees referred to herein as the "Employees").

218. Upon information and belief, the Employees were compensated to primarily, if not exclusively, procure or maintain each young female massage therapist, or to assist, knowingly or unknowingly, in the concealment of any misconduct committed against each massage therapist.

219. Upon information and belief, the employment responsibilities of the various Employees, included but were not limited to 1) recruiting young females, including minor children such as Plaintiff, to provide massages, 2) creating Jeffrey Epstein's massage schedule, 3) maintaining Jeffrey Epstein's massage schedule, 4) escorting various young females into the massage room at the Property 5) maintaining contact with the various young females who were recruited to the Property for the purposes of providing Jeffrey Epstein with a massage, 6) providing compensation to each young masseuse upon the completion of her engagement with Jeffrey Epstein, 7) providing meals and food and other services to the young females in order to provide an air of legitimacy to the functions of the corporation, 8) providing hospitality services to the young females in order to provide an air of legitimacy to the functions of the corporation, 9) providing educational services, 10) providing medical services, 11) providing transportation services, 12) providing housing services, 13) providing various other enticements to ensure the continued cooperation of the various young female masseuse with Defendant and Epstein's objective, 14) encouraging individuals, including the females who were recruited to the house to

provide a massage to recruit other young females to engage in the same activity for Jeffrey Epstein, and 15) coordinating together and with Jeffrey Epstein to convey a powerful and legitimate enterprise system capable of gaining cooperation from young females recruited for massage, often minors such as Plaintiff.

220. In fulfilling their employment responsibilities, each Employee voluntarily assumed a duty with respect to each young female recruited to massage Jeffrey Epstein, including Plaintiff.

221. To fulfill said duty, each Employee was required to perform their assumed duty carefully without omitting to do what an ordinarily prudent person would do in accomplishing the task.

222. The young females being recruited to engage in massages for Jeffrey Epstein were inexperienced in the art of massage, a fact that was known or should have been known Employees in the exercise of reasonable care.

223. Plaintiff relied on the Employees voluntary assumption of a duty to act with reasonable care towards her.

224. In the exercise of reasonable care, the Employees knew or should have known of the dangerous propensities of Jeffrey Epstein and the proximate harm that would be caused by his likely sexual misconduct and various violations of Article.

225. The failure of the Employees to act in the same manner as an ordinarily prudent person, placed Plaintiff in a more vulnerable position than if the Employees had not assumed the obligation to treat her with reasonable care.

226. In breaching its duty, Defendants and their Employees launched a force or instrument of harm directed toward Plaintiff. In doing so, Defendants and their Employees enhanced the risk Plaintiff faced and caused her to forego any opportunity she may otherwise have

had to avoid the risk inherent with being in a room alone with Jeffrey Epstein to perform a massage as an untrained minor child, and in the case of Ms. Araoz, someone who was not invited there to give massages.

227. Defendants' and their Employees', negligence was a proximate cause of the sexual offenses committed against Plaintiff in violation of Article 130.

228. As a direct and proximate result of Defendants' and their Employees' negligence, the Plaintiff has in the past suffered and, in the future, will continue to suffer physical injury, pain, emotional distress, psychological trauma, mental anguish, humiliation, embarrassment, loss of self-esteem, loss of dignity, invasion of her privacy and a loss of her capacity to enjoy life, as well as other damages. Plaintiff incurred medical and psychological expenses and Plaintiff will in the future suffer additional medical and psychological expenses. These injuries are permanent in nature and Plaintiff will continue to suffer these losses in the future.

## FIFTH CLAIM
## FRAUDULENT CONVEYANCE AGAINST LESLIE WEXNER, ABIGAIL S. WEXNER, YLK CHARITABLE TRUST, THE WEXNER FAMILY CHARITABLE FUND, THE WEXNER FOUNDATION.

229. The Plaintiff incorporates by reference all preceding paragraphs and re-alleges them as if set forth fully herein.

230. Defendants were engaged in a business or transaction.

231. At the time of the fraudulent conveyance, Plaintiff was a future creditor as defined under the New York Debtor and Creditor law.

232. On or about October 23, 2007, an alleged child abuse victim, Ava Cordero aka Maximilia Cordero filed a civil against Epstein, the alleged perpetrator, and against Wexner and Nine East, as the owners of the premises where the alleged abuse occurred. In the lawsuit,

the Plaintiff alleges that in 2000 and 2001, while Cordero was a minor, Epstein lured

Cordero to Wexner's Property and violently sexually assaulted her in violation of §§

130.20, 130.40; 130.50, 130.52; 130.52, 130.65, 130.91, and 130.91 of Article

233. Less than two months after the lawsuit was filed, and less that 2 weeks after Epstein

finalized his non-prosecution agreement in Florida which would have him pleading guilty

to solicitation of underage prostitution and registering as a sex offender, in order to shield

Wexner from liability, Wexner's wife formed YLK Charitable Fund for the purpose of

enabling Epstein to clandestinely purchase the Property.

234. In order to shield himself from liability, for negligence in allowing violations of Article

130 to repeatedly occur at the Property, where all of the alleged crimes against Cordero,

Ms. Araoz and so many other victims, from claims of current and future creditors, whose

claims had not matured, Wexner fraudulently transferred his interest in Nine East, which

held title to the property, to Epstein.

235. The transfer documents were done as an assignment whereby "in consideration of the

premises," an Epstein controlled 501c3 nonprofit assigned all of its interest in and to

several assets worth $12,377,844, which was approximately the same amount

($12,300,000) that Wexner paid for premises.

236. At the time of the fraudulent transfers, Defendants were aware of current legal claims

against Epstein, and knew, or reasonably should have known, about Plaintiffs potential

exposure to Ms. Araoz for legal claims.

237. The fraudulent transfers were effectuated for the express purpose of evading financial

liability to current and future creditors, including Plaintiff.

238. Defendants, by these fraudulent transfers, intended to hinder, delay or defraud, both

present and future creditors, including Plaintiff, from satisfying any judgment they may

have against the property where all of the sexual crimes in violation of Article 130 against minors occurred.

239. Defendants' fraudulent conveyances were made without fair consideration, despite the person making it, Leslie Wexner, being a Defendant in actions for money judgements.

240. The conveyances were fraudulent as to Plaintiff as a future creditor as defined under New York debtor creditor law.

241. Plaintiff is therefore entitled to avoid the fraudulent transfers.

242. Plaintiff is thereby entitled to attach or levy execution upon any property or assets that were fraudulently conveyed.

243. In addition, Plaintiff is entitled to recover interest, costs, and disbursements of this action, including reasonable attorney's fees pursuant to New York Debtor and Creditor law.

244. Defendants have violated each of the following sections of New York Debtor Creditor law: 273-a, 276, 276-a, 278 and 279.

## SIXTH CLAIM
## AIDING AND ABETTING AGAINST THE WEXNER FAMILY CHARITABLE FUND, THE WEXNER FOUNDATION, LESLIE H. WEXNER, THE NEW ALBANY COMPANY, LLC

245. Plaintiff incorporates by reference all preceding paragraphs and re-alleges them as if set forth fully herein.

246. Plaintiff suffered physical, psychological, and/or other injuries or conditions suffered as a result of conduct perpetrated against her by Jeffery Epstein in violation of NYPL §§ 130.20, 130.25, 130.35, 130.52, 130.65 and/or 130.67.

247. Upon information and belief, The Wexner Family Charitable Fund, The Wexner Foundation, Leslie H. Wexner, The New Albany Company, LLC and their employees

were all aware of their role as part of an overall illegal or tortious activity at the time they provided the assistance to Mr. Epstein in perpetrating the injuries;

248. Upon information and belief, The Wexner Family Charitable Fund, The Wexner Foundation, Leslie H. Wexner, The New Albany Company, LLC and their employees knowingly and substantially assisted Jeffery Epstein in his violation as detailed in paragraph 245 and otherwise herein;

249. As a direct and proximate result of Defendants' and their Employees' actions, the Plaintiff has in the past suffered and, in the future, will continue to suffer physical injury, pain, emotional distress, psychological trauma, mental anguish, humiliation, embarrassment, loss of self-esteem, loss of dignity, invasion of her privacy and a loss of her capacity to enjoy life, as well as other damages. Plaintiff incurred medical and psychological expenses and Plaintiff will in the future suffer additional medical and psychological expenses. These injuries are permanent in nature and Plaintiff will continue to suffer these losses in the future.

## SEVENTH CLAIM
## CONSPIRACY LIABILITY AGAINST THE WEXNER FAMILY CHARITABLE FUND, THE WEXNER FOUNDATION, LESLIE H. WEXNER, THE NEW ALBANY COMPANY, LLC

250. Plaintiff incorporates by reference all preceding paragraphs and re-alleges them as if set forth fully herein.

251. Plaintiff suffered physical, psychological, and/or other injuries or conditions suffered as a result of conduct perpetrated against her by Jeffery Epstein in violation of NYPL §§ 130.20, 130.25, 130.35, 130.52, 130.65 and/or 130.67.

252. Upon information and belief, The Wexner Family Charitable Fund, The Wexner Foundation, Leslie H. Wexner, The New Albany Company, LLC along with Jefferey

Epstein established an agreement to participate in perpetrating the above referenced harms;

253. The Wexner Family Charitable Fund, The Wexner Foundation, Leslie H. Wexner, The New Albany Company, LLC through their employees executed several overt acts in furtherance of the agreement including but not limited to those actions set forth in paragraph 245 and otherwise herein.

254. The Wexner Family Charitable Fund, The Wexner Foundation, Leslie H. Wexner, The New Albany Company, LLC and their employees intentionally participated in the furtherance of the plan and purpose.

255. As a direct and proximate result of Defendants' and their Employees' actions, the Plaintiff has in the past suffered and, in the future, will continue to suffer physical injury, pain, emotional distress, psychological trauma, mental anguish, humiliation, embarrassment, loss of self-esteem, loss of dignity, invasion of her privacy and a loss of her capacity to enjoy life, as well as other damages. Plaintiff incurred medical and psychological expenses and Plaintiff will in the future suffer additional medical and psychological expenses. These injuries are permanent in nature and Plaintiff will continue to suffer these losses in the future.

## EIGHTH CLAIM
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS AGAINST DEFENDANTS AGAINST THE WEXNER FAMILY CHARITABLE FUND, THE WEXNER FOUNDATION, LESLIE H. WEXNER, THE NEW ALBANY COMPANY, LLC

256. Plaintiff repeats and realleges all allegations set forth above as though set forth at length herein.

257. Defendants The Wexner Family Charitable Fund, The Wexner Foundation, Leslie H. Wexner, The New Albany Company, LLC have intentionally and recklessly engaged in a

malicious campaign of tortious conduct against the Plaintiff, as has been detailed and described above.

258. As facts elicited to date and as discovery will further reveal, Leslie Wexner, through his various entities and utilizing the vast fortunes, employees, agents, and other assets of those entities facilitated and encouraged the international sex trafficking headed by Epstein, that lasted potentially decades and which the Plaintiff fell victim to.

259. Specifically, Wexner and the employees and agents of his entities were not only aware of, but also facilitated, and materially aided Epstein in recruiting children for Epstein's sexual pleasure, as detailed herein.

260. Defendants The Wexner Family Charitable Fund, The Wexner Foundation, Leslie H. Wexner, The New Albany Company, LLC thus engaged in conduct toward Plaintiff that was extreme and outrageous so as to exceed the bounds of decency in a civilized society.

261. Defendants The Wexner Family Charitable Fund, The Wexner Foundation, Leslie H. Wexner, The New Albany Company, LLC have intentionally and recklessly engaged in the extreme and outrageous conduct described above for the sole purpose of causing Plaintiff, a minor at the time, severe emotional distress, and harm.

262. By engaging and continuing to engage in the actions and conduct described above, Defendants The Wexner Family Charitable Fund, The Wexner Foundation, Leslie H. Wexner, The New Albany Company, LLC have caused harm, severe emotional distress, and anxiety to Plaintiff.

263. As a result of said emotional distress that has been caused Plaintiff has been forced to undergo psychiatric treatment and has been prescribed a litany of anti-depressant and anti-anxiety medications simply so that she can function in her day-to-day life.

264. As a proximate result of the above-mentioned acts, Plaintiff has been damaged, has suffered severe and permanent injuries, and was forced to endure extreme pain, suffering, emotional distress, and mental anguish.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests this Court for judgment on their behalf and for the following relief:

1. Enter Judgment according to the declaratory relief sought;

2. On the First Claim, as against Defendant Leslie Wexner, compensatory damages and punitive damages in an amount to be determined at trial;

3. On the Second Claim, as against Leslie Wexner, compensatory damages and punitive damages in an amount to be determined at trial;

4. On the Third Claim, as against all named Defendants, compensatory damages in an amount to be determined at trial;

5. On the Fourth Claim, as against The Wexner Family Charitable Fund, The Wexner Foundation, Leslie H. Wexner, The New Albany Company, LLC, compensatory and punitive damages in an amount to be determined at trial;

6. On the Fifth Claim, as against Leslie Wexner, Abigail S. Wexner, YLK Charitable Trust, The Wexner Family Charitable Fund, The Wexner Foundation, compensatory and punitive damages in an amount to be determined at trial;

7. On the Sixth Claim, as against The Wexner Family Charitable Fund, The Wexner Foundation, Leslie H. Wexner, The New Albany Company, LLC compensatory and punitive damages in an amount to be determined at trial;

8. On the Seventh Cause of Action as against The Wexner Family Charitable Fund, The Wexner Foundation, Leslie H. Wexner, The New Albany Company, LLC compensatory and punitive damages in an amount to be determined at trial;

9. Expedited discovery including but not limited to;

    a. a copy of the fully executed Purchase and Sale Agreement pertaining to the property located at 9 East 71st Street, NYC that states the terms and conditions of such alleged transfer of said property along with a copy of: (i) the NYS Transfer Tax Return that corresponds with such alleged transfer; (ii) the NYC Transfer Tax Return that corresponds with such alleged transfer; (iii) copies of cancelled checks that were paid in connection with such NYS and NYC Transfer Tax Returns; and (iv) any and all ACRIS documents filed along with such NYS and NYC Transfer Tax Returns.

    b. A copy of the New York State and New York City Transfer Tax Forms and other ancillary documents along with a copy of the check (indicated as paid by Mr. Wexner's bank) that indicates that such New York State and New York City transfer taxes were duly paid as of the date of the alleged sale.

    c. explanation as to why Mr. Wexner is listed as Owner of the Property on two NYC permits dated 1/8/2002 and 6/4/2002.

10. For a court order voiding any and all fraudulent conveyances described herein;

11. Attorney's fees and interest, and disbursements;

12. For such other relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues so triable.

Dated: January 6, 2023

By: /s/ Robert J. Hantman

Robert J. Hantman, Esq.
Hantman & Associates
www.hantmanlaw.com
1120 Avenue of the Americas, 4th Floor
New York, NY 10036
Tel: (212) 684-3933
rhantman@hantmanlaw.com

## VERIFICATION

I Jennifer Araoz, declare as follows:

1. I am the Plaintiff in this case and a citizen of the United States of America above the age of majority.
2. I have personal knowledge of myself my activities, and my intentions, including those set out in the First Amended Verified Complaint, and if called on to testify I would competently testify as to the matters stated herein.
3. I verify under penalty of perjury under the laws of the United States of America that the factual statements in the First Amended Verified Complaint concerning myself, my activities, and my intentions are true and correct.

Executed on: Jan 6, 2023

Jennifer Araoz

Signed before me on 6th day of January, 2023

Notary Public

EVER F VACA
Notary Public - State of New York
NO. 01VA6373958
Qualified in Queens County
My Commission Expires Apr 16, 2026