EXHIBIT

A

exhibitsticker.com

1

1                UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF NEW YORK

2  - - - - - - - - - - - - - - - X
                       :

3    JENNIFER D. ARAOZ,      :  22-CV-00125(AMD)

4        Plaintiff,      :

5                      :  United States Courthouse

6    -against-          :  Brooklyn, New York

7                      :  September 7, 2022

8    THE NEW ALBANY COMPANY,  :  10:30 a.m.
    LLC, et al.,         :

9        Defendants.     :

10  - - - - - - - - - - - - - - - X

11    TRANSCRIPT OF CIVIL CAUSE FOR PRE-MOTION CONFERENCE
        BEFORE THE HONORABLE ANN M. DONNELLY

12          UNITED STATES DISTRICT JUDGE

13

14             A P P E A R A N C E S:

15  For the Plaintiff:     HANTMAN & ASSOCIATES
                  1120 Avenue of the Americas

16                  4th Floor
                  New York, NY 10036

17

18                  BY:  ROBERT HANTMAN, ESQ.
                      STANLEY CASEY, ESQ.

19  For the Defendant:     ZEIGER, TIGGES & LITTLE LLP
                  41 South High Street, Suite 3500

20                  Columbus, OH 43215

21                  BY:  MARION H. LITTLE, ESQ.

22  Court Reporter:        DENISE PARISI, RPR, CRR
                  Official Court Reporter

23                  Telephone: (718) 613-2605
                  E-mail:  DeniseParisi72@gmail.com

24

25  Proceedings recorded by computerized stenography.  Transcript
  produced by Computer-aided Transcription.

1          (In open court.)

2          THE COURTROOM DEPUTY:  All rise.  This is civil

3     cause for a pre-motion conference, Docket Number 22-CV-125,

4     Araoz versus The New Albany Company, LLC, et al.

5          Counsel, state your appearance.  Plaintiff first.

6          MR. HANTMAN:  Good morning, Your Honor.

7          Robert Hantman from Hantman Associates.  I'm with

8     Mr. Casey, who is an associate of the firm.

9          I thank you for allowing me to come here dressed up.

10    It's somewhat unique to be in the court in person.

11          Thank you, Your Honor.

12          THE COURT:  My pleasure.  Good morning.

13          MR. LITTLE:  May it please the Court.

14          Marion Little on behalf of defendants, Your Honor.

15          THE COURT:  Good morning.

16          So, as I said when I came in, I picked up the wrong

17    binder, but I remember the case pretty well.

18          So this is a pre-motion conference on an anticipated

19    motion to dismiss pursuant to 12(b)(2) and 12(b)(6) of the

20    federal rules.

21          So the first thing is there's the motion to

22    disqualify counsel, which Judge Levy is going to handle, and I

23    think we probably should postpone setting a motion schedule

24    until after Judge Levy decides that motion.

25          I don't know if it's up on ECF, but I've spoken with

1  him, so I don't know if anybody has anything that you want to

2  say about that particular motion except I don't think it will

3  take that long for him to decide.  Anything that you wanted to

4  say, Mr. Little?

5          Let me tell you one other thing.  It's fine to stay

6  seated if you want.  I can actually hear you better with the

7  microphone, so if it's not too difficult for you to stay

8  seated, it actually makes it easier.

9          But go ahead.

10          MR. LITTLE:  It's old habits, Your Honor.

11          THE COURT:  I know.

12          MR. LITTLE:  We have -- we stipulated to an

13  extension of time for the plaintiff's counsel to file an

14  opposition to that motion as of yesterday, because otherwise

15  the memo contra would have been due yesterday, Your Honor.

16          THE COURT:  Okay.  So anything else that you wanted

17  to say about that?

18          MR. HANTMAN:  No, Your Honor.  We wrote a letter in

19  response to Mr. Little's letter, and I think that almost

20  covers everything.

21          THE COURT:  Okay.

22          MR. HANTMAN:  I'm sure -- Judge Levy is very

23  familiar with this case.

24          THE COURT:  Yes, I know.

25          MR. HANTMAN:  He's been working with us for a long

1  time, and we were actually hoping -- you know, we're really

2  hoping that he would just take control of the case --

3            THE COURT:  You can --

4            MR. HANTMAN:  -- and not bother you.

5            THE COURT:  What did you say?  To not --

6            MR. HANTMAN:  To not bother you.

7            THE COURT:  That's why I took the job.

8            So, anyway, you can certainly consent to his

9  jurisdiction.  He knows the case very well, and he's extremely

10 smart so that's something you can certainly think about.

11           I think since we don't waste your time, did you fly

12 in from Ohio?

13           MR. LITTLE:  I did, Your Honor.

14           THE COURT:  So we might as well get something done

15 here, don't you think?

16           MR. LITTLE:  That would be fine, Your Honor.

17           THE COURT:  Well, let me just ask a couple of

18 questions, first of all, just about the complaint.

19           You know, you have a couple of claims in there that

20 I'm not sure would survive a statute of limitations claim.

21 You've got a fraudulent conveyance.  I don't think that the

22 New York statute extended the statute of limitations on

23 fraudulent conveyances.  I might be wrong about that, but I

24 don't think -- I haven't thought about it that much, but I

25 don't think that that extension, you know, for a particular

1  category of claims applies to every claim that you want to put

2  in a complaint.

3          Is that your understanding, or -- I don't know what

4  the answer is?

5          MR. LITTLE:  Well, the proposition the Court just

6  articulated is that the legislation did not revive all

7  possible claims as true, Your Honor.  I know that there's at

8  least one claim in the complaint we have identified as not

9  surviving the statute of limitations.

10          THE COURT:  Was that the fraudulent conveyance?

11          MR. LITTLE:  I know we had another defense on that

12  that was probably even easier --

13          THE COURT:  Okay.

14          MR. LITTLE:  -- and so the Court wouldn't have to

15  jump through the mental gymnastics on the statute of

16  limitations analysis because there's simply not an allegation

17  that anyone was rendered insolvent by the transfer of the

18  asset.

19          THE COURT:  All right.

20          And then there's also a -- there's kind of a

21  freestanding conspiracy claim.  I don't know what that is.  Is

22  that a -- I'm not sure that it would survive a motion to

23  dismiss.

24          MR. HANTMAN:  Your Honor, if I may for a moment.

25          This started with a summons with notice filed

1   pro se --

2          THE COURT:  Right.

3          MR. HANTMAN:  -- by the young lady.  There was an

4   answer actually filed, even though an answer might not have

5   been normally -- be customary with state court, it actually

6   was filed January 14th --

7          THE COURT:  Okay.

8          MR. HANTMAN:  -- exactly at that point, motions

9   could have been made -- any number of motions could have been

10  made to get the case dismissed.

11         Subsequently, we were actually retained just

12  hopefully to try to resolve this thing and we focused,

13  primarily, on the fraudulent transfer.

14         THE COURT:  Right.

15         MR. HANTMAN:  Everything else -- we didn't invent

16  anything, we just took the verified complaint of the client

17  and we filed the papers.

18         The present motion -- or the request to file the

19  motion to dismiss really wasn't focused on the different

20  statute of limitations.  It was really limited to just a --

21  mostly the jurisdiction and claiming that our complaint was

22  conclusory, in general, when, in fact -- I think it speaks for

23  itself -- it's verified, and it's anything but conclusory.

24         Now, as far as --

25         THE COURT:  Well, we can talk about that in a

1   minute, but --

2            MR. HANTMAN:  As far as the statute of limitations

3   on some of those matters, other than the -- the original case

4   was under the Child's Victims Act, which is --

5            THE COURT:  Right.

6            MR. HANTMAN:  -- 22 NYC 202.72, which did extend the

7   statute of limitations for that.

8            As far as whether other causes of action -- which

9   are somewhat derivative or flow from that -- stand or not

10  stand, we've not briefed at the present time.

11           THE COURT:  Nobody has briefed anything at the time,

12  that's why we're having the conference.

13           I'm a fairly practical person and I like to keep

14  things as efficient as possible, and I don't think that it's

15  probably efficient to have claims in a complaint that wouldn't

16  withstand the talent.  I haven't decided anything.  I'm just

17  throwing it out there for you to think about.

18           MR. HANTMAN:  Well, here's what I'm willing to do --

19           THE COURT:  Well, you can tell me what you're

20  willing to do -- I'm not ordering you to do anything right

21  now.  I'm alerting you to certain issues that I see when I

22  look at the complaint.  There are some other issues when I

23  look at the complaint as well.  There's a lot of group

24  pleading and I'm just putting aside the jurisdictional

25  questions.  There's -- you know, there's not a lot of notice

1   as to which defendant is alleged to have done what.

2          There are -- I mean, there's a lot of things about

3   what a lot of other people did who are not parties, but

4   there's, at least from my reading of it, you know, not a lot

5   of clarity about what the individual defendant did versus what

6   the organizational defendants did.  One of them is not in

7   existence anymore.  I don't know if you can sue -- I can't

8   remember which one it is -- but it doesn't exist anymore.  I

9   don't know if you can bring a lawsuit against an entity that

10  doesn't exist.  These are just things I noticed about the

11  complaint.

12         But I would like to hear on this question of

13  jurisdiction.  I know the plaintiff says there's long-arm

14  jurisdiction, but I'm not really -- I don't understand what

15  the argument is that gives New York jurisdiction.  Is it

16  business transactions?  Is it just the ownership of the

17  building in Manhattan?  And if it's the business, you have to

18  show that there's been a transaction of business in New York

19  that's related -- that the claims arise out of the business

20  activity.

21         So I'm not a hundred percent sure that you can make

22  that case with every defendant in the complaint.  So -- and to

23  what extent have you talked about doing jurisdictional

24  discovery?

25         MR. LITTLE:  Your Honor, may I interrupt for a

1   moment?

2            THE COURT:  Of course.

3            MR. LITTLE:  The Court talked about practicalities,

4   and there's some information that has come to our attention

5   since we submitted the letter to the Court.

6            THE COURT:  Okay.

7            MR. LITTLE:  If I may approach.

8            THE COURT:  Sure.

9            Does Counsel have whatever this is?

10           MR. LITTLE:  Yes, Your Honor.

11           THE COURT:  Is it two copies or one?

12           MR. LITTLE:  One copy for your staff attorney and

13   one copy for you, Your Honor.

14           THE COURT:  That's a great idea.

15           MR. LITTLE:  I clerked for a few years for the

16   federal judge and so I know how to handle it most days.

17           Your Honor, in reviewing the complaint in

18   anticipation of this conference, like you, I noticed that

19   there were so many other allegations referring to other

20   parties' conduct, and I also noticed that because of some

21   redundancy, it looked like there was some cutting and pasting.

22   So we decided to do a little bit more investigation.

23           And what we learned, if you look at page -- or Tab

24   2, is that the plaintiff in this case had actually filed in

25   August of 2019 a lawsuit against the Epstein estate, Maxwell,

1    and Jane Doe.

2            THE COURT:  Okay.

3            MR. LITTLE:  And then on October 10, 2019, there had

4    been an amended complaint filed in this New York state action,

5    and I have copies of this materials in the package, Your

6    Honor, I don't have certified copies just because we didn't

7    have time to secure them on such a rapid basis, but in that

8    amended complaint, they sued Epstein's estate, Maxwell, Nine

9    East 71st Street Corporation, which is the entity that owned

10   the subject property, and then NES, LLC, which was the entity

11   that Jeffrey Epstein used to acquire the property at a later

12   date.

13           And then there's others, and I will notice that -- I

14   will make that note for the Court in just a second.

15           But some year plus after the filing of that lawsuit,

16   there's a stipulation discontinuation with prejudice, and if

17   the Court reviews that complaint, you will see that it is

18   almost verbatim to most of the allegations found in the

19   instant complaint.  So we've put at Tab 3 a copy of that first

20   amended complaint filed by the plaintiff.  As I referenced

21   earlier, it includes claims against the Epstein estate,

22   Maxwell, also Lesley Groff, who is referenced in our papers,

23   the Nine East 71st Street, and then there's also another lady

24   who was the maid that's referenced in it.

25           So the allegations are the same.  It all relates to

1   the supposed or alleged misconduct that occurred at the home

2   that is the basis for the lawsuit.

3           And when you look at Tab 6, Your Honor, of our

4   materials, these are excerpts from the complaint before Your

5   Honor, and throughout that complaint, the plaintiff is

6   alleging that the defendants in this case served as the

7   employer for the defendants that were in the original lawsuit,

8   and that's referenced over and over.

9           I've simply put two pages of those allegations, but,

10  quite frankly, there are more that could be mined from the

11  current complaint.

12          The reason I emphasize that, Your Honor, is that

13  when you look at Tab 7, we're going to have a res judicata

14  event here.  We have a voluntarily dismissal of prejudice,

15  which constitutes an adjudication on the merits.  They are the

16  same allegations, and there are -- there is privity as it

17  relates to the parties.

18          So any time there is an employer or employee

19  relationship alleged that establishes privity for res

20  judicata -- and I wish I had learned of this before we

21  submitted the letter to the Court, but, obviously, as part of

22  the submission we'll make for dismissal on the merits, Your

23  Honor, we'll want to include the res judicata arguments based

24  on the discovery of this complaint and its dismissal with

25  prejudice.

1          I believe, and I agree with the Court there is many

2     other claims that don't satisfy 12(b)(6) because either the

3     claim fails on the merits or it just doesn't plausibly state a

4     claim.  But probably the simplest exit strategy on the merits

5     at this point is res judicata.

6          Now as it relates to the jurisdictional issues, Your

7     Honor, if you look behind Tab 1 -- now, I just have a

8     compilation in there of materials because we sort of changed

9     in our preparation after we discovered the complaint, but we

10    have five separate defendants, only four of which are

11    currently in existence because the YLK Charitable Fund has

12    been dissolved, but The New Albany Company is a real estate

13    company in New Albany, Ohio, and that's its principle place of

14    business.  It doesn't conduct business anywhere else.  If you

15    wanted to buy a real estate in New Albany, Ohio, there would

16    be an opportunity to do so through that company, but,

17    otherwise, no.

18         The Wexner Foundation, of course, has its principle

19    place of business in Ohio.  It does make charitable

20    contributions throughout the world, but its business is --

21    none of the claims here arise out of any of its conduct --

22         THE COURT:  Just slow down a little bit.

23         MR. LITTLE:  -- arise out of any of its conduct.

24         And then, of course, then, the Wexners -- Abigail

25    Wexner and Les Wexner -- are Ohio citizens.  They did --

1   Mr. Wexner did have an interest in the nonparty here Nine East

2   71st Street Corporation many years ago, and the Court asked

3   whether there had been any type of jurisdictional discovery.

4   Well, of course seeing our motion to disqualify which relates

5   to the breach of the confidentiality agreement, but behind Tab

6   9 is the outline from a timeline standpoint of the information

7   that's been provided to plaintiff's counsel showing the fact

8   that Mr. Wexner had no ownership in the subject property at

9   the time of the alleged misconduct.  He was -- had all

10  disassociation from the property in 1998.  He had actually

11  started his disassociation of the property earlier than that

12  because in -- after acquiring it in 1989, he later leased it

13  to Jeffrey Epstein in 1994.

14          We've produced to Counsel the documents, Your Honor,

15  showing the changing in utility expenses, pest control costs,

16  the taxes for the property.  We've even given them the moving

17  invoices showing the removal of the Wexner's art from the

18  property.  And if we were really good at misconduct, I guess

19  we convinced *The New York Times* to also publish an article in

20  January of '96 talking about the fact that Mr. Wexner wasn't

21  living there anymore and had hardly lived there at all since

22  the acquisition of the property.

23          We've also given excerpts of tax returns that show

24  the vesture of Mr. Wexner from that property as well.

25          So in terms of -- it would have been by preference

1  that all was kept confidential pursuant to the agreement

2  struck with Counsel, but now that that agreement has been

3  breached I'm happy to disclose to the Court that we have made

4  available this information on a -- without the formality of

5  discovery, to establish Mr. Wexner's lack of possession or

6  control of the subject property at the time of the alleged

7  misconduct.  So that part has occurred.

8          So I think I finally answered the Court's question

9  from ten minutes ago in a sort of a roundabout way.

10          THE COURT:  No, that's fine.

11          Do you have any response to this?

12          MR. HANTMAN:  Yes, Your Honor.

13          As far as what's -- having more specifics in the

14  complaint and knowing exactly who did what to whom, I think

15  it's undisputed that the claim arises out of something that

16  happened to a young lady when she was like 15 years old,

17  that's a long time ago.  Clearly, as lawyers, we can only go

18  on what she knows or what she thinks happened.

19          THE COURT:  But what does that have to do with these

20  defendants.  I mean, that's the issue.  I mean, a lot of

21  these -- this situation is obviously the subject of a long

22  criminal trial in the Southern District.  I think the issue is

23  it's -- even reading the complaint, it sounds like you should

24  have a good claim against some of the people that were

25  directly involved.  The difficulty that I think -- I haven't

1    read motions yet, but even putting aside all of the questions

2    about whether the dismissal of the other case with prejudice

3    means that you have a res judicata issue -- you might -- it's

4    a pretty good argument -- but aside from that, the complaint

5    just kind of randomly at times throws in that the defendants,

6    as a group, employed people and there are other references

7    to -- that claims that are made on information and belief and

8    just -- I mean, I read a lot of complaints.  You can't use

9    discovery to try to -- try to build a case and so I'm just

10   alerting you to what I think some of the defects are.  You

11   have -- you know, group pleading is a problem here because

12   it's hard to tell who you're claiming did what.

13          And as I said -- even if he owned the building at

14   the time all this was happening, I think it would be tough to

15   make a case for liability unless you can show the -- that he

16   knew what was going on and that he did something to contribute

17   to it.  But I think just the problems with the complaint are,

18   it's just not very specific, and I think that the rules

19   require that.

20          MR. HANTMAN:  Well, Your Honor, as to whether he

21   knew or didn't know what was going on, I think it's a given

22   that there's public information --

23          THE COURT:  Public information, yes, it could be

24   right, it could be wrong.

25          MR. HANTMAN:  But there's testimony from Ms. Maxwell

1   that we mentioned in our letter, in her deposition, she

2   certainly mentions enough that should get us by a motion to

3   dismiss.

4           THE COURT:  But that relates to these defendants?

5   Does she say that these defendants did all the things that you

6   claim they did.

7           MR. HANTMAN:  I don't think that she was even asked

8   specifically who was working at the premises at that time.

9   Our client certainly doesn't even know if the names of the

10  people when she's 15 -- and these illegal things are happening

11  to her.  She wasn't asking Mr. Epstein, Who are these people?

12  What are their names?  You know, who do they work for?

13          THE COURT:  Well, I'm not suggesting that that's a

14  requirement, but when you file a complaint with any kind of an

15  allegation, it has to be legally sufficient.

16          I feel like we're getting ahead of ourselves a

17  little, because I don't really understand what -- and maybe

18  this is just a failure of imagination on my part, but I don't

19  really understand your claims about jurisdiction over these

20  various parties.  You've got -- and now I'm just -- just for

21  ease of reference -- you've got The New Albany Company.

22  What's the jurisdiction over The New Albany Company in

23  New York.  What's the basis of long arm jurisdiction?

24          MR. HANTMAN:  Well, Your Honor, first of all, at a

25  minimal we feel there's negligence and negligence supervision

1   as to what was going on as to the building.  So who owns the

2   building at the time is important, number one --

3            THE COURT:  What connection did The New Albany

4   Company have to New York?

5            MR. HANTMAN:  Well, at this point -- Mr. Little has

6   done a good job in trying to bring things up now, frankly, for

7   the first time in front of Judge Levy --

8            THE COURT:  But I'm the district judge.  I asked for

9   it.  I want it.

10            MR. HANTMAN:  No, I understand.  But I'm just

11   saying, prior to this, the main issue was the ownership of the

12   property.

13            THE COURT:  Okay.

14            MR. HANTMAN:  And that was the only thing which we

15   were addressing.  Now we're at a different stage and we'll

16   address what's a legitimate concern to, Your Honor.

17            THE COURT:  But you've got five Ohio-based

18   defendants.  And there has to be a basis for the exercise of

19   personal jurisdiction over those defendants and I just want to

20   understand what it is.  If we don't have it, then I don't have

21   jurisdiction over the case.

22            MR. HANTMAN:  Well, I think that question rises and

23   falls on whether Wexner or these other entities, okay,

24   basically either own the property at the time of this -- of

25   these incidents which happened or were involved, and this is

1    -- this would be more or less summary judgment, not a motion

2    to dismiss, and/or they conspired among themselves to have a

3    fraudulent transfer when, in fact, there was really not a

4    transfer to Mr. Epstein.  They say they gave it to him, but

5    there's no proof that they ever got paid for it.  They say

6    they gave him the property, but we have building permits which

7    have Wexner's name on it and there's a lot of things which are

8    subject to question which, frankly, we were hoping not to even

9    be at this stage.  We were hoping -- and I'm not an expert on

10   the real estate -- on title work, okay, but we brought in an

11   expert to look at the -- you know, look at what this public

12   record, essentially, and try to make a determination -- to

13   answer your question -- as to who owned this property and if

14   anyone -- if they didn't own the property, who was involved in

15   trying to falsify the records to save Mr. Wexner and those

16   companies potential liability.

17          THE COURT:  But when is this supposed to have

18   happened?  In the '90s?

19          MR. HANTMAN:  Well, it happened a long time ago,

20   yes.

21          THE COURT:  But what's the motive in the '90s?

22          MR. HANTMAN:  Well, no, it would be -- it would have

23   to have been at the time that this incident happened, and the

24   incident happened when --

25          THE COURT:  In '98, no?

1          MR. HANTMAN:  Yeah, it happened a long time ago.

2          THE COURT:  Right.

3          MR. HANTMAN:  And we believe that at the time that

4     this happened, and even afterwards, these parties were

5     intwined with each other and participating in a scheme to make

6     it look as if Wexner and these companies had no ownership of

7     the property; that it was just Epstein who owned the property.

8     That's where the case really rises and falls.

9          THE COURT:  But you have to have some evidence of

10    that that's not just you wonder if it's happened.

11         MR. HANTMAN:  No, a hundred percent we need evidence

12    of this, and that's why even Judge Levy recognized that he

13    thought it was a good use of time for us to exchange

14    information with Mr. Little to get to this bottom line.

15         And actually --

16         THE COURT:  And there was a confidentiality

17    agreement, and I'm not sure how all that stuff wound up in the

18    complaint, that's not for me to decide today --

19         MR. HANTMAN:  Well, nothing was attached to the

20    complaint.  It was just reference to certain things that were,

21    like, either public information, or, just to be specific,

22    there's nothing attached to it, okay, number one.

23         But, number two, there was only five different

24    documents which we felt was needed to make the determination

25    as to whether any of these people should be involved or not

1  involved.

2  THE COURT: Did you get them?

3  MR. HANTMAN: Well, no, we didn't get them and

4  that's exactly why it ended up -- we were pleading with Judge

5  Levy. I said, Your Honor -- and this is quote/unquote --

6  Judge, listen, we're perfectly fine without having litigation.

7  Our client, the last thing she wants is to be in trial of this

8  type of matter --

9  THE COURT: She what?

10  MR. HANTMAN: To be in trial. Our client.

11  THE COURT: She wants a trial?

12  MR. HANTMAN: No, she doesn't.

13  THE COURT: I see.

14  MR. HANTMAN: The last thing she wants is a trial.

15  She wants to get resolution.

16  I suggested to Judge Levy: Listen, why don't you

17  appoint an independent expert in title, okay, and we will send

18  them what we have, let Mr. Little send them what he has and

19  let him give a report and recommendation as to whether the

20  property was owned by these various corporations or

21  Mr. Wexner's companies at or about the time that these

22  incidents happened. That's what I suggested.

23  THE COURT: What did Judge Levy say?

24  MR. HANTMAN: Well, he thought it was a good idea,

25  frankly. And Mr. Little said, No, our client doesn't want to

1    wait any longer.  He wants you to file a complaint.  So we

2    file a complaint.

3            But I don't disagree with what you're saying, but

4    again, Judge Levy felt constrained to order something at that

5    time --

6            THE COURT:  He felt constrained?

7            MR. HANTMAN:  Well, he didn't want to, I guess.  He

8    said, Well look, I can't do anything about this.  File your

9    complaint.  He said, File your complaint, so we filed the

10   complaint.

11           Now that we're here, I, again, urge or request that

12   the Court initially may appoint an independent expert to look

13   at this title thing because that will answer some of the

14   questions.  Maybe there is no case, but we believe there

15   should be at least some discovery, but we would rather have

16   discovery, you know, which is limited and focused and

17   economically done and expeditiously done than having all of

18   these different issues.

19           I mean, we're not trying to be unreasonable, and

20   we're certainly not trying to make up allegations to satisfy a

21   motion to dismiss.  We have a verified complaint, which,

22   frankly, is as much as this young lady knows at the present

23   time, and I believe that, if Mr. Little is correct, at some

24   point, the proper remedy would be a motion for summary

25   judgment.  But as far as jurisdiction, it should be at least

1    limited jurisdiction, discovery, and/or let's go back to step

2    number one and let's look at who owned the building and

3    whether these defendants were involved or not involved.  That

4    doesn't satisfy the allegations that people who worked for

5    these corporate defendants or for Mr. Wexner's company,

6    whether they really worked for him or these companies, and

7    whether they should -- they would be responsible, but even if

8    we can't find who they are, there would be negligent

9    supervision.  The owner of the property, or whoever hired

10   these people, would be responsible for whatever they did or

11   didn't do.

12          THE COURT:  I don't know what employees you are

13   talking about.  It sounds like they are Mr. Epstein's

14   employees.  No?

15          MR. HANTMAN:  Well, listen, Your Honor --

16          THE COURT:  I don't know what the answer is.

17          MR. HANTMAN:  You know more than me.

18          THE COURT:  I don't.

19          MR. HANTMAN:  We don't know that they are

20   Mr. Epstein's employees.  We believe that there's allegations

21   that they were employees of a certain corporate defendants --

22          THE COURT:  Of the New Albany company?

23          MR. HANTMAN:  Yes, yeah.

24          THE COURT:  Okay.  Again, I think we've lost the

25   thread here a little bit, but I think the issues that you have

1   to answer -- and it's the case in every litigation, if I don't

2   have jurisdiction over these five Ohio-based defendants who

3   don't appear to have any connection to New York -- and perhaps

4   I've missed it -- but then I don't -- I can't -- I'm not

5   permitted to exercise jurisdiction over the case regardless of

6   what the other potential flaws in the case are.

7           Let me give Mr. Little a chance to respond.  Just do

8   it slowly, if you could.

9           MR. LITTLE:  Yes, Your Honor.  I think there's been

10  a conflation of a couple different distinct concepts here, so

11  let me, if I can, clarify those.

12          When this case was first filed, we communicated to

13  that Counsel Mr. Wexner did not have any ownership interest in

14  the property and the alleged -- at the alleged time, which is

15  three years after the transfer of the home, and we even

16  proposed to Counsel, we'll even show you the documents that

17  are available from 20 years ago, whatever we can find to

18  document this.  And I think finding moving invoices was pretty

19  good work on our part to find something that basic and we did,

20  but we did that pursuant to the confidentiality agreement.

21          Now, several issues arose from that:  One, despite

22  the confidentiality agreement, there was continued disclosures

23  to the magistrate judge in an effort by Counsel to enlist the

24  magistrate judge to, basically, do counsel's job in terms of

25  stating what the claim is, and we rejected that.  At the same

1    time, we did make the materials available, we made them

2    available on a couple of different occasions, but what we

3    found out is that over the two-month period that we were going

4    through this process, there were continued demands for

5    information we don't have in our possession, we don't control,

6    so we would hear a question, well there was a building permit

7    later that had Mr. Wexner's name on it.  Well, as you might

8    know, an owner of a property doesn't pull the building permit.

9    That's the contractor.

10          And there had been a building permit pulled years

11   ago in Mr. Wexner's name when he was doing renovations on the

12   property.  The fact that some contractor later put his name on

13   it, that's not something I can control.  He can go interview

14   the building contractor he wants.  Or if they want to

15   interview someone, they can interview the notary who notarized

16   the paper showing the transfer of the interest.  That's

17   something they can do.

18          But in terms of the other pieces of information they

19   claim they don't have the benefit of, that makes two of us.

20   We don't have the benefit of that information either.  I can't

21   provide them what we don't have, but this -- continued to just

22   be prolonged, and in a case that was filed last August, I

23   think the phrase goes, "All good things must come to an end,"

24   they needed to finally file their complaint, which they were

25   obligated to do in January, or dismiss the action and we gave

1   them that option.  Just dismiss it.  That's your choice.  Or

2   file your complaint.  And then when they filed the complaint,

3   we, of course, identified for them the host of the issues.

4         Now, Counsel suggested to you that jurisdictional

5   issues were not paramount at the inception of this case.  That

6   is untrue.  Of course all they gave us is initial notice, so

7   the perfunctory answer to that notice says there's no

8   jurisdiction as to these defendants, but there's nothing to

9   move against since there's no complaint.  But in each of the

10  status reports submitted to the magistrate, there's a

11  reference to the fact that there's a lack of jurisdiction over

12  these defendants, that was paramount.  At the same time, at a

13  concurrent time frame, we're simply trying to provide someone

14  some documents pursuant to a confidentiality agreement so they

15  can satisfy their obligations to Counsel to say, Tell the

16  client there's no basis for bringing this action, let's just

17  move on.

18        They decided that no matter what we give them, they

19  are going to continue with the action.  That's fine.  It's

20  time to litigate it.  It's time for them to put up the facts

21  that support their contention.

22        And when you read the complaint from the original

23  New York action that was filed years ago, you will see that

24  there's very specific specificity by this plaintiff as to

25  whose employees they used to work.  They were Jeffrey

1   Epstein's employees.  They were Jeffrey Epstein's maid,

2   Jeffrey Epstein's secretary, and, in fact, there's specific

3   allegations in the New York complaint that Jeffrey Epstein

4   controlled that property.

5           Now, we have a new complaint that says now

6   Les Wexner and these defendants controlled blah-blah-blah --

7   there's an assortment of adjectives used there as to -- or

8   verbs as to what we supposedly did or did not do.  But the

9   simple truth is, one of these are factually incorrect.  But

10  more fundamentally, they have not satisfied that initial

11  preliminary obligation they must discharge to establish the

12  Court's jurisdiction here in New York, and that's why we've

13  raised these issues.  For simplicity purposes, Your Honor, we

14  raised them both 12(b)(2) and 12(b)(6), because if we were

15  going to file a motion, we would probably do it all in one

16  time to minimize the number of times the Court had to look at

17  this file in its early inception, but we think there are

18  legitimate criticisms, concerns, regarding the allegations

19  advanced in this case both from a jurisdictional and

20  substantive standpoint, and that's why we've submitted the

21  request to file a motion.

22          MR. HANTMAN:  Your Honor, since it's undisputed that

23  Mr. Wexner's name did appear on building permits after the

24  time that it's alleged he had nothing to do with this, that

25  alone now becomes a question of fact.  Okay?

1          THE COURT:  I don't -- maybe it does.  You still

2    don't have any allegations of jurisdiction, which is -- so if

3    I were to get a motion and the jurisdictional question was

4    resolved against you, a lot of times I don't even go on to the

5    rest of it because if I don't have jurisdiction, that's the

6    ends of the inquiry.

7          And I take it -- I viewed all the letters back and

8    forth -- there has never been an interest in settling;

9    correct?

10          MR. LITTLE:  Just the contrary, Your Honor.  We've

11    always made it very clear, we're not paying any money on any

12    of these type of --

13          THE COURT:  Right.  Okay.

14          MR. HANTMAN:  Your Honor, if I may.

15          The jurisdiction we believe is that the plaintiff

16    lives in New York.

17          THE COURT:  Yes.

18          MR. HANTMAN:  The building is in New York.  Whatever

19    happened to her, happened in New York.  Whoever owned the

20    building among these different entities which we think that

21    they were the owners, not Epstein at the time that this

22    happened and it was a fraudulent transfer, even if they are

23    out of state, they knew or should have known that by reason of

24    what they were doing, it would have an impact on someone or

25    persons in New York, so I think --

1      THE COURT:  Well, that will be your answer then when

2  the motion is filed.  I have to tell you, I don't think it's

3  very persuasive as I sit here, but you will cite the cases

4  that will permit me to draw that conclusion.  So, -- but I'm

5  not going to set the motion schedule now, only because I think

6  the first order of business is to have that -- the motion to

7  disqualify counsel decide it.

8      And when are you going to file -- I'm not deciding

9  it.  Judge Levy is.  And so when are you going to file your

10 response to that?

11     MR. HANTMAN:  Well, since it was filed, there was no

12 briefing schedule, it wasn't clear to us when the answer would

13 --

14     THE COURT:  Okay.  I'm just curious, did you pick a

15 date?

16     MR. HANTMAN:  I think it would be two weeks.

17     THE COURT:  Okay.  So Judge Levy works fast, so once

18 he decides that, I think -- the other thing I'm going to

19 encourage you to do is take a look at your complaint again,

20 mindful of a couple of concerns -- I'm not sure why they have

21 to have all of these defendants in there, but, you know, you

22 know your case better than I do, and to look at some of these

23 claims that are in the complaint, whether the -- consider

24 whether the statute of limitations and the particular law that

25 extended the statute of limitations, whether that would apply

1  to a fraudulent conveyance claim.  I don't know the answer to

2  that, but I think it's an interesting question.

3          And then look at this conspiracy -- sort of

4  free-floating conspiracy claim, I'm not sure that's a valid

5  claim, but it might be.  But these are all things that you

6  should consider, and consider whether or not this is an action

7  you want to continue with.

8          So once Judge Levy makes a decision about the

9  disqualification of counsel, then we'll proceed from there,

10  depending on what the decision is.

11          If he denies the motion, I suspect what I will ask

12  you to do is file a status report updating me on any decisions

13  you've made about whether to continue with the action, whether

14  you are going to file an amended complaint, but we can deal

15  with those things as they come.

16          Give me just a second.

17          (Pause.)

18          THE COURT:  All right.  Anything else anybody wants

19  to put on the record?

20          MR. HANTMAN:  No, but I guess what Mr. Little gave

21  you for -- to give you an overview, this is not filed right.

22  This is what --

23          THE COURT:  I think it was just his talking points.

24  Do you want him to file it?

25          MR. HANTMAN:  No, because this raises so much --

1   it's very ingenious.  I mean, I appreciate this because it's

2   very thorough, but it goes way --

3          THE COURT:  Take a look at it, maybe it will give

4   you some ideas.  I don't know, I haven't read it all the way

5   through.  But I think it was just a -- I don't know if you

6   want to file it as a supplement to your letter.

7          MR. LITTLE:  I do not, Your Honor, unless the Court

8   is so inclined that we do so.  I typically use those type of

9   materials to help frame the discussion with the Court.

10          MR. HANTMAN:  I appreciate his diligence and we'll

11   try to narrow the issues, Your Honor.

12          THE COURT:  Okay.  All right.  So as soon as I -- as

13   soon as Judge Levy makes a decision, then we'll proceed from

14   there.

15          All right.  I do want to thank our court reporter.

16          All right, thanks everybody.

17          (Matter concluded.)

18

19                  *     *     *     *     *

20

21   I certify that the foregoing is a correct transcript from the
     record of proceedings in the above-entitled matter.
22

23      /s/ Denise Parisi              January 13, 2023
     _____        _____
24         DENISE PARISI                      DATE

25