UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------------ X

JENNIFER D. ARAOZ,

*Plaintiff*,

- against –

THE NEW ALBANY COMPANY LLC, et al.

*Defendants*,

------------------------------------------------------------------ X

INDEX NO.: 1:22-CV-00125
(AMD) (RML)

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'

## MOTION TO DISMISS

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ........................................................................................................ iv

I.  INTRODUCTION .................................................................................................................... 1

II.  BACKGROUND AND PROCEDURAL HISTORY ............................................................ 2

III.  LEGAL ARGUMENT ........................................................................................................ 5

  A.  The Plaintiff Is Not Limited Only To Legal Theories Expressly Stated In Her Complaint 5

  B.  The Instant Action Is Not Barred By Res Judicata .......................................................... 10

    1.  Res Judicata Does Not Apply Because the Issues and Facts Involved in the Initial

    Action and This Action are Different. ................................................................................. 10

    2.  Res Judicata Does Not Apply Because the Instant Action Is Based on New Evidence

    That Did Not Exist at the Time of the Initial Action. ......................................................... 13

  C.  Defendants' Motion Should Be Denied So That Plaintiff Can Be Afforded Discovery To

  Support Her Causes Of Action Against Particular Defendants And Narrow The Issues ......... 16

  D.  PLAINTIFF HAS SUFFICIENTLY PLEAD CONSPIRACY ....................................... 19

  E.  PLAINTIFF'S FRAUDULENT CONVEYANCE CLAIM IS NOT INCURABLY

  DEFECTIVE BECAUSE IT IS ALSO BASED ON THE SEXUAL CRIMES OF EPSTEIN

  AND AS SUCH CPLR § 214 APPLIES TO REVIVE IT ....................................................... 21

    1.  Plaintiff has stated a Claim under New York's Debtor and Creditor Law § 276. ........ 23

  G.  THIS COURT HAS PERSONAL JURISDICTION OVER THE DEFENDANTS AND

  EVEN WITHOUT DISCOVERY, PLAINTIFF HAS SHOWN GENERAL AND SPECIFIC

  JURISDICTION ....................................................................................................................... 26

IV.  CONCLUSION ................................................................................................................... 33

i

## __TABLE OF AUTHORITIES__

**Cases**

*Albert v. Carovano*, 851 F.2d 561, 571 n.3 (2d Cir. 1988) ............................................................ 6

*Amigo Foods Corp. v. Marine Midland Bank-New York*, 39 N.Y.2d 391, 396, (1976) .............. 17

*Andrew S. v Gristina*, 97 AD3d 651, 652, 950 N.Y.S.2d 137 (2nd Dep't 2012). ....................... 26

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ........................................................................... 5, 16

*Assocs. v. Brodsky*, 257 AD 2d 526, 529 (1st Dep't 1999) ........................................................... 23

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007) ........................................................ 16

*Boyle v N. Salem Cent. Sch. Dist.,* 208 AD3d 744 (2d Dept 2022); ............................................ 25

*Brown v Quiniou*, 2003 US Dist LEXIS 6257, at *9 (SDNY Apr. 15, 2003) ............................. 13

*Cantor v. Levine*, 495 N.Y.S.2d 690 (2d Dep't 1985) ................................................................. 17

*Chamberlain v. City of White Plains*, 986 F. Supp. 2d 363, (S.D.N.Y. 2013) ............................ 20

*Chase Manhattan Bank, N.A. v. Celotex Corp*., 56 F.3d 343, 346 (2d Cir. 1995) ...................... 11

*Cohn v. Lionel Corp*., 21 N.Y.2d 559 (1968) .............................................................................. 20

*Cosmos Mason Supplies, Inc. v. Lido Beach Associates, Inc.,* 95 A.D.2d 818, (2d Dep't 1983). 17

*Denson v. Donald J. Trump for President, Inc*., 2021 N.Y. Slip Op. 32095(U), 2021 N.Y. Misc.

   LEXIS 5428, at *8 (Sup. Ct. N.Y. Cty. Oct. 26, 2021) ........................................................... 11

*Deutsche Bank Sec., Inc. v Montana Bd. of Investments*, 7 N.Y.3d 65, 71 (2006) ...................... 28

*Deutsche Bank Secs., Inc. v. Mont. Bd. of Invs*., 7 N.Y.3d 65, 71 (N.Y. 2006) ........................... 28

*Doe v Enlarged City Sch. Dist. of Middletown*, 195 AD3d 595 (2d Dept 2021) ......................... 25

*Doe v. Alsaud*, 12 F. Supp. 3d 674, 677 (S.D.N.Y. 2014) ........................................................... 21

*Doe v. Trump*, S.D.N.Y. 1:16-cv-04642 .................................................................................... 15

*Dolgas v. Wales*, 2023 WL 2795845 (N.Y. App. Div. Apr. 6, 2023) .......................................... 22

*Dowd v. DeMarco*, 314 F. Supp. 3d 576, 588 (S.D.N.Y. 2018) ................................................. 21

*Dutton v. Young Men's Christian Ass'n of Buffalo Niagara*, 171 N.Y.S.3d 276, 280 (4th Dep't 2022) ............................................................................................................... 22, 23

*Edwardo v Roman Cath. Bishop of Providence*, 66 F.4th 69 (2d Cir. 2023) .............................. 26

*Fischbarg v. Doucet*, 9 N.Y.3d 375, 380 (N.Y. 2007).................................................................. 28

*Ford v. Grand Union Co.*, 197 N.E. 266, 268–69 (N.Y. 1935).................................................... 10

*G.G. v. Salesforce.com*, 603 F. Supp. 3d 626, 644 (N.D. Ill. 2022) .............................................. 7

*Gafco, Inc. v. H.D.S. Mercantile Corp.*, 47 Misc.2d 661, 664 (Sup. Ct., N.Y. County 1965)..... 23

*George v Windham*, 169 AD3d 876 (2d Dept 2019) .................................................................... 25

*Girard v. 94th St. & Fifth Ave. Corp.*, 530 F.2d 66 (2d Cir.) ..................................................... 20

*Giuffre v Dershowitz,* 2021 US Dist LEXIS 218528 (SDNY Nov. 10, 2021) ............................... 9

*Greater Chautauqua Fed. Credit Union v. Marks*, 2023 U.S. Dist. LEXIS 57087, *24 n. 25 (SDNY Mar. 31, 2023) ........................................................................................................ 16

*Greenberg v. Board of Governors of the Fed. Reserve Sys.*, 968 F.2d 164, 168 (2d Cir. 1992) .. 10

*Hain v. Jamison*, 68 N.E. 3d 1233, 1236-37 (N.Y. 2016) ........................................................... 10

*In re Layo*, 460 F.3d 289, 292-93 (2d Cir. 2006)........................................................................ 13

*Doe v Deutsche Bank AG., 2023 US Dist LEXIS 75503, [SDNY May 1, 2023, No. 22-cv-10018 (JSR)]* ..................................................................................................................... passim

*Johnson v City of Shelby,* 574 US 10 (2014) ................................................................................ 5

*Kenneth R. v R.C. Diocese*, 229 AD2d 159 (2d Dept 1997)........................................................ 25

*Kenneth R. v Roman Catholic Diocese of Brooklyn*, 229 AD2d 159, 161, (2nd Dep't 1997)...... 26

*LaMarca v. Pak-Mor Mfg. Co.,* 95 N.Y.2d 210, 216 (N.Y. 2000) .............................................. 29

*Legeno v. Corcoran Group*, 308 Fed. Appx. 495, 497 (2d Cir. 2009) ......................................... 17

*LG 40 Doe v. Robert L. Eberhardt*, Erie County Supreme Court Index No. 805762/2020.... 22, 25

*LG 67 Doe v Resurrection Lutheran Church*, 75 Misc 3d 327 (Sup Ct, Erie County 2022)........ 13

iii

*Licci ex rel. Licci v. Lebanese Canadian Bank*, 732 F.3d 161 (2d Cir. 2013)........................ 28, 29

*L-Tec Elcs. Corp. v. Cougar Elec. Org., Inc.*, 198 F.3d 85, 87-88 (2d Cir. 1999) ...................... 10

*M.C. v. State*, 163 N.Y.S.3d 741, 753 (N.Y. Ct. Cl. 2022)...................................................... 22, 25

*Martinez v. JRL Food Corp.*, 194 A.D.3d 488 (1st Dep't 2021) .................................................. 12

*Maurizi v. Callaghan* ................................................................................................................. 22

*McLeod v. Jewish Guild for the Blind* ........................................................................................ 6

*Medtech Products Inc. v. Ranir*, LLC, 596 F. Supp. 2d 778, 795 (S.D.N.Y. 2008).................... 20

*MFS/Sun Life Trust v. Van Dusen Airport Servs.*, 910 F. Supp. 913, 935 (S.D.N.Y. 1995) ........ 23

*Nassau County Employee "L" v. County of Nassau*, 345 F. Supp. 2d 293, 305 (E.D.N.Y. 2004) 21

*Noble v. Weinstein*, 335 F. Supp. 3d 504, 524 (S.D.N.Y. 2018) ..................................................... 7

*Northern Ins. Co. of Am. v. Square D. Co.*, 201 F.3d 84, 87 (2d Cir. 2000) ............................... 14

*Parke-Bernet Galleries, Inc. v Franklyn*, 26 NY2d 13, 17 (1970) ............................................. 27

*PB-36 Doe v. Niagara Falls City School District*, 152 N.Y.S.3d 242, 245............................ 22, 25

*Porina v. Marward Shipping Co.*, 521 F.3d 122, 126 (2d Cir. 2008)........................................... 27

*Presidential Realty Corp. v Michael Sq. W., Ltd.*, 44 NY2d 672, 673 ( N.Y. 1978).................... 28

*Rushaid v. Pictet & Cie*, 28 N.Y.3d 316, 331 (N.Y. 2016) .......................................................... 29

*S. New Eng. Tel. Co. v Global NAPs Inc.*, 624 F3d 123, 138 (2d Cir. 2010) .............................. 27

*S.C. v New York City Dept. of Educ.*, 949 N.Y.S.2d 71 (2nd Dep't 2012).................................... 26

*Sheppard v United States Tennis Assn. Inc.*, 199 AD3d 846, 847 (2nd Dep't 2021) ................... 26

*Shor v Touch-N-Go Farms, Inc.* 933 N.Y.S.2d 686 (2nd Dep't 2011).......................................... 26

*Siegelman v. Cunard White Star Ltd.*, 221 F.2d 189, 196 (2d Cir. 1955)...................................... 6

*Skinner v. Switzer*, 562 U.S. 521, 530 (2011) ............................................................................... 5

*Smith v. Campbell*, 782 F.3d 93, 99 (2d Cir. 2015) ...................................................................... 6

*State of New York v. Vayu*, 2023 N.Y. Slip Op. 801, 2023 WL 1973001 (February 14, 2023) ... 27

iv

*United States v. Farah*, 766 F.3d 599, 612 (6thCir. 2014) ............................................................ 8

*WCVAWCK-Doe v Boys & Girls Club of Greenwich, Inc.,* AD3d, 2023 NY Slip Op 02026, at *2

   (2nd Dep't 2023)............................................................................................................. 27

*Wilson v Dantas*, 128 A.D.3d 176, 182-83 (1st Dep't 2015)........................................................ 28

**Statutes**

Child Victims Act ..................................................................................................... 2, 25

**Rules**

CPLR § 214-g .................................................................................................. 2, 13, 22, 25

## I.   <u>INTRODUCTION</u>

This is a classic case of "Truth vs. Power and Money" where the rich and powerful enablers of Jeffrey Epstein led to the sexual assault of a teenage girl on the Upper East Side of Manhattan. There is an inseparable link between each of the named defendants' (each hereinafter individually a "Defendant", or collectively "Defendants") and Jeffery Epstein as facilitators of his well-known pedophile and sexual trafficking ring run, in part, out of 9 East 71st Street, New York, NY 10021 (the "Property"), while there is evidence the property was owned by an entity in which Leslie Wexner held 100% of the shares. (Doc. No. 40-11 ¶¶5-6; Affirmation Matthew J. Simon Esq. annexed to the Affirmation of Robert J. Hantman as Exhibit 2, or "Hantman Aff.").

If Defendants had no connection to, and played no material role in Epstein's pedophile activities, Wexner, through his excellent legal team could simply produce the financial and legal documents that show the flow of funds relating to the Property which enabled Epstein's assault of Plaintiff, instead of avoiding discovery. Further, if this case was so simple as to afford dismissal pre discovery, the Defendants' arguments beg the question: why was it necessary to request an extra ten pages in Defendants' memorandum?

Just as Epstein had the illustrious legal team including Alan Dershowitz; Kirkland and Ellis, Jay Lefkowitz, Alexander Acosta, former U.S. Labor Secretary, and Ken Starr; the Law Office of Marc Fernich; and Troutman Pepper LLP – to defer and deflect his actions – so too does Leslie Wexner have Marion Little of Zeiger, Tigges & Little LLP. However, Plaintiff, Jennifer D. Araoz ("Plaintiff") and our firm are confident that if afforded the opportunity to take proper discovery and question witnesses such as Ghislaine Maxwell and others, the playing field will be leveled and the rich and powerful will be made to answer for their actions.

If, after reasonable discovery, Defendants can prove that they had no part in the enabling of Jeffrey Epstein which resulted in harm to Plaintiffs, then the case can be resolved at the summary judgment stage. Ms. Araoz is hopeful that after she has had a fair and impartial opportunity to be heard, there will be no doubt of the pivotal role that Defendants played in the terror brought upon her at such a young and tender age.

## II. BACKGROUND AND PROCEDURAL HISTORY

Plaintiff incorporates by reference the factual allegations of her First Amended Verified Complaint in the Instant Action. (Doc. No. 36 "FAVC").[1] Tellingly, nowhere in Defendants' motion do they acknowledge that the state court action now complained of was filed by Plaintiff – *pro se* – on August 14, 2021, in the Supreme Court of the State of New York, County of Queens, under New York's Child Victims Act ("CVA"), (*see* CPLR § 214-g) (the "Initial Action"). Nor do they explain why a motion for relief sought here was not filed there, especially in respect to the issue of *res judicata*, seemingly an afterthought to the Defendants.

Plaintiff's Initial Action alleged that that she was a victim of the well-known pedophile and sex trafficking operation orchestrated by Jeffery Epstein at the Property, owned at least one time, and now believed at the time of her harms, by an entity in which Leslie Wexner held 100% of the shares. (Doc. No. 40-11 ¶¶5-6). Defendants removed the Initial Action to this Court on January 7, 2022, pursuant to 28 U.S.C. § 1441. (Doc. No. 1).

From the outset Plaintiff sought to verify her belief that Defendant Leslie Wexner, ("Wexner"), or one of his shell corporations, owned the Property at the time of the Plaintiff's grooming and assault which occurred between the fall of 2001through 2002, and whether his acts

---

[1] At the outset counsel regrets that the amended verified complaint in the Instant Action (defined below) was not modified in a more restricted and concise manner, but due to Defendants' purposeful obscuring of their involvement in the harms Plaintiff suffered, without discovery, to unilaterally limit Plaintiff's claims would not be effective advocacy.

or omissions contributed to Epstein's wrongdoing. There is no doubt that Epstein's improper actions were generally known to Wexner at the time, as they were very close friends, and Epstein touted his Victoria's Secret connection as a trap for aspiring models. (FAVC ¶¶57-98; Hantman Aff. ¶¶4-29).[2] Since then, and as set forth more fully herein, Ms. Araoz uncovered further proof of the relationship at issue, and Wexner's enabling and abetting of the harm that Ms. Araoz and countless other women endured.

The undersigned was originally retained to attempt to resolve the matter without further court intervention. Informal discovery was conducted, and Plaintiff suggested to the Magistrate Judge the appointment of an independent expert to decide the issue of ownership over the Property, which would have avoided Defendants' Motion. Instead, Defendants refused the suggestion and demanded that Plaintiff file her complaint. Defendants proceeded under a plethora of technical grounds, including the unsuccessful attempt to disqualify Plaintiff's counsel. (Doc. Nos. 23, 24, 28, 31, 37, 39, and 40).

In spite of Defendants effort to avoid discovery in this action brought under the CVA, in harmony with its legislative intent, Defendants' motion to dismiss, while failing to provide material information regarding the Property as stated in the Affirmation of Matthew J. Simon, Esq. (Exhibit 2) only serve to underscore the numerous material issues of fact which support a denial of Defendants motion. It is especially telling that Defendants only now have produced affidavits and documents previously withheld regarding the ownership of the Property which only serve to highlight that this case should not be dismissed as a matter of law.

---

[2] *See also* Gabriel Sherman, "*The Mogul and the Monster: Inside Jeffrey Epstein's Decades-Long Relationship With His Biggest Client*", VANITY FAIR,  June 8, 2021 https://www.vanityfair.com/news/2021/06/inside-jeffrey-epsteins-decades-long-relationship-with-his-biggest-client

Further, the numerous affidavits and exhibits submitted by Defendants fail to refute the Plaintiff's factual allegations. Tellingly, neither Les Wexner, Abigail Wexner, or their security persons who resided in the Property while Epstein also resided there denied knowledge of Epstein's crimes, denied that they supported them, or denied that they employed the Named Employees[3] and unnamed employees as alleged in the FAVC. (Doc. Nos. 40-8, 40-11, and 40-15).

Notably, three other recent cases have been filed in the Southern District of New York alleging third parties had knowledge of and helped facilitate Epstein's sex trafficking ring: *Jane Doe 1 v. Deutsche Bank AG et al*, S.D.N.Y. No. 22-10018; *Jane Doe 1 v. JPMorgan Chase & Co*, S.D.N.Y. No. 22-10019; *Government of the U.S. Virgin Islands v. JPMorgan Chase Bank NA*, S.D.N.Y. No. 22-10904.

In the above actions, two Doe plaintiffs claimed that Epstein could not have run his operation without ready access to cash through the banking system. *Doe v Deutsche Bank AG.*, 2023 US Dist LEXIS 75503, at *4 [SDNY May 1, 2023, No. 22-cv-10018 (JSR)].)[4] They accuse JP Morgan of knowingly financially supporting and enabling Epstein's crimes, and failing to file suspicious activity reports with authorities regarding Epstein's financial transactions. *Id*. at 4-7. The Doe defendants also alleged that one ultimate source of JP Morgan's alleged knowledge was James Staley, who headed JP Morgan's private banking division and serviced Epstein's accounts. *Id*. at 7. They alleged that Stanley had become Epstein's close friend, was firsthand witness of his crimes against the Doe defendants, and even perpetrated the same crimes. *Id*. The

---

[3] As set forth in the First Amended Verified Complaint - Ghislaine Maxwell ("Ms. Maxwell"), Rosalyn S. Fontanilla A.K.A. Lynn Fontanilla ("Ms. Fontanilla") referred to in the First Amended Verified Complaint as the "Maid,", Lesley Groff ("Ms. Groff"), referred to in this First Amended Verified Complaint as the "Secretary," and Ms. Espinosa. ("Named Employees")
[4] This is the lead case; however, the decision was filed in all three cases.

Doe plaintiff's claims against Deutsche Bank are similarly couched on such defendants knowingly enabling Epstein's crimes with financial services. *Id*. at 8-11.

Significantly, Judge Jed S. Rakoff presiding over all three of the cases denied motions to dismiss in each on May 1, 2023, after Plaintiff here had filed her FAVC clarifying points of law as detailed herein.

In this case the link and nexus between Epstein and Defendant Wexner – and related parties – is much stronger, indisputable, and publicly known as detailed in the Affidavit of Jennifer Araoz submitted herewith as Exhibit 1, the Affirmation of Matthew J. Simon, Esq., submitted herewith as Exhibit 2, the Affirmation of Robert J. Hantman, Esq., and the additional sworn affidavits, transcripts, documents, news articles, and documentaries, referenced therein and annexed thereto, and as set forth hereafter.

### III. LEGAL ARGUMENT

### A.    The Plaintiff Is Not Limited Only To Legal Theories Expressly Stated In Her Complaint

Complaints must plead facts, not law. Under Federal Rule of Civil Procedure 8(a), a complaint must contain "a short and plain statement of the claim." The Supreme Court has read Rule 8 to require that factual allegations meet a threshold "plausibility standard." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The courts have consistently read the rule to eschew any requirement that complaints link those allegations "to a precise legal theory." *Skinner v. Switzer*, 562 U.S. 521, 530 (2011). In *Johnson v. City of Shelby*, the Supreme Court confirmed that when plaintiffs provide a sufficient "factual basis for their complaint," they are "required to do no more to stave off threshold dismissal for want of an adequate statement of their claim." 574 U.S. 10, 12 (2014) (per curiam).  While there exists a current circuit split as to whether a plaintiff can invoke new legal theories not expressly stated in the complaint at summary judgement stage, the

Second Circuit has made clear it is among the circuits which does allow such additional invocations. In *McLeod v. Jewish Guild for the Blind*, the Second Circuit Court of Appeals held that a plaintiff could rely on state and municipal human-rights statutes at summary judgment – even though she didn't cite them in her complaint. 864 F.3d 154, 158 (2d Cir. 2017). The court explained that a plaintiff isn't barred from asserting a legal theory for "failure to cite a statute, or to cite the correct one. Factual allegations are alone what matters." *Id*. (citing *Albert v. Carovano*, 851 F.2d 561, 571 n.3 (2d Cir. 1988) (*en banc*)); *see also Smith v. Campbell*, 782 F.3d 93, 99 (2d Cir. 2015); *Siegelman v. Cunard White Star Ltd*., 221 F.2d 189, 196 (2d Cir. 1955) ("Under Rule 8 … [i]t is not necessary to set out the legal theory on which the claim is based.").

This point is clearly supported in recent cases and the decision by Judge Jed S. Rakoff, which provided insight into the applicability and viability of 28 legal claims against both individuals and business entitles that aided and abetted in Epstein's crimes. *Doe*, 2023 US Dist LEXIS 75503. Specifically, in light of the analysis set out by Judge Rakoff, Plaintiff here has stated causes of action arising under the federal Trafficking Victims Protection ACT,  ("TVPA") and the Racketeering Influenced and Corrupt Organizations Act ("RICO"). *Doe*, 2023 US Dist LEXIS 75503.

A violation of TVPA Participation per 18 U.S.C. § 1591(a)(2) involves three elements: 1) the defendant must have participated in a commercial sex trafficking venture, 2) the defendant must have known (or recklessly disregarded) that force, fraud, or coercion would be used in the sex-trafficking venture, and 3) the defendant must have benefited from its participation in the venture. *Id*. at 23-24.

Taking Plaintiff's factual allegations as true, in light of the numerous times Wexner was warned and notified of Epstein's behavior, and the numerous times he covered them up as opposed to stopping them as he had promised, it is clear that Wexner, and potentially his wife and the entity defendants named herein perpetrated "specific conduct that furthered the sex trafficking venture," *Noble v. Weinstein*, 335 F. Supp. 3d 504, 524 (S.D.N.Y. 2018),  that was "more than just passive facilitation, but some level of active engagement." *G.G. v. Salesforce.com*, 603 F. Supp. 3d 626, 644 (N.D. Ill. 2022). Undoubtably, the link between Epstein and the Defendants is much stronger than the nexus between banking institutions and Epstein.

Again, based upon the numerous sworn testimonies, court documents, documentaries, and journalistic news articles outlining the relationship between Wexner and Epstein, and the heinous violent crimes perpetrated by Epstein, it is undisputable that Wexner, and potentially his wife, and through them their related entities, knew, or recklessly disregarded the fact that, "force, fraud, or coercion" was used to "cause [a] person to engage in a commercial sex act… or that the person has not attained the age of 18 years and will be caused to engage in a commercial sex act." 18 U.S.C. § 1591(a)(2). Judge Rakoff went further to clarify that such "[k]nowledge, therefore, is required with respect to the venture, not with respect to any particular person." *Doe*, 2023 US Dist LEXIS 75503 at *28.

As for the final element of 18 U.S.C. § 1591(a)(2), benefit, it is undisputed that Epstein was Wexner's personal financial manager and was listed as president of Defendant New Albany Company LLC, in its 1998 registration document. (FAVC ¶¶ 21, 42)  Further, Epstein served as an officer of New Albany until 2007, (FAVC ¶42)[5] Epstein served as a trustee of Defendant

---

[5] An allegation unchallenged by the Affidavit of William G. Ebbing, President & CEO of The New Albany Company LLC. (Doc. No. 40-18)

Wexner Foundation, from 1992 to 2007(FAVC ¶23)[6] and Epstein served as Vice President of

Defendant Wexner Family Charitable Fund from 2001 to 2004. (FAVC ¶24)[7] Epstein was also

trustee of other non-defendant Wexner entities such as Health and Science Interests, Health and

Science Interests II, International Charitable Interests. Epstein also provided services as the

trustee over Wexner's children's trusts. (FAVC¶¶67-68; Emily Steel, Steve Eder, Sapna

Maheshwari and Matthew Goldstein, "*How Jeffrey Epstein Used the Billionaire Behind*

*Victoria's Secret for Wealth and Women*", THE NEW YORK TIMES, July 25, 2019,

https://www.nytimes.com/2019/07/25/business/jeffrey-epstein-wexner-victorias-secret.html).

Judge Rakoff's decision also explained the applicability of liability for Obstructing

TVPA Enforcement pursuant to TVPA. 18 U.S.C. § 1591(d) upon persons and entities involved

in Epstein's sex trafficking. *See Doe*, 2023 US Dist LEXIS 75503 at *32-33. "For a defendant to

be liable for obstructing the enforcement of the TVPA, it must (1) know of an effort to enforce

the TVPA and (2) intentionally obstruct or attempt to obstruct that enforcement effort. *See*

*United States v. Farah*, 766 F.3d 599, 612 (6thCir. 2014). Judge Rakoff held that the defendants'

knowledge of Epstein's crimes and the investigations into them coupled with his use of their

services as an asset, and their failure to report Epstein could arise to a violation of 18 U.S.C. §

1591(d). *Doe*, 2023 US Dist LEXIS 75503 at *34.

Here, Plaintiff has also alleged facts to support liability for direct perpetration of sex-

trafficking. A direct perpetrator of sex trafficking is someone who knowingly "recruits, entices,

harbors, transports, provides, obtains, advertises, maintains, patronizes, or solicits" an underage

person to engage in a commercial sex act or does the same to an adult by means of force, fraud,

---

[6] An allegation unchallenged by the Affidavit of Rabbi Barbara Elka Abrahamson, President of The Wexner Foundation.(Doc. No. 40-16)

[7] An allegation unchallenged by the Affidavit of Peggy W. Ugland, Treasurer of The Wexner Family Charitable Fund. (Doc. No. 40-17)

or coercion. 18 U.S.C. § 1591(a)(1); *see also Doe*, 2023 US Dist LEXIS 75503 at *35. If it is true, and notably Defendants have not denied, that the Named Employees and unnamed employees, were employees or agents of the Defendants, then their direct actions[8] would arise to a violation of the statute.

    Here, Plaintiff has also alleged facts to support liability for conspiracy to violate the TVPA. *Doe*, 2023 US Dist LEXIS 75503 at *40. Plaintiff alleged in her First Amended Verified Complaint, and the evidence submitted in the affidavits and exhibits herewith, establish that Wexner was repeatedly warned by his other employees and business associates regarding Epstein's sexual crimes, but instead of correcting these issues or removing Epstein's access to Wexner's vast fortune and physical assets, Wexner instead increased Epstein's access, hid his crimes, and even participated in the sex crimes himself, evidencing such an agreement to jointly participate in sex trafficking. *Giuffre v Dershowitz*, 2021 US Dist LEXIS 218528 (SDNY Nov. 10, 2021); (Hantman Aff. ¶¶5-47.

    Similarly, Judge Rakoff's decision also explains the applicability of RICO claims as against Epstein associates. *Doe*, 2023 US Dist LEXIS 75503 at *42. Here, taking Plaintiff's allegations as true, Wexner exerted some control over and directed the sex trafficking enterprise by employing the Named Employees and unnamed employees, and providing Epstein and others

---

[8] Such as: 1) recruiting young females, including minor children such as Plaintiff, to provide massages; 2) creating Jeffrey Epstein's massage schedule; 3) maintaining Jeffrey Epstein's massage schedule; 4) escorting various young females into the massage room at the Property; 5) maintaining contact with the various young females who were recruited to the Property for the purposes of providing Jeffrey Epstein with a massage; 6) providing compensation to each young masseuse upon the completion of her engagement with Jeffrey Epstein; 7) providing meals and food and other services to the young females in order to provide an air of legitimacy to the functions of the corporation; 8) providing hospitality services to the young females in order to provide an air of legitimacy to the functions of the corporation; 9) providing educational services; 10) providing medical services; 11) providing transportation services; 12) providing housing services; 13) providing various other enticements to ensure the continued cooperation of the various young female masseuse with Defendants' and Epstein's objective; 14) encouraging individuals, including the females who were recruited to the house to provide a massage to recruit other young females to engage in the same activity for Jeffrey Epstein; and 15) coordinating together and with Jeffrey Epstein to convey a powerful and legitimate enterprise system capable of gaining cooperation from young females recruited for massage, often minors such as Plaintiff. (FAVC ¶219)

such as Maxwell with money, cars, jet planes, and notably the Property, among other real estate and assets. (Doc. No. 36; Exh. D., Affirmation of Matthew Simon - Exhibit 2).

Finally, Judge Rakoff's decision also solidified that the "[defendants], like everyone else, owed [plaintiff] the ordinary duty of reasonable care. This duty can extend to actions undertaken by third parties. *Doe*, 2023 US Dist LEXIS 75503 at *46; *and see* Restatement (Third) of Torts: Phys. & Emot. Harm § 19 ("The conduct of a defendant can lack reasonable care insofar as it foreseeably combines with or permits the improper conduct of the plaintiff or a third party."); *Ford v. Grand Union Co.*, 197 N.E. 266, 268–69 (N.Y. 1935) (defendant owes a duty to avoid injury to others "by forces set in motion" by the defendant). Further, "[w]hen an alleged injury is caused by an intervening criminal act, such as sexual abuse, the defendant's conduct is a proximate cause only when that intervening act is "a natural and foreseeable consequence of a circumstance created by [the] defendant." *Hain v. Jamison*, 68 N.E. 3d 1233, 1236-37 (N.Y. 2016). As stated herein and in the record before the court, the Defendants, and particularly Wexner, knew or should have known that his actions and non-actions not only sustained but were the primary facilitators of Epstein's crimes. *Doe*, 2023 US Dist LEXIS 75503 at *48.

## B.      The Instant Action Is Not Barred By Res Judicata

The Second Circuit has held that *res judicata*, or claim preclusion, "prevents a plaintiff from relitigating claims that were or could have been raised in a prior action against the same defendant where that action has reached a final judgment on the merits." *L-Tec Elcs. Corp. v. Cougar Elec. Org., Inc.*, 198 F.3d 85, 87-88 (2d Cir. 1999); *see also Greenberg v. Board of Governors of the Fed. Reserve Sys.*, 968 F.2d 164, 168 (2d Cir. 1992).

### 1.  *Res Judicata Does Not Apply Because the Issues and Facts Involved in the Initial Action and This Action are Different.*

A "formalistic approach" to privity is shunned – rather it should be examined as whether

the newly named defendants share an interest with those named in the first action. *Chase Manhattan Bank, N.A. v. Celotex Corp*., 56 F.3d 343, 346 (2d Cir. 1995). Here, there is no shared interest between any defendant in the Plaintiff's former action against the Epstein estate, *Araoz v. The Estate of Jeffrey Edward Epstein, et al.*, Supreme Court of the State of New York, County of New York, Index No. 950010/2019, (the "State Action"), and any Defendant in the Instant Action. Indeed, as set forth in the Hantman Affirmation, recently obtained public information evidence that Defendants are independently liable for their own negligent and intentional acts that led to the sexual assaults that occurred on the Property and environment it harbored for Mr. Epstein.

The application of *res judicata* requires the claim sought to be resolved to have been "reasonably and plainly comprehended to be within the scope" of the State Action. *Denson v. Donald J. Trump for President, Inc*., 2021 N.Y. Slip Op. 32095(U), 2021 N.Y. Misc. LEXIS 5428, at *8 (Sup. Ct. N.Y. Cty. Oct. 26, 2021) (*res judicata* claim rejected because "it cannot by any measure be concluded that the substantive issues underlying [p]laintiff's New York City Human Rights Law §8-107[7] were comprehended to be within the scope of either proceeding").

Here, Plaintiff was not aware at the time during the State Action, nor when she executed the stipulation of discontinuance filed in the State Action, that the Defendants in the Instant Action owned the Property where she was assaulted, nor that they employed or controlled employees at the Property, nor that Epstein was essentially bankrolled by Wexner. (Araoz Affidavit, ¶ 3-4, 8; Hantman Aff. ¶45). None of the Defendants here were parties to the State Action. Thus, the stipulation discontinuing a prior lawsuit was not intended to encompass Plaintiff's current claims as to Mr. Wexner's liability, and that of his companies, which are wholly separate from the claims against Mr. Epstein and involve an entirely different set of facts.

The claims herein do not <u>only</u> arise from Epstein's status as an employee. Indeed, even the passages quoted by the Defendants from the First Amended Verified Complaint highlight the focus of this action and its nucleus of fact whereupon the Defendants or other companies they owned and operated – which Plaintiff hopes discovery will clarify – as being distinct from those in the State Action. (Defendants' Memorandum, pages 12-13).

Thus, while the general history of Plaintiff's grooming and assault are unchallenged, the causes of action in this lawsuit rely upon entirely different facts as those in the State Action. The issues involved in the State Action concern different factual predicates from the Instant Action. Thus, the Instant Action is not barred by the doctrine of *res judicata*. *See, e.g., Martinez v. JRL Food Corp.*, 194 A.D.3d 488 (1st Dep't 2021) (action commenced after plaintiff discovered true accident location was not barred by *res judicata*, where prior actions were commenced against parties believed to have ownership and control of the incorrect premises).

Plaintiff's claims in the State Action are not determinative of Defendants' negligence and vicarious theories brought here under CVA, and as even more recently fleshed out by Judge Rakoff. *Doe*, 2023 US Dist LEXIS 75503. Liability for Mr. Epstein's entities listed in the State Action involve completely different questions of fact, which resolved the direct responsibility for the assaults, and thus does not have bearing on Mr. Wexner's negligence and intentional actions and his failure to supervise his own companies, properties, and employees. Rather, in the Instant Action, much more than a simple oversight of security is alleged and Plaintiff's claims paint a picture of an environment where Mr. Wexner and his companies harbored, and even encouraged, Epstein's sex abuse and pedophilic activities.

As outlined above, nothing in the State Action posits that the liability of the Defendants' here was indispensable to the State Action. Nor was it contemplated in the legislative

development of the CVA, that all the attenuated liability to redress a harm must be heard in a single action. The CVA was created to seek justice against abusers "and the institutions who may have harbored them."[9]  CPLR § 214-g; *LG 67 Doe v Resurrection Lutheran Church*, 75 Misc 3d 327 (Sup Ct, Erie County 2022).

### 2. *Res Judicata Does Not Apply Because the Instant Action Is Based on New Evidence That Did Not Exist at the Time of the Initial Action.*

Generally, newly discovered evidence does not preclude the application of *res judicata*. However, there are two exceptions to this rule: (1) the evidence was fraudulently concealed; (2) the evidence could not have been discovered with due diligence.  *In re Layo*, 460 F.3d 289, 292-93 (2d Cir. 2006).

Here, no amount of due diligence could have been made to discover the evidence pertaining to the Instant Action, as Plaintiff was not aware at the time during the State Action or when she executed the stipulation of discontinuance filed in the State Action, that the Defendants in the State Action owned the Property where she was assaulted, or that they employed or controlled employees at the Property. Indeed, the State Action named 34 defendants, none of which are named in Instant Action.[10]

As the honorable Constance Baker Motley explained, "[c]laim preclusion operates in two ways: it bars claims that were brought and decided in the prior litigation, and it bars all other claims relating to the same transaction against the same defendant that could have been brought at the same time." *Brown v Quiniou*, 2003 US Dist LEXIS 6257, at *9 (SDNY Apr. 15, 2003);

---

[9] "Governor Hochul Signs Adult Survivors Act", New York State Governors Website, Assembly member Linda Rosenthal quoted https://www.governor.ny.gov/news/governor-hochul-signs-adult-survivors-act.

[10] Notably, about a month before CVA went into effect and a claim was ripe against Epstein, on July 10, 2019, Plaintiff filed the Initial Action in New York Supreme Court against Epstein, under Index number 156728/2019. The Initial Action was entitled Petition for a Pre-Action Disclosure pursuant to CPLR 3102(c). Plaintiff sought the identity of Plaintiff's recruiter, various pre-trial discovery, and Epstein's deposition. Plaintiff attached a copy of the to-be-filed complaint as an exhibit. In opposition, Epstein claimed his deposition would be pointless because would plead his Fifth Amendment rights against self-incrimination on each claim, before becoming moot due to his death.

*and see Northern Ins. Co. of Am. v. Square D. Co.*, 201 F.3d 84, 87 (2d Cir. 2000). However, the Defendants in the Instant Action were <u>not</u> defendants in the earlier case.

For example, as set forth in the Hantman Affirmation, the evidence released or discovered by the Plaintiff only <u>after</u> the State Action, includes the Vanity Fair article outlining the years of warnings various people gave to Wexner regarding Epstein's crimes, (Hantman Aff. ¶¶5-7, 12, 24), Ghislaine Maxwell 2020 unsealed deposition, (Hantman Aff. ¶¶26-27) documentaries and other news articles, (Hantman Aff. ¶¶16, 21-22, 27, 32, 37-38, 44, 45), and recent civil actions and criminal trials. (Hantman Aff. ¶¶17-20, 25-31, 33, 46-47). There was nothing Plaintiff could have done to discover this evidence in the State Action. Specifically, Wexner and his legal team have gone through great efforts to keep his name under seal and out of public filings (Hantman Aff. ¶¶ 27-31).

Further, Wexner, Epstein, Maxwell, and their agents and employees were notorious for utilizing deceit, covert and overt threats, and coercion to keep their victims silent. Indeed, the Plaintiff here has testified that she did not have any knowledge of Les Wexner's negligent and intentional acts or omissions at all relevant times during the prosecution of the State Action, nor did she when she was a 14 year old girl when the initial harms took place (Jennifer Araoz Affidavit ¶¶2-4, 6, 9) and that she now realizes everything Epstein told her about himself was lie (Jennifer Araoz Affidavit ¶7) and that "Wexner, Epstein, the employees and agents that worked for them, and others covered up Mr. Wexner's involvement and continue to do so, both in court in the various actions surrounding the sex tracking ring, and outside of court" (Jennifer Araoz Affidavit ¶11).[11] During her grooming Plaintiff was plied with alcohol, (FAVC ¶119), paid cash

---

[11] Notably, about a month before CVA went into effect and a claim was ripe against Epstein, on July 10, 2019, Plaintiff filed a Petition for a Pre-Action Disclosure pursuant to CPLR 3102(c) in a separate action in New York Supreme Court against Epstein, under Index number 156728/2019. Plaintiff sought the identity of Plaintiff's recruiter, various pre-trial discovery, and Epstein's deposition. Plaintiff attached a copy of the to-be-filed complaint as an exhibit. In

compensation to entice her to conceal the activities and to normalize the activities, (FAVC ¶134), and the security, various employees, elaborateness and grandness of the Property all contributed to the Plaintiff feeling as though "there was no feasible or safe means of escape" (FAVC ¶¶118 and 133).

Indeed, other victims have highlighted the coercion, duress, threats, and brutal physical harm that they sustained or witnessed others sustain in efforts to shroud Epstein's actions and the involvement of his co-conspirators. For example, in the action *Doe v. Trump*, S.D.N.Y. 1:16-cv-04642, a Jane Doe sued Epstein and Donald Trump alleging multiple brutal assaults at the Property. During this *Doe v. Trump* action another woman utilizing the Tiffany Doe pseudonym submitted a sworn declaration. *Doe v. Trump*, 1:16-cv-04642, S.D.N.Y. Doc. No. 1-2. In this declaration Tiffany Doe states that she was hired to solicit adolescent women to attend parties thrown by Epstein between 1991-2000,  "most of which were held at [the Property]." *Doe v. Trump,* 1:16-cv-04642, S.D.N.Y. Doc. No. 1-2 at ¶4. During these parties Tiffany Doe alleges she that she witnessed Trump and Epstein physically threaten life and well-being of the girls they assaulted and that she personally received death threats against herself and her family if she ever disclosed the abuse of minors that she witnessed at the Property. *Id.* at ¶¶13-16.[12]

---

opposition, Epstein claimed his deposition would be pointless because would plead his Fifth Amendment rights against self-incrimination on each claim, before becoming moot due to his death.

[12] "12. I personally witnessed Mr. Trump physically threaten the life and well-being of the Plaintiff if she ever revealed any details of the physical and sexual abuse suffered by her at the hands of Mr. Trump.

13. I personally witnessed Mr. Epstein physically threaten the life and well-being of the Plaintiff if she ever revealed the details of the physical and sexual abuse she suffered at the hands of Mr. Epstein or any of his guests.

14. I personally witnessed Defendant Trump telling the Plaintiff that she shouldn't ever say anything if she didn't want to disappear like the 12-year-old female Maria, and that he was capable of having her whole family killed.

15. After leaving the employment of Mr. Epstein in the year 2000, I was personally threatened by Mr. Epstein that I would be killed and my family killed as well if I ever disclosed any of the physical and sexual abuse of minor females that I had personally witnessed by Mr. Epstein or any of his guests.

16. I am coming forward to swear to the truthfulness of the physical and sexual abuse that I personally witnessed of minor females at the hands of Mr. Trump and Mr. Epstein, including the Plaintiff, during the time of my employment from the years of 1990-2000 for Mr. Epstein. I swear to these facts under penalty of perjury even though I fully understand that the life of myself and my family is now in grave danger."

**C.      Defendants' Motion Should Be Denied So That Plaintiff Can Be Afforded Discovery To Support Her Causes Of Action Against Particular Defendants And Narrow The Issues**

Plaintiff cannot prove her case through the complaint – nor is she required to do so. Plaintiff is only required to, and has, set forth sufficient factual allegations, which accepted as true, "state[s] a claim to relief that is plausible on its face." *Ashcroft*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

But according to Defendants, Plaintiff's complaint is "woefully insufficient," has no "viable claims", and improperly contains the language "upon information and belief" (Defs. Memo at 2). Defendants' arguments merely underscore the need for discovery, questions of fact, and the premature nature of the motion to dismiss, especially when all reasonable inferences are drawn in Plaintiff's favor. *See, e.g., Greater Chautauqua Fed. Credit Union v. Marks*, 2023 U.S. Dist. LEXIS 57087, *24 n. 25 (SDNY Mar. 31, 2023) (to the extent the AG seeks more information, that simply underscores the need for discovery and the premature nature of the motion to dismiss, at which stage all reasonable inferences must be drawn in favor of the plaintiffs).

As stated above, Defendants rejected Plaintiff's request for informal discovery (and the suggestion of an expert selected by the Magistrate Judge) to ascertain the issue of ownership of the Property. Defendants insisted that Plaintiff file her complaint so they could now file a motion to dismiss while their own submissions raise questions of fact.

Moreover, it would be prejudicial to Plaintiff at this stage of the proceedings to prevent further development of the facts.  Indeed, Defendants have submitted evidence that begs the question regarding the ownership of the Property and raise issues of fact. It is evident that material facts are solely in Defendants' possession. If at the end of discovery, Defendants believe

16

there is no factual dispute, they can move for summary judgment. *See, e.g, Legeno v. Corcoran Group*, 308 Fed. Appx. 495, 497 (2d Cir. 2009) (where resolution of an issue required further fact-finding, it was premature to grant the motion to dismiss).

Under state law, pre-suit investigative discovery is allowed for the purpose of filing a sufficient complaint. *See* N.Y. C.P.L.R. § 3211(d) (a motion to dismiss should not be granted where facts are unavailable to the party opposing the motion to dismiss, and allows for, among other things, "disclosure to be had and may make such other order as may be just").

The same rationale should be considered under the circumstances. Where a plaintiff shows that a defendant has knowledge or possesses information necessary to oppose a motion to dismiss – as here, a court should refrain from granting a motion to dismiss. *E.g., Amigo Foods Corp. v. Marine Midland Bank-New York,* 39 N.Y.2d 391, 396, (1976) (holding that where "a party demonstrates that facts may exist in opposition to a motion to dismiss, discovery is sanctioned" and granting of motion to dismiss is inappropriate). Furthermore, the Court should give plaintiffs the benefit of doubt where plaintiffs assert that they cannot adequately rebut a motion to dismiss. *Cosmos Mason Supplies, Inc. v. Lido Beach Associates, Inc.,* 95 A.D.2d 818, (2d Dep't 1983); *Cantor v. Levine*, 495 N.Y.S.2d 690 (2d Dep't 1985) (holding that nonmoving party properly given benefit of doubt when lower court refused to grant motion to dismiss because non-moving party did not know dates of publication of defamatory letter in question or when its contents were mailed).

As pointed out in the Hantman Affirmation (¶¶ 52-53) discovery is needed particularly when considering the undisputed association of Wexner, and even his wife Abigail's, with Epstein and their knowledge of his illegal acts taking place in New York at the Property, as well as at other such properties in Ohio and elsewhere around the globe, all of which were widely

known in certain circles and repeatedly reported on by his own employees. (See Hantman Aff. ¶¶ 5-47)

Specifically, discovery needed to further bolster the claims in this action include but are not limited to: the depositions of Defendants Leslie Wexner and Abigail Wexner; Craig White - Director of Security for the Wexner Family and resident of the Property during the time Epstein lived there; Ghislaine Maxwell – Epstein's known accomplice; Lesley Groff; and Ms. Espinosa, (the "Named Employees"), Maria Farmer; Tiffany Doe of the *Doe v. Trump* S.D.N.Y. 1:16-cv-04642 action; and other potential witnesses who worked at the Property, attended events and "parties" there, or otherwise were aware of or facilitated the sex trafficking ring; contact information and employment records for the Named Employees; the Stock Purchase Agreement that sets forth the terms and conditions of an alleged sale of shares of stock from Mr. Wexner to Mr. Epstein on November 11, 1998, relating to the alleged transfer of the Property and all closing documents executed on such transfer date; a copy of the New York State and New York City Transfer Tax Forms and other ancillary documents along with a copy of the check (indicated as paid by Mr. Wexner's bank) indicating that such New York State and New York City transfer taxes were duly paid as of the date of the alleged sale; and explanation as to why Mr. Wexner is listed as Owner of the Property on two NYC permits dated January 8, 2002, and June 4, 2002. (Hantman Affirmation ¶¶52-53)

Based on the forgoing it is no surprise that Defendants seek to end this lawsuit immediately and avoid discovery as it is clear that the alleged suicides of Jeffrey Epstein and Jean Luc Brunel[13] in Paris is not enough to insulate the rich and powerful from potential exposure and the justice of the legal system is the only hope of a child victim whose goal is to

---

[13] Died on February 19, 2022, at Prison de La Sante, Paris France who faced allegations of sexual assault and was related to Epstein.

put those who believe themselves to be above the law to be held accountable and to ensure that what happened to her and countless others is not repeated.

## D.     PLAINTIFF HAS SUFFICIENTLY PLEAD CONSPIRACY

As stated in Plaintiff's letter to the Court dated January 20, 2023, "Plaintiff is aware that civil conspiracy liability is not a stand-alone cause of action under New York Law, but a vehicle of liability against Defendants for claims against other persons, however Plaintiff has included this claim as notice to the Defendants." (Doc. No. 38 n. 4).

In any event, Plaintiff has sufficiently pled facts that demonstrate 1) multiple primary torts in Epstein's acts, (Complaint ¶¶ 146-155) as well as their own torts of negligence, (Complaint ¶¶178-214, 227, 228, 234); 2) an agreement between two or more parties, (FAVC ¶¶250-255); 3) an overt act in furtherance of the agreement, (FAVC ¶¶ 43, 45, 51, 216-226)[14] ; 4) the parties' intentional participation in the furtherance of a plan or purpose, (FAVC ¶¶28-32, 41, 55, 56, 64, 167, 183, 195, 196,197, 198, 200-212, 216-226, 258-259); and, 5) resulting damage or injury. (FAVC ¶255). The Defendants essentially ignore Plaintiff's 264 paragraph, 45 page verified complaint containing a 122-paragraph fact section.

Defendants' argument that conspiracy liability is defeated because many of the facts pled here are upon information and belief, is another misleading statement of law. In the one case they cite to support this proposition, *Medtech Prod. Inc. v. Ranir, LLC*, the court found "The only allegation that can  be fairly read to allege an agreement among [d]efendants to misappropriate Medtech's trade secrets reads as follows: 'Upon information and belief, DenTek, Duane, CDS, and Kaplan conspired, agreed, and planned to use Medtech's confidential and proprietary information. . . .'" *Medtech Products Inc. v. Ranir*, LLC, 596 F. Supp. 2d 778, 795 (S.D.N.Y.

---

[14] *See Supra footnote #9*

2008) (internal citations omitted).  The fact that plaintiff in that matter made the allegation upon information and belief didn't defeat the claim, it was that it was the sole paragraph addressing the claim.

Here, Plaintiff has pled many facts that show the relationship between Epstein and Wexner as well as written and unwritten agreements they made, as did the other Defendants in this action, such as those surrounding the Property, in direct and indirect furtherance of the harms to Plaintiff. (FAVC ¶¶6, 9, 11, 19-26, 39-51, 54-55, 57-59, 64-98, 101, 156-174, 247-249, 251-255, 258-260; Hantman Aff. ¶¶ 4-51). Plaintiff has pled facts regarding the overt acts evidencing the agreement to participate and further the harm to Plaintiff by the Named Employees. (Complaint ¶¶ 43, 45, 51, 216-226).

If Epstein and the Named Employees were employed by Defendants than Plaintiff's conspiracy claims may fail due to the "intracorporate conspiracy" doctrine which is premised on the concept that a corporation generally cannot conspire with its employees or agents as all are considered a single legal entity. *See Girard v. 94th St. & Fifth Ave. Corp.*, 530 F.2d 66 (2d Cir.). However, if they are not employees then such a claim would not fail, while such a determination of non-employee status may have effects on Plaintiff's other claims. "Undeniably, a plaintiff is entitled to advance inconsistent theories in alleging a right to recovery." *Cohn v. Lionel Corp.*, 21 N.Y.2d 559 (1968).  Discovery will shed light on this issue of employment or non-employment of these people as Defendants have thus far refused to acknowledge.

Moreover, there exist exceptions to the intracorporate conspiracy doctrine. One such is the "personal stake" exception, *Chamberlain v. City of White Plains*, 986 F. Supp. 2d 363, (S.D.N.Y. 2013), that "allows suits against individuals within a single entity when they are pursuing personal interests wholly separate and apart from the entity." *Dowd v. DeMarco*, 314 F.

Supp. 3d 576, 588 (S.D.N.Y. 2018) (quotation marks omitted); *see also Little v. City of New York*, 487 F. Supp. 2d 426, 442 (S.D.N.Y. 2007) (noting an exception to the intracorporate conspiracy doctrine "where the individuals are motivated by an independent personal stake in achieving the corporation's objective" (internal quotation marks omitted)). "Therefore, the doctrine's applicability depends upon whether the individual defendants were acting within the scope of their official duties or pursuing their independent personal interests." *Nassau County Employee "L" v. County of Nassau*, 345 F. Supp. 2d 293, 305 (E.D.N.Y. 2004)

"Simply joining corporate officers as defendants in their individual capacities is not enough to make them persons separate from the corporation in legal contemplation[,] [t]he plaintiff must also allege that [the officers] acted other than in the normal course of their corporate duties." *Girard*, 530 F.2d at 72 (first alteration in original) (internal quotation marks omitted).

However, "New York courts consistently have held that sexual misconduct and related tortious behavior arise from personal motives and do not further an employer's business, even when committed within the employment context." *See Doe v. Alsaud*, 12 F. Supp. 3d 674, 677 (S.D.N.Y. 2014).

As such, here the conduct of the Named Employees may fall outside the scope of their employment, availing them to liability under a conspiracy theory of liability. Some of the actions may have fallen within the scope of their employment such as scheduling, communications, and transportation. While others, such as providing the Plaintiff and other minor girls alcohol, or in the case or Epstein sexually assaulting the victims, would fall without the scope of employment.

**E.      PLAINTIFF'S FRAUDULENT CONVEYANCE CLAIM IS NOT INCURABLY DEFECTIVE BECAUSE IT IS ALSO BASED ON THE SEXUAL CRIMES OF EPSTEIN AND AS SUCH CPLR § 214 APPLIES TO REVIVE IT**

On this point, the Defendants provide both a misunderstanding of the facts and the law. First, Plaintiff's fraudulent conveyance claim does arise directly out of the sexual crimes of Epstein and the Defendants' involvement in helping him continue to perpetrate them and to obscure their own involvement and that of the Named and Unnamed Employees. (Complaint ¶¶156-174, 229-244). The claim need not be based upon the on conduct by any Defendant "constituting a sexual offense" as suggested by Defendants. (Defs. Memo at 21.) This reading of the statute would drastically limit CPLR § 214-g far beyond the scope that any court has limited and is against the plain language of the statue. *See* CPLR § 214-g; *Dutton v. Young Men's Christian Ass'n of Buffalo Niagara*, 207 A.D.3d 1038, (4th Dep't 2022); *PB-36 Doe v. Niagara Falls City School District*, 152 N.Y.S.3d 242, 245; *M.C. v. State*, 163 N.Y.S.3d 741, 753 (N.Y. Ct. Cl. 2022) (same); and *see LG 40 Doe v. Robert L. Eberhardt*, Erie County Supreme Court Index No. 805762/2020.

The case of *Maurizi v. Callaghan* is distinguishable in that the plaintiff there based an IIED claim off of the emotional harm he suffered when defendants Professional Skaters Association ("PSA"), and The United States Figure Skating Association d/b/a U.S. Figure Skating ("USFS") refused to acknowledge his claims against his molester-skating coach. *Id.* 2022 WL 1446500, at *16 (W.D.N.Y. Feb. 25, 2022), R&R adopted 2022 WL 1444182 (W.D.N.Y. May 5, 2022).

*Dolgas v. Wales*, 2023 WL 2795845 (N.Y. App. Div. Apr. 6, 2023) is also distinguishable in that the plaintiff there sought to revive claims under 42 USC § 1983 which is broad in scope and encompasses a "wide spectrum of claims". *Id*. at 4. While here, as stated above Plaintiff, has tied her fraudulent conveyance claims directly to the commission of the sexual crimes against her.

1. ***Plaintiff has stated a Claim under New York's Debtor and Creditor Law §***
   ***276.***

Here, New York's Debtor and Creditor Law (the "DCL") applies. DCL § 276, concerns

actual fraud, as opposed to constructive fraud, and does not require proof of unfair consideration

or insolvency. *Assocs. v. Brodsky*, 257 AD 2d 526, 529 (1st Dep't 1999) (citation omitted).

Because it is difficult to prove actual intent, the plaintiff may rely on "badges of fraud" to

raise an inference of fraud, i.e., circumstances so commonly associated with fraudulent transfers

"that their presence gives rise to an inference of intent." *Id.* (internal quotation marks and citations

omitted). Among such circumstances are: 1) a close relationship between the parties to the alleged

fraudulent transaction; 2) a questionable transfer not in the usual course of business; 3) inadequacy

of the consideration; and 4) retention of control of the property by the transferor after the

conveyance. *Id.*

"Depending on the context, badges of fraud will vary in significance, though the presence

of multiple indicia will increase the strength of the inference." *MFS/Sun Life Trust v. Van Dusen*

*Airport Servs.*, 910 F. Supp. 913, 935 (S.D.N.Y. 1995); *see also Gafco, Inc. v. H.D.S. Mercantile*

*Corp.*, 47 Misc.2d 661, 664 (Sup. Ct., N.Y. County 1965) ("[a]lthough 'badges of fraud' are not

conclusive and are more or less strong or weak according to their nature and the number occurring

in the same case, a concurrence of several badges will always make out a strong case") (internal

quotation marks and citations omitted).

Further, where a transaction is entered into fraudulently to escape obligations of a

predecessor "[a] corporation may be held liable for the torts of its predecessor." *Dutton v. Young*

*Men's Christian Ass'n of Buffalo Niagara*, 171 N.Y.S.3d 276, 280 (4th Dep't 2022) (internal

quotations omitted) (trial court's grant of defendant's motion to dismiss under CPLR 3211 action

brought under the CVA reversed because plaintiff's complaint stated causes of action based on successor liability under a theory of de facto merger.)

Here all the aforementioned indica of fraud are present, among many others. Plaintiff has alleged that Wexner and Epstein enjoyed a close relationship.[15] Everything about this transfer is questionable and out of the ordinary course of regular business – from the fact that Wexner had just spent years renovating it[16] before conveying it to Epstein, to the timing of the transfer right around when Epstein's sexual crimes were beginning to be publicized, and the multiple shell companies were utilized to make the transfer.[17] The inadequacy of the consideration remains a question of fact as Epstein has been alleged to have bragged about obtaining the Property from Wexner for $1,[18] and that apparently the transfer was conducted through a transfer of shares in a nonprofit with value allegedly line of a $20,000,000 purchase price, or through a promissory note yet unprovided by the Defendants.[19] Finally, Wexner retained control over the Property as evidence by him stationing his head of security there, and upon information and belief the other Named and Unnamed employees.

## F.   PLAINTIFF SUFFICIENTLY STATES A CLAIM FOR NEGLIGENT RETENTION

---

[15] Their relationship was so close that some have suggested it may have even been sexual in nature. Gabriel Sherman, "*The Mogul and the Monster: Inside Jeffrey Epstein's Decades-Long Relationship With His Biggest Client*", VANITY FAIR, June 8, 2021 https://www.vanityfair.com/news/2021/06/inside-jeffrey-epsteins-decades-long-relationship-with-his-biggest-client.

[16] Affidavit of Leslie Wexner Doc. No. 40-11 ¶11.

[17] Complaint ¶¶158-174.

[18] Christopher White, *EXCLUSIVE: 'Wexner will do anything for me!' Jeffrey Epstein victim tells how he winked when he boasted of his closeness with billionaire Victoria's Secret boss who sold him Manhattan's biggest townhouse for just $1*, DAILY MAIL, July 21, 2022 https://www.dailymail.co.uk/news/article-11029425/Jeffrey-Epstein-boasted-lingerie-mogul-Les-Wexner-gave-Manhattan-townhouse-1.html ("'Epstein told me in New York,' Farmer, 52, claimed. 'He said: "Maria, I got all this for one dollar." 'He held out his arms, spanning the room, and said, "Look at all of this." 'And there are decorators from France coming and going, and you've got all this fabulous food, and maids, and everything, it's just so unbelievable. 'And I said, "Why? How did you get it for one dollar?" And he looked at me with the biggest smile, and said, "Wexner will do anything for me, Maria." "And I mean anything." Then he winked.')

[19] Defendants have provided summary descriptions of this transfer but never provide proof of payment or other supporting documentation. (See Affirmation of Matthew Simon, Esq., Exhibit 2, real estate expert)

There exist now a slew of cases brought under The Child Victim Act ("CVA") and N.Y. C.P.L.R. Sec. 214-g establishing a trend of "vicarious liability" claims brought against parties other than the abuser under various theories, such as negligent hiring, negligent security, premises liability, and common law negligence, as well as aiding and abetting the abuse, transporter liability, and civil RICO violations.[20]

These cases, in the most part, are proceeding past the motion to dismiss stage and even to verdict. *See, e.g., PB-36 Doe v Niagara Falls City Sch. Distict,* 72 Misc 3d 1052 (Sup Ct, Niagara County 2021) (denying motion to dismiss claimant's negligent hiring, retention, and supervision claim); *M.C. v. State,* 163 N.Y.S.3d 741, 753 (N.Y. Ct. Cl. 2022) (same); *and see LG 40 Doe v. Robert L. Eberhardt,* Erie County Supreme Court Index No. 805762/2020 (awarding plaintiff over $26,000,000 via jury verdict, what is believed to be the first verdict under the CVA).

Causes of action alleging negligence based upon negligent hiring, retention, or supervision are not statutorily required to be pleaded with specificity. *See Boyle v N. Salem Cent. Sch. Dist.,* 208 AD3d 744 (2d Dept 2022); *Doe v Enlarged City Sch. Dist. of Middletown*, 195 AD3d 595 (2d Dept 2021); *Kenneth R. v R.C. Diocese*, 229 AD2d 159 (2d Dept 1997).

To sustain a cause of action sounding in negligent supervision of a child under the alleged facts of this case, the plaintiff must establish that the defendant "had sufficiently specific knowledge or notice of the dangerous conduct which caused injury; that is, that the third-party acts could reasonably have been anticipated" *George v Windham*, 169 AD3d 876 (2d Dept 2019) (internal quotation marks omitted); *see Andrew S. v Gristina*, 97 AD3d 651, 652, 950

---

[20] Indeed, on May 24, 2022, less than one year after the revival window of the New York Child Victims Act (CVA) closed, Gov. Kathy Hochul signed into law the Adult Survivors Act (ASA) that the New York Assembly passed one day earlier.

N.Y.S.2d 137 (2nd Dep't 2012).

Similarly, "'[t]o establish a cause of action based on negligent hiring, negligent retention, or negligent supervision [of an employee], it must be shown that the employer knew or should have known of the employee's propensity for the conduct which caused the injury'." *S.C. v New York City Dept. of Educ.*, 949 N.Y.S.2d 71 (2nd Dep't 2012), quoting *Shor v Touch-N-Go Farms, Inc.*933 N.Y.S.2d 686 (2nd Dep't 2011); *and see Sheppard v United States Tennis Assn. Inc.,* 199 AD3d 846, 847 (2nd Dep't 2021); *Kenneth R. v Roman Catholic Diocese of Brooklyn*, 229 AD2d 159, 161, (2nd Dep't 1997).

Moreover, Plaintiff has stated a general negligence claim based on the facts alleged against Wexner and such a claim in this context has been recently examined by Judge Rakoff. *Doe*, 2023 US Dist LEXIS 75503 at *45-48.

## G.   THIS COURT HAS PERSONAL JURISDICTION OVER THE DEFENDANTS AND EVEN WITHOUT DISCOVERY, PLAINTIFF HAS SHOWN GENERAL AND SPECIFIC JURISDICTION

Plaintiff has set out grounds for both general and specific jurisdiction over the Defendants and their summarily stated self-serving affidavits, unsupported by any evidence whatsoever, are not enough to strip this court of jurisdiction when such contacts with this state are public and well known and where Plaintiff has alleged specific actions and non-actions in relation to her damages and the Property.

To determine whether jurisdiction exists over a non-domiciliary, federal courts look to the state's long-arm statute. *Edwardo v Roman Cath. Bishop of Providence*, 66 F.4th 69 (2d Cir. 2023); *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 171 F.3d 779, 784 (2d Cir. 1999).

Where, a district court in adjudicating a motion pursuant to Federal Rule of Civil Procedure 12(b)(2) "relies on the pleadings and affidavits, and chooses not to conduct a full-blown

evidentiary hearing, plaintiffs need only make prima facie showing of personal jurisdiction." *Porina v. Marward Shipping Co.*, 521 F.3d 122, 126 (2d Cir. 2008); *S. New Eng. Tel. Co. v Global NAPs Inc.*, 624 F3d 123, 138 (2d Cir. 2010). Further, the "facts alleged in the complaint and affidavits in opposition to such a motion to dismiss are deemed true and construed in the light most favorable to the plaintiff, and all doubts are to be resolved in favor of the plaintiff." *WCVAWCK-Doe v Boys & Girls Club of Greenwich, Inc.,* AD3d, 2023 NY Slip Op 02026, at *2 (2nd Dep't 2023).

New York's Long Arm statute, CPLR §302 sets forth that courts of New York may exercise personal jurisdiction over non-domiciliaries "or his executor or administrator, who in person or through an agent;

1)   transacts any business within the state or contracts anywhere to supply goods or services in the state;
2)   commits a tortious act within the state, except as to a cause of action for defamation of character arising from the act;
3)   commits a tortious act without the state causing injury to person or property within the state, except as to a cause of action for defamation of character arising from the act, if he i) regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in the state, or (ii) expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce; or 4) owns, uses or possesses any real property situated within the state."

NY CPLR §302.

"CPLR 302 is a single-act statute requiring but one transaction—albeit a purposeful transaction—to confer jurisdiction in New York'." *State of New York v. Vayu*, 2023 N.Y. Slip Op. 801, 2023 WL 1973001 (February 14, 2023); *Parke-Bernet Galleries, Inc. v Franklyn*, 26 NY2d 13, 17 (1970), quoting Joseph McLaughlin, Supplementary Practice Commentary to CPLR 302, McKinney's Cons. Laws of N.Y., Book 7B (1969 Cum Supp), at 129-130; *see  also*

*Deutsche Bank Sec., Inc. v Montana Bd. of Investments*, 7 N.Y.3d 65, 71 (2006) (collecting cases).

Indeed, "the nature and purpose of a solitary business meeting conducted for a single day in New York may supply the minimum contacts necessary to subject a nonresident participant to the jurisdiction of our courts." *Presidential Realty Corp. v Michael Sq. W., Ltd*., 44 NY2d 672, 673 ( N.Y. 1978)). "[P]roof of one transaction in New York is sufficient to invoke jurisdiction, even though the defendant never enters New York, so long as the defendant's activities here were purposeful and there is a substantial relationship between the transaction and the claim asserted." *Deutsche Bank Secs., Inc. v. Mont. Bd. of Invs*., 7 N.Y.3d 65, 71 (N.Y. 2006)*; see also Wilson v Dantas*, 128 A.D.3d 176, 182-83 (1st Dep't 2015).

"Purposeful activities are those with which a defendant, through volitional acts, 'avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Fischbarg v. Doucet*, 9 N.Y.3d 375, 380 (N.Y. 2007) (quoting, *McKee Elec. Co. v. Rauland–Borg Corp*., 20 N.Y.2d 377, 382 (N.Y. 1967)). Whether a non-domiciliary has engaged in sufficient purposeful activity to confer jurisdiction requires an examination of the totality of the circumstances. *Id*. (quoting, *Farkas v. Farkas*, 36 A.D.3d 852, 853 (2d Dep't 2007)). The quality of a defendant's contacts is the "primary consideration" in establishing personal jurisdiction. *Id*.

As to the required nexus, the courts require "a relatedness between the transaction and the legal claim such that the latter is not completely unmoored from the former, regardless of the ultimate merits of the claim." *Licci ex rel. Licci v. Lebanese Canadian Bank*, 732 F.3d 161 (2d Cir. 2013). "[W]here at least one element arises from the New York contacts, the relationship

between the business transaction and the claim asserted supports specific jurisdiction under the statute." *Id*. at 341.

Further, the exercise of "personal jurisdiction under the long-arm statute must comport with federal constitutional due process requirements." *Rushaid v. Pictet & Cie*, 28 N.Y.3d 316, 331 (N.Y. 2016). In this regard, the nondomiciliary must have "certain minimum contacts with [the forum] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Id*. (citation omitted).

The "minimum contacts" test "has come to rest on whether a defendant's conduct and connection with the forum State are such that it should reasonably anticipate being hauled into court there." *LaMarca v. Pak-Mor Mfg. Co.,* 95 N.Y.2d 210, 216 (N.Y. 2000). Such minimum contacts exist where a defendant "purposefully avails itself of the privilege of conducting activities within the forum State." *Id*. Similarly, where the non-domiciliary uses the forum to "achieve the wrong complained of", a plaintiff will satisfy "the minimum contacts component of the due process inquiry." *Licci ex rel. Licci v. Lebanese Can. Bank, SAL*, 732 F.3d 161, 173 (2d Cir. 2013).

Whether personal jurisdiction offends "notions of fair play and substantial justice" depends on a consideration of "the burden on the defendant, the forum State's interest in adjudicating the dispute, the plaintiff's interest in obtaining convenient and effective relief, the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and the shared interest of the several States in furthering fundamental substantive social policies". *Rushaid v. Pictet & Cie*, 28 N.Y.3d 316, 331 (2016).This Court has personal jurisdiction over Defendant Mr. Wexner because he maintained residence at the Property during time in which Epstein was grooming the Plaintiff, or at least rented the Property out to Epstein

during this time. (Wexner Affidavit Doc. No. 40-11; FAVC ¶39). He conducted business in New York with a fair measure of permanence and continuity and was essentially at home in New York and should reasonably anticipate being hauled into court as the owner of L Brands, Victoria's Secret & Co., ("Victoria's Secret"), Nine East 71st Street Corporation, a closely held New York Corporation that originally owned the Property, the New Albany Company, and other businesses, (FAVC ¶39) He, and through agents such as Epstein and the Employees transacted business in New York, out of the Property, including the employment of Epstein and the Named Employees, contracted to supply goods or services into New York at the Property and with the Plaintiff and other child victims, committed tortious act in New York including the assaults perpetrated against the Plaintiff and others, and owns, possesses, or uses the Property in New York that was the location of the Plaintiff's injuries. (FAVC ¶39).

This Court has personal jurisdiction over Defendant Abigail S. Wexner because she maintained residence at the Property, conducted business in New York with a fair measure of permanence and continuity and was essentially at home in New York and should reasonably anticipate being hauled into court. (FAVC ¶40). This is particularly true as evidence submitted by defendants in support of their motion make it clear that she coordinated and supervised Epstein's rental of the Property and transfer of utilities to him, (*see* Doc No. 40-10), and further as the founder and president of YLK Charitable Fund, that at one point owned the Property, (FAVC ¶¶40-41), and which received $47 million from Epstein months after its formation and shortly after Epstein was sentenced to a term in a Palm Beach County jail on a charge of soliciting an underage

prostitute,[21] Wexner has alleged that this $42 million represented money that Epstein had stolen from the Wexner family.[22]

This Court also has personal jurisdiction over Defendant The YLK Charitable Fund because it was also used as a vehicle to facilitate and hide Epstein's crimes evidenced by its only donations being from him, one of which included a transfer of $13,425,914 (almost the exact amount Wexner paid for the Property in 1991), may have employed or been represented by the Named Employees and unnamed employees as well as Epstein, it conducted business in New York with a fair measure of permanence and continuity and was essentially at home in New York, and at one point owned the Property where the Plaintiff suffered her injuries. (FAVC ¶¶12, 14, 17, 18, 40-41, 45, 47, 164, 169, 170-174, 233).

In addition, he Wexner's personal family 'Director of Security' also lived at the Property during the time of the damages complained hereof. (*See* Doc. No. 40-8).

This  Court has personal jurisdiction over Defendant New Albany because it conducted business in New York with a fair measure of permanence and continuity and was essentially at home in New York as Epstein and Mr. Wexner were presidents of New Albany, Epstein served as an officer of New Albany until 2007, Epstein primarily worked from the Property in New York, perpetrated his crimes during the course of his duties to New Albany, was shielded by New Albany. (FAVC ¶¶39, 42-43,).

Upon information and belief, New Albany also employed Epstein and the Employees that materially aided Epstein in his crimes and cover ups. (FAVC ¶¶247, 248, 253-254, 260-262)

---

[21] Brian Schwartz, "*Jeffrey Epstein used $46 million charitable donation to keep alive his ties with billionaire Les Wexner*", CNBC, July 11, 2019,  https://www.cnbc.com/2019/07/11/epstein-donated-46-million-to-les-wexners-private-foundation-in-2008.html

[22] Mark Williams, "*Epstein had no day-to-day role in Wexner Foundation, report finds*" THE COLUMBUS DISPATCH, February 27, 2020, https://www.dispatch.com/story/business/2020/02/27/epstein-had-no-day-to/1620923007/

This Court has personal jurisdiction over Defendant The Wexner Family Charitable Fund because it conducted business in New York with a fair measure of permanence and continuity and was essentially at home in New York as Epstein served as Vice President of the Wexner Family Charitable Fund, from 2001 through2004. (FAVC ¶¶12, 17-18, 46-48, 171, 247-248, 252-254, 260-262).

Epstein primarily worked from the Property in New York, perpetrated his crimes during the course of his duties to The Wexner Family Charitable Fund, thereafter, Epstein's attorney Darren Indyke served as Vice President from 2004-2007, it is also successor in interest to the YLK Charitable Fund as in December 2010, the YLK Charitable Fund was shut down and its remaining assets from Jeffrey Epstein's fraudulent conveyance (thru his charity COQU) — about $33.3 million (which included the $13,425,914 fraudulently conveyed to pay for the Property) — were transferred to the Wexner Family Charitable Fund. (FAVC ¶47). The Wexner Family Charitable Fund also employed Epstein and the Employees that materially aided Epstein in his crimes and cover ups. (FAVC ¶48).

Notably, Abigale Wexner does not contest the allegations of the complaint that she was, at all relevant times, a director of The Wexner Family Charitable Fund and The Wexner Foundation. (FAVC ¶12; Abigail Wexner Affidavit Doc. No 40-15).

The affidavit of Peggy W. Ugland, the Treasurer of The Wexner Family Charitable Fund, denies that they currently have any employees or agents in New York, without evidence, but does not deny that fund previously had employees working in New York or even at the Property. (Doc. No. 40-17 ¶8).

Indeed, strikingly, in none of the Defendants' sworn affidavits, nor any other evidence submitted in support of their motion, nor otherwise have they ever denied that they employed the

Named Employees or the unnamed employee's referenced in the FAVC ¶¶216, 217), or otherwise denied the Plaintiff's substantive claims as to their involvement.

This court has personal jurisdiction over Defendant The Wexner Foundation because it conducted business in New York with a fair measure of permanence and continuity and was essentially at home in New York as Epstein served as a trustee The Wexner Foundation, from 1992 to 2007. (FAVC ¶¶12, 49, 50-51, 67).

Epstein was also the bookkeeper for the Wexner Foundation, Epstein primarily worked for the Property in New York, perpetrated his crimes during the course of his duties to The Wexner Foundation, and was shielded by The Wexner Foundation.  (FAVC ¶50).

Upon information and belief, The Wexner Foundation also employed the Employees that materially aided Epstein in his crimes and cover ups. (FAVC ¶¶248, 253-254).

Defendants have availed themselves of the jurisdiction of this court and could have and should have made their motion in the preceding Initial Action, instead delaying the expense of the Plaintiff. Defendants use the judicial system much like their shell companies to shield their actions and simultaneously harm the Plaintiff.

## IV. CONCLUSION

For the foregoing reasons, Plaintiff respectfully request that the Court deny Defendants' motion in its entirety and permit her to continue in this action to the discovery stage.

Dated: May 31, 2023

Respectfully submitted,

By: /s/ Robert J. Hantman

Robert J. Hantman, Esq.
Hantman & Associates
www.hantmanlaw.com

1120 Avenue of the Americas, 4th Floor
New York, NY 10036
Tel: (212) 684-3933
rhantman@hantmanlaw.com
*Counsel for Plaintiff*

<u>**CERTIFICATE OF SERVICE**</u>

The undersigned hereby certifies that on May 31, 2023, a copy of the foregoing was filed electronically with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all attorneys of record.

<u>/s/ Robert J. Hantman</u>

Robert J. Hantman