## DECLARATION OF MARION H. LITTLE, JR.

I, Marion H. Little, Jr., declare under penalty of perjury, based on personal knowledge, as follows:

1.     I am one of the attorneys representing Defendants The New Albany Company, LLC, The Wexner Family Charitable Fund, The YLK Charitable Fund, Abigail S. Wexner, The Wexner Foundation, and Leslie H. Wexner (collectively, the "Defendants").

**A.     Plaintiff's 2021 Filing.**

2.     On or about August 14, 2021, Plaintiff filed a summons with a notice in the Supreme Court of New York, County of Queens.  Roughly four months later in December, Plaintiff proceeded with service of a notice demanding $10 million based upon alleged "conduct perpetrated against her at the premises owned and/or controlled by defendant Leslie H. Wexner, located at 9 East 71st Street, New York, NY, from 2001-2002."  The foregoing were purportedly filed *pro se*. However, contemporaneously with service of process, Plaintiff sent an unsolicited email on December 14, 2021, to me advising she had retained Attorney Hantman and was hopeful there could be a "fair and reasonable resolution" of her $10 million claim "out of the public spotlight and without further public filings, court intervention and potential trial."  A true and accurate copy of this email is attached as Exhibit A.

3.     By a letter dated December 27, 2021, a true and accurate copy of which is marked as Exhibit B, I advised Attorney Hantman of Plaintiff's email and requested that Plaintiff not communicate directly with the undersigned's firm given her retention of counsel.  My letter also outlined that:

- The allegations advanced were false.  Mr. Wexner sold his entire interest in the subject property in 1998, several years before the relevant time period during

which Plaintiff claims she was harmed.   The media, of course, had already extensively reported on the timing of this sale.

- The numerous other Defendants never had any relationship with the subject property.   A review of the public record would show that some of the named Defendant entities did not even exist at the time of the alleged harm.

- Defendants rejected Plaintiff's coercion attempt.   Defendants would "not pay her any amount based on her demonstrably false claims" and rejected Plaintiff's "threat to damage them in the 'public spotlight' or by "further public filings."

I demanded dismissal of the action and reserved the right to recover fees and expenses.

**B.      Production of Due Diligence Materials Pursuant To A Confidentiality Agreement.**

4.      On or about January 10, 2022, I received a letter from Mr. Hantman Attorney offering statements strongly suggesting no reasonable investigation into Plaintiff's allegations had been made, but declaring a desire to "avoid litigation."  I responded in a January 14, 2022 letter, a copy of which is marked as Exhibit C.   I first noted that there would be no payments made to Ms. Araoz and then noted the lack of any basis for the claim.

> . . .   We accept your representation that your client would "prefer to avoid litigation."   The only way for her to do so, however, is to voluntarily dismiss this action.   Our clients will not pay any monetary payment or other consideration to her.  No basis exists for any claim she may wish to pursue against our clients.   As we expressed to you when we first spoke last month, the undersigned's practice is to be forthright with opposing counsel and specifically advise at the inception of a case when no payment will ever be paid. Such is the case here.  Nothing outlined in your January 10 letter supports a different conclusion.
>
> Just the opposite is true.  The 16 numbered paragraphs recited in your letter fall into three general categories.   The first is the recitation of facts that are of no consequence to the noticed claims— that is, they offer no evidence in support of your client's position.

2

In other instances, the numbered paragraphs simply draw conclusions from facts that are either untrue or otherwise draw conclusions that are not reasonably supported by the asserted facts. As a final category, you conflate distinct events and transactions and then conveniently assume that they relate to "property control" when, in fact, they do not. Virtually every allegation shares at least one common element: they are cobbled together from press clippings that, much like your letter, offer defamatory speculation and innuendo, but nothing beyond that.

5.      Not only did Plaintiff have no basis for her claims, I informed counsel there were documents available disproving Plaintiff's premise that any Defendant owned the subject property during the relevant time period: I wrote:

But there is no reason to speculate or guess. The relevant documentary evidence easily disproves your client's allegations, and in particular, they conclusively demonstrate our clients' lack of involvement or control of the subject property during the stated time frame. The documents include:

- Mr. Wexner's 1998 sale of his interest in the 9 East 71st Street Corporation.

- The 1998 settlement statement reflecting the transaction and the apportionment of the real estate taxes.

- The consideration paid to Mr. Wexner for the sale.

- Mr. Wexner's 1998 resignation of any officer status or association with 9 East 71st Street Corporation.

6.      I then indicated that I would be willing to make these materials available subject to a confidentiality agreement. Otherwise, Ms. Araoz should simply proceed with her litigation.

If you would like to inspect these materials, subject to a confidentiality agreement, we are amenable to making them available for your review. These are the same documents that we would, in any event, produce as part of any permitted discovery. However, if your client is intent on seeking payment irrespective of whatever documents you review, she should proceed with the litigation without delay because no payment will be forthcoming. You can then simply review the documents as part of the ordinary discovery process once the case is transferred to the Southern

3

District of Ohio, provided any claims survive our clients' Motion to
Dismiss.

7.      By a letter of January 24, 2022, a true and accurate copy of which is marked as

Exhibit D, I wrote Mr. Hantman noting that he had not formally entered an appearance in the

litigation.  However, Magistrate Judge Levy had issued a scheduling order that required the parties

to meet certain deadlines.  Specifically, I wrote:

> The scheduling order issued by Magistrate Judge Levy imposed
> certain requirements the parties must satisfy in anticipation of the
> telephonic conference on February 16.  One of those requires the
> parties to meet and confer on discovery.  Please advise whether you
> intend to enter an appearance in this matter.  We do not want to
> initiate any contact with the Plaintiff if she is represented by counsel.
> At the same time, we want to ensure we comply with the Court's
> order and expectations.  As such, kindly advise as to whether we
> should speak directly to you or whether the Plaintiff will continue
> pro se and we should speak directly to her.

8.      Mr. Hantman responded on January 27, 2022, but side-stepped the issue of his

appearance.  The undersigned responded in a letter dated February 1, 2022 a true and accurate

copy of which is marked as Exhibit E.  I wrote:

> Given Ms. Araoz's pro se status and your prior communications on
> her behalf, we wrote on January 24 asking whether we should confer
> with you, or directly with Ms. Araoz, to comply Magistrate Judge
> Levy's requirements prior to the February 16 teleconference.
> Pursuant to Magistrate Levy's Order, we are required to meet and
> confer on discovery by tomorrow, February 2.
>
> In response to our letter, you responded on January 27 asking for
> Defendants' response to the Summons with Notice (which we
> previously provided) and asking for the documents confirming what
> we previously told you—that your client's allegations are without
> merit.
>
> Once the Court enters an appropriate confidentiality agreement, we
> will produce the documents confirming there is no viable claim
> against our clients.  In the meantime, we again request that you
> please let us know whether you will be entering an appearance on
> behalf of Ms. Araoz.  It is important to us that we timely comply

4

with the Court's order and expectations that include working with
you or Ms. Araoz in advance of the telephone conference.

Given tomorrow's deadline, we would appreciate a response by
tomorrow morning.

9.      On March 25, 2022, the parties entered into a Confidentiality Agreement, a true

and accurate copy of which is marked as Exhibit F.  The intent of the agreement was expressly

spelled out on the first page:  Defendants were confident that there is absolutely no merit to

Plaintiff's claims, and Defendants were willing to provide documents to allow Plaintiff's counsel

to conduct his due diligence before proceeding further before this Court.

> WHEREAS, Defendants believe there is no merit to
> Plaintiff's claims because, among other reasons, the subject
> property was not owned or controlled by any of the Defendants at
> the time of the challenged conduct; assert that Plaintiff is obligated
> to file a complaint with twenty days of the Defendants' notice of
> appearance; and contest the court's jurisdiction in the Federal
> Action over Defendants.

> WHEREAS, Defendants are willing to provide documents
> to allow Plaintiff's counsel to investigate this matter before
> proceeding further in the Federal Action (the "Due Diligence"). The
> Magistrate Judge has deferred certain scheduling matters in the
> Federal Action to permit this Due Diligence to occur.

> WHEREAS, Plaintiff's counsel shall review the materials
> and information produced by Defendants during the Due Diligence
> (the "Due Diligence Materials") pursuant to the terms and
> conditions of this Agreement.

10.     To be clear, all information exchanged between the parties during the Due

Diligence period constituted Due Diligence Material under the Confidentiality Agreement.  This

is made clear in Section 2:

> The time period commencing with the Effective Date and
> continuing until the delivery of a Party's written notice terminating
> the Due Diligence constitutes the "Due Diligence Period."  Any
> information or documents exchanged between or among the Parties
> during the Due Diligence Period shall be deemed Due Diligence

> Materials and shall be governed by the terms and conditions of this
> Agreement.  Any Party may terminate the Due Diligence Period
> upon three business days' notice to the other Parties.

11.     Under Section 3 of the Confidentiality Agreement, the Due Diligence Materials

could be used only "for purposes of evaluating claims advanced" in this lawsuit.

> The attorneys for the Party receiving the Due Diligence Materials
> pursuant to this Agreement shall use such Due Diligence Materials
> solely for purposes of evaluating the claims advanced in the Federal
> Action.  For purposes of this Agreement, a Party's attorney is
> limited to counsel of record in the Federal Action as of the Effective
> Date.  Nothing in this Agreement, however, shall limit or prohibit a
> Party from independently seeking discovery of any Due Diligence
> Materials in any continued proceedings in the Federal Action.

12.     Defendants agreed to enter into this arrangement subject to a strict confidentiality

obligation, which is expressly stated in paragraph 4 of the Confidentiality Agreement:

> The existence of this Agreement, its terms and conditions and the
> ***existence, delivery, and contents of the Due Diligence Materials***
> ***shall be strictly confidential*** and not communicated or disclosed to
> any other person, except as incidental to the enforcement of this
> Agreement.

13.     The confidentiality obligations imposed under the Agreement never lapse:  "A

Party's confidentiality obligation under this Agreement shall become effective as of the Effective

Date and shall remain perpetually in effect."  [§ 7.]  If a party were forced to bring an action to

enforce the Confidentiality Agreement, the prevailing party is entitled to its cost of suit and

reasonable attorneys' fees.  [§ 10.]

14.     On March 29, 2022, pursuant to the Confidentiality Agreement executed by the

parties, we produced documents Bates numbered NAC 000001 – NAC 000063.

15.     As explained in our letter of April 13, 2022, a true and accurate copy of which is

marked as Exhibit G, the materials produced demonstrated that neither Mr. Wexner or any of the

other Defendants owned or controlled the subject premises at the time of the alleged incidents.  In

particular, the transactional documents provided:

- Showed the timing of the Wexners' move from the subject premises.

- Showed the transfer of utilities to Epstein.

- Payments made by Epstein for the subject premises after the Wexners vacated.

- A contemporaneous article referencing that the Wexners barely lived at the subject property following its initial renovation.

- Payments made by Epstein to pay for the subject property.

- Filed tax returns reflecting the transfer of all of Mr. Wexner's ownership in, and resignation from, the ownership entity to Epstein.

### C.   <u>Termination (And Plaintiff's Breach) of The Confidentiality Agreement.</u>

16.     It ultimately became clear, however, that no matter what information Defendants

produced, it would never be sufficient.  Instead, Plaintiff was simply playing a game.  During the

course of this game, Plaintiff falsely stated to the Magistrate Judge that there were ongoing

settlement discussions and information exchanged, with the latter being a violation of the

Confidentiality Agreement.  For example, in conferences with Magistrate Judge Levy, Plaintiff's

counsel disclosed the process being undertaken pursuant to the Confidentiality Agreement

notwithstanding the express confidentiality provisions.

17.     In our letter of May 16, 2022, a true and accurate copy of which is marked as

Exhibit H, we made clear that it was time for Plaintiff to either dismiss her action or file it and

advance such claims that could be consistent with Rule 11.  In particular, we wrote:

> Thank you for your email of May 15, 2022.  As expressed in our
> prior communication, we believed there was no value in deferring

this litigation. However, at your request, we agreed to yet an additional two-week extension. Your May 15 email proves that our intuition was right. Weeks ago we should have simply set this matter on a litigation tract.

Your proposal now is to secure additional information for resolving or "at least narrow[ing]" the issues. Narrowing of the issues will be done through the litigation process. We will not secure affidavits for you or your client's benefit, including from an individual with whom we have never had any contact. That is what the litigation process is intended to accomplish.

Any questions concerning the timing of ownership are readily resolved by the attached K-1s issued by the holding company—copies of which were already provided to you. The 1997 K-1 reflects Mr. Wexner as 100% owner. The 1998 K-1 reflects that Mr. Wexner was owner for 86.30140% (315 days) of the year while Epstein was owner for 13.69860% (50 days) of the year. This, of course, coincides with the November 11, 1998 transfer date. In addition, there is no company tax return for 1999 in our client's possession because he did not own any portion of the company in 1999.

You have also been provided ample examples of the transfer of utilities to Epstein, notarized transfer documents, and internal records reflecting Epstein paid the agreed price for the residence. As a final piece, we are enclosing Schedule D-1 from Mr. Wexner's tax return showing the November 11, 1998 transaction date, and $19.3 million purchase price. Epstein paid $20 million but some of the price was allocated to furniture.

This evidence makes clear that Mr. Wexner had no connection to the property after November 1998 and you have no evidence whatsoever tying any of the other defendants to the residence at all.

The time has come for your client to either dismiss or, alternatively, to file her complaint. Your client previously attempted to extort a payment in exchange for her agreement not to publicly file details of her claims. We rejected her demand. She should now file whatever she believes she can consistent with Rule 11.

We will defer taking any action until 4:00 p.m. EST this afternoon. After that, we will ask the Magistrate to schedule this matter for a status conference so that we can adopt an order that allows us to bring this matter to a conclusion with prejudice.

18.     Frustrated by the lack of progress, we terminated the March 25, 2022 Confidentiality Agreement, effective on Monday, May 23, 2022.  A true and accurate copy of the May 17, 2022, correspondence from my partner, Matthew Zeiger, to Mr. Hantman is marked as Exhibit I.  Pursuant to Section 6 of the Confidentiality Agreement, a demand was made for the return of all the "Due Diligence Materials."

19.     Mr. Hantman did not cooperate, however, in returning the materials and complying with the Confidentiality Agreement.  On May 19, 2022, the undersigned wrote a letter to Mr. Hantman, , a true and accurate copy of which is marked as Exhibit J, which states:

> We received your email this morning at 2 a.m.  We have provided you ample information to conclusively show that none of the named defendants had any interest in, or control over, the residence at issue after November of 1998. We have also gone so far as to provide you the page of Mr. Wexner's tax return showing the sale of the residence in 1998. Your client's allegations in her Summons with Notice allegedly occur years later.
>
> Despite providing this information, you continue to ask for documents from years prior to your client's allegations and make statements of pure speculation and conjecture.
>
> After months of working with you, your client's actions make clear that she not intend to voluntarily dismiss the lawsuit and as such we need to move this matter to conclusion through the Court process. While your client may be a victim of sexual abuse as you suggest, the documents we have provided unequivocally show that any such abuse had absolutely nothing to do with our clients.

20.     Following thereafter, on June 1, 2022, we sent another letter to Mr. Hantman demanding the return of the Due Diligence Materials.  A true and accurate copy of the June 1, 2022 correspondence is marked as Exhibit K.  The undersigned wrote:

> By a letter dated May 17, 2022, we issued notice of our clients' termination of the March 25, 2022 Confidentiality Agreement, and requested that the Plaintiff assemble and return to our firm, pursuant to Section 6 of said Agreement, all original and unmarked copies of the Due Diligence Materials and otherwise destroy all other

documents, including but not limited to all excerpts, summaries and
digests that reveal Due Diligence Materials.

Two weeks have passed and we have not received the return of the
Due Diligence Materials.  We request that Plaintiff immediately
comply with the Confidentiality Agreement and return the Due
Diligence Materials and otherwise comply with the Confidentiality
Agreement.

21.    We further explained in a letter dated June 2, 2022, a true and accurate copy of

which is marked as Exhibit L, that Plaintiff was unnecessarily delaying this matter and she needed

to comply with the Magistrate's order.

We are following up to your email of May 31, 2022.  As explained
in our previous letters, we do not intend to produce any additional
documents and, as noticed under separate cover, we demanded the
return of the Due Diligence Materials previously supplied.  The
documents previously supplied conclusively establish Mr.
Wexner's lack of ownership of the subject property during the
relevant period and the remaining Defendants' complete lack of
association with the subject property. Those documents included the
entity's New York tax return, Mr. Wexner's K-1 from the entity and
excerpts from Mr. Wexner's federal tax return showing the sale of
100% of Mr. Wexner's in November 1998.

The only remaining issue you point to is a building permit that was
not filed by or signed off on by the owner.  As we have already
advised, Plaintiff will have to conduct her own research and due
diligence as to contractors, as that is irrelevant and not, quite frankly,
our issue or concern.   An inaccurate permit application by a
contractor that was not hired by our client is not an "admission" in
any sense of the word.

Plaintiff originally filed this action on August 14, 2021—nearly ten
months ago.  It has been roughly six months since Plaintiff
threatened to go public unless she was paid hush money.  Thus,
Plaintiff has had both the time and motivation to marshal those facts
she believes support her claim.  She has failed to do so.  Thus, we
restate the same comments we made in our initial call and most
recently before the Magistrate Judge:  there is no settlement to be
had, ever.

Please file the complaint and do so without further delay.  The
undersigned's  practice  is  to  grant  extension  requests  as  a

10

professional courtesy.  However, we cannot consent to yet another extension in good conscience and consistent with our ethical obligations to our clients.  If after all this time Plaintiff requires even more time to file her complaint, she should file a motion with the Magistrate Judge.  We will not file an opposition but Plaintiff should not represent we consent to the motion or that it is unopposed.  Instead, she should offer the Magistrate Judge an explanation why she cannot timely comply with his Order.

22.    Over Plaintiff's objections, Defendants demanded that Plaintiff file the complaint that should have been filed no later than January 27, 2022, as she was statutorily obligated to do so.  The Magistrate Judge ordered Plaintiff to file her complaint on or before June 8, 2022. [05/19/2022 Docket Entry.]  Plaintiff did not.  Instead, Plaintiff filed a motion for an extension of time.  [Doc. No. 19.]  Plaintiff's counsel made the following false statement to the Court:

Following this entry, the parties continued to engage in their settlement discussions and informal discovery on the topic of ownership of the subject property in this action, 9 East 71st Street, New York, NY 10021 (the "Property"), at the time in question. While Defendants have provided some information on the issue, they have failed or refuse to deliver further documents and information requested which should dispose of the issue definitively. Additionally, while Plaintiff has not been available, we have been informed that she has information on an old computer that she is trying to access which would assist in the filing of the complaint.

23.    I filed a letter with the Magistrate Judge [Doc. No. 20] specifically noting counsel's misstatements to the Court.

The motion is premised upon inaccuracies.  First, counsel represents that the parties have "continued to engage in their settlement discussions."  This is untrue.  Defendants have never had any settlement discussions with the Plaintiff or her counsel and have affirmatively stated they never will.  To the contrary, we have simply made documents available to counsel in an effort to inform them that no factual basis exists for the advancement of Plaintiff's claims.  Second, Counsel represents that following the May 19, 2022 minute entry the parties continued to engage in "informal discovery."  That is also untrue.  The information establishing the

lack of any good faith basis for the advancement of the claims in this case, as required under Rule 11, was provided long ago.

24.    In a letter dated June 21, 2022, a true and accurate copy of which is marked as Exhibit M, I once again noted the violation of the Confidentiality Agreement.

> We are responding to your email of June 20, 2022.
>
> Several points are important.  First, we have no interest in pursuing any form of mediation with you or your client.  We have been clear from day one in this matter:  our clients have no liability, our clients will pay nothing, and, in particular, our clients will not make a payment to avoid the publicity your client promised would ensue from the litigation.
>
> Second, the time period for what you describe as "voluntary discovery" has passed.  We have previously provided the requisite notice under the Confidentiality Agreement to terminate it and compel the return of the Due Diligence Materials.  You should conduct the due diligence and discovery you believe is appropriate to comply with your obligations in pursuing this litigation.  However, as it relates to additional data from our clients, you will need to do so formally through the court proceedings.  Our clients already provided the information conclusively establishing their lack of a relationship—they need not do more.
>
> Third, your proposed retention of the Due Diligence Materials is another, but only the most recent, breach of the Confidentiality Agreement.  You have disclosed the existence of the Confidentiality Agreement, in violation of its plain terms, to the Magistrate Judge.  That was one breach.  From the emails that we received, the contents of the Due Diligence Materials were provided to counsel other than the counsel of record in the above-referenced action.  That is a second breach of contract.  Now you propose to retain copies of the Due Diligence Materials notwithstanding the affirmative obligation to destroy the same.  This is a third breach of contract.    You are reminded that the Confidentiality Agreement provides for the recovery of attorney's fees in seeking the enforcement of its terms.  If you and your client remain steadfast in not complying, we will seek the enforcement of the Confidentiality Agreement, and your client will be responsible for the payment of our attorney's fees.  We do not intend to continue to "beg" you and your client to comply with a written commitment.  Instead, we will simply file an action for its enforcement.

Fourth, finally, we take issue with the suggestion that your client does not want to "file a complaint to avoid unnecessary stress and unwanted publicity." Your client has appeared on The Today Show and seems to have no difficulties with publicly speaking on such subject matters. And indeed, you are reminded of her original attempt to extort our clients by demanding the payment of $10 million. Simply put, our clients will not be threatened. Our clients will not be extorted. And our clients will not pay money for a claim that does not exist.

25.   When Plaintiff finally filed her Complaint on June 29, 2022, counsel caused Plaintiff to repeatedly violate the Confidentiality Agreement as part of his effort to create a false and misleading narrative throughout the text of the Complaint. For example, each of the following paragraphs of the Complaint discloses information protected under the Confidentiality Agreement:

1.       . . . In spite of efforts to resolve this case and avoid further court intervention, particularly at the federal level, with its potential attendant unwanted publicity, plaintiff simply requested additional information related to determining title of the property in question. In fact, a request by plaintiffs' counsel to have an independent expert, appointed by the Magistrate Judge issue a Report and Recommendation to the Court, on the issue of title, was rejected by defendants' counsel, leaving plaintiff no option other than to proceed with this action, ***_and while informal discovery has been exchanged on the matter, Defendants have failed or refused to deliver documents and information which could have resolved the issue as to title of the property, as set forth more fully herein_***.
…

47.       The parties have engaged ***_in informal discovery on the topic of ownership of the property at the time in question_***, however Defendants have failed or refused to deliver documents and information which should dispose of the issue definitively at least as to title of the property.
…

48(c).   The name of the "Guarantor" referenced in a relevant ***_promissory note dated 11/11/1998_***, and a signed document relating to such guaranty; (ii) along with proof of payments relating to the ***_principal amount of $10 million and all accrued interest payments_*** (wire transfer statements or

13

checks).  (text from footnote:  It is outside the usual practice and custom that a ***Promissory Note***, as referenced above, would not be secured by a real asset (in this case the real property located at 9 East 71st Street or another hard asset) since it is associated with the sale of such property located at 9 East 71st Street. In the event of a default of such Promissory Note, they would not have a secured interest in such property.

…

281(c). the name of the "Guarantor" referenced in a relevant ***promissory note dated 11/11/1998***, and a signed document relating to such guaranty; along with proof of payments relating to the ***principal amount of $10 million*** and all accrued interest payments (wire transfer statements or checks).

26.     In short, Plaintiff compounded the prior breaches of the Confidentiality Agreement by doubling down and creating a misleading narrative in the complaint based upon the delivery and disclosure of the Due Diligence Materials, including:  (a) the fact that Defendants had voluntarily disclosed information to Plaintiff; (b) the specific non-public mechanics by which the sales transaction occurred; (c) the consideration paid to Defendant; and (d) even what was allegedly not included in the Due Diligence Materials.

27.     We noted this breach in our letter of July 15, 2022, a true and accurate copy of which is marked as Exhibit N.

28.     Doubling down on the various false statements made in the complaint, the New York Daily News reported on the complaint including the various comments purportedly offered by Mr. Hantman to the reporter.  In the undersigned's letter of July 19, 2022, a true and accurate copy of which is marked as Exhibit O, we noted the false statements which were attributable to Mr. Hantman in the article.

1.     <u>False Statement No. 1</u>:  "Jennifer Araoz claims she was 15 when she was lured into giving Epstein massages at the mansion on East 71st Street that Wexner reportedly owned."

The Truth:     As those materials already provided to you confirm, Wexner did not own the East 71st Street property in 2001.

2.    False Statement No. 2:   "Wexner, trying to avoid liability, gave the building to Epstein.  He knew bad things were happening there.  He wanted to get rid of it."

The Truth:     Wexner did not "give the building" to Epstein; he did not know bad things were "happening there"; and he did not "get rid of it" because of any issues involving Plaintiff or any other victim.  The sales transaction occurred before any disclosure as to Epstein's conduct, and the documents you have received outline the consideration and relevant dates.

3.    False Statement:   "Wexner is trying to escape paying for Epstein's crimes."

The Truth:     The sales transaction had nothing to do with Epstein's actions or inactions.  It occurred before any disclosure as to Epstein's conduct.

**D.    Service of Safe-Harbor Rule 11 Letters.**

29.    Following the Court's September 7, 2022, status conference, we served, on November 28, 2022, a Rule 11 Safe Harbor letter upon Mr. Hantman.  A true and accurate copy of the Rule 11 Safe Harbor notice is marked as Exhibit P.

30.    In response, on December 19, 2022, we received a correspondence from Mr. Hantman indicating that he was unaware of the state court action previously pursued by the Plaintiff, which had been subject to release.  A true and accurate copy of the December 19, 2022, correspondence is marked as Exhibit Q.  Our response, dated December 20, 2022, a true and accurate copy of which is marked as Exhibit R, is also attached.

31.    In our December 20, 2022, letter we also sought a copy of the settlement and release agreements Plaintiff had entered into which related in any way to the activities of Jeffrey Epstein

including any agreement from the resolution of the state court case. We followed that demand up

with a letter dated December 21, 2022, a true and accurate copy of which is marked as Exhibit S.

> We are writing as a follow-up to our letter of December 20 to which you responded by email. Our December 20 correspondence, among other things, requested a copy of any settlement agreements entered into by your client regarding or relating to Epstein.
>
> The state court action previously filed by your client, Jennifer Danielle Araoz v. The Estate of Jeffrey Edward Epstein, et al., Supreme Court of the State of New York, County of New York, Index No. 950010/19, appears to have been settled. The person in possession of such settlement agreement would be your client individually, or one of her other attorneys, which means she has "control" of such records pursuant to Rule 34 of the Federal Rules of Civil Procedure. Our December 20 letter merely requested that any such settlement agreement(s) be provided. You responded, however, that you do not have documents in your possession and suggested that we "contact Mr. Epstein's lawyers and request all documents from them." There seems to be some confusion as to the appropriate roles. The documents are in your client's possession or control. It makes no difference whether you are currently in possession. We will be requesting copies of these materials in discovery or as part of any post-dismissal proceedings.
>
> Presumably you would have reviewed the scope of such settlement release prior to the initiation of the above-referenced lawsuit. If you have not, we strongly encourage that you, prior to filing an amended complaint on January 6, 2023, review your client's settlement agreements to ascertain whether the claims you intend to assert have already been released. It is incumbent upon any counsel advancing these claims to conduct such an investigation.

32.  After Plaintiff filed her first amended complaint, we served our second Rule 11

Safe Harbor notice by a letter of January 13, 2023, a true and accurate copy of which is marked as

Exhibit T. The correspondence included a draft notice of Rule 11 motion.

33.  In response to the first amended complaint, Defendants filed their motion to

dismiss. Plaintiff filed a memorandum in opposition. In response to that memorandum in

opposition, Defendants served their third Rule 11 Safe Harbor notice upon Mr. Hantman.  A true and accurate copy of the July 14, 2023, Rule 11 Safe Harbor notice is marked as Exhibit U.

     **E.**    **Fees and Expenses.**

34.    For purposes of the fee demand discussed below, I offer some background information.  I graduated *summa cum laude* from the Ohio State University College of Law in June 1989 and have been licensed to practice law in the state of Ohio since November 1989.  From June 1989 to June 1991, I served as a law clerk for Federal District Court Judge Joseph Kinneary.

I have been admitted to the United States District Court for the Southern District of Ohio; the United States District Court for the Northern District of Ohio, the United States District Court for the Eastern District of Michigan, and the Second, Third, Fourth, Fifth, Sixth, Eighth, Ninth, Tenth, and Eleventh Circuit Courts of Appeals.  I have practiced on a *pro hac vice* basis in many other states and jurisdictions, including New York state and federal courts.

35.    I am one of but a few "Band 1" rated Ohio attorneys for General Commercial litigation by Chambers.  I have been recognized in the publication Best Lawyers In America in the following areas: Administrative/Regulatory Law, Commercial Litigation, Communications Law, Employment Law – Individuals, Legal Malpractice Law – Defendants, Litigation – Construction, Litigation – First Amendment, Litigation – Labor & Employment, Litigation – Securities and Media Law.  I have likewise been recognized in Super Lawyers of America for many years, including recognition as a top lawyer in Ohio and/or Columbus for multiple years.

36.    I am the presiding (or managing) partner for my firm.  I have reviewed the invoices issued to, and paid by, the Defendants in this case.  The total expenses are $6,644.09, which consist of pro hac vice filing fees, photo copying, computerized legal research, court reporter fees (for conference before the Court), and travel expenses for in-person hearings in New York.

37.     The hourly rates for the services ranged from a low range of $190 for paralegal and $350 for junior associates to $800 for myself.  From my engagement of New York counsel on various matters, I know our Firm's rates are substantially lower than New York attorneys of comparable experience.

38.     Nevertheless, Defendants incurred substantial fees (exceeding hundreds of thousands of dollars) in preparing for and defending this action, with such efforts including (a) collecting background information and conducting a factual investigation; (b) addressing Plaintiff's voluminous complaint and amended complaint; (c) exchanging information in an effort to resolve this matter without the necessity for motion practice; (d) motion practice; (e) preparation of substantial Rule 11 safe-harbor letters; and (f) preparation of the Rule 11 motion.

39.     Exhibit V consists of true and accurate copies of invoices for the time and expenses incurred in responding to Plaintiff's memorandum in opposition to the Motion to Dismiss, preparing the third Rule-11 safe-harbor letter, and addressing the subject of supplemental authority.  The time exceeds $69,000.  I chose these specific invoices because these are all fees and expenses incurred well after any attorney (by any means of measurement) would have known that continued pursuit of this action was frivolous.  This figure does not include the time and expenses incurred in preparing the Rule 11 Motion for Sanctions.

40.     Our clients have directed that we limit our sanction demand to $50,000 with all amounts collected contributed to the Center for Family Safety and Healing at Nationwide Children's Hospital, Columbus, Ohio.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on March 14, 2024.

_____
Marion H. Little

770-964:1025217